Brett A. Shumate
Assistant Attorney General
Drew C. Ensign
Deputy Assistant Attorney General
Charles E.T. Roberts
Counsel to the Assistant Attorney General
Civil Division
Elianis N. Perez
Assistant Director
Catherine M. Reno
Senior Litigation Counsel
Amanda B. Saylor
Trial Attorney
Office of Immigration Litigation
General Litigation and Appeals Section

*Attorneys for the United States*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>  v.<br><br>City of New York; Eric L. Adams, Mayor of The City of New York, in his official capacity; New York City Council; Adrienne E. Adams, Speaker of the New York City Council, in her official capacity; New York City Department of Correction; Lynelle Maginley-Liddie, Commissioner of the New York City Department of Correction, in her official capacity; New York City Department of Probation; Juanita N. Holmes, Commissioner of the New York City Department of Probation, in her official capacity; New York City Police Department; Jessica S. Tisch, Commissioner of the New York City Police Department, in her official capacity,<br><br>    Defendants. | Complaint<br><br>No. 1:25-cv-4084 |

Plaintiff, the United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## PRELIMINARY STATEMENT

1.  Within hours of assuming the Presidency, President Trump declared a "national emergency exists at the southern border of the United States" from the unprecedented "illegal entry of aliens" into the country. Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025). "Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans." Executive Order 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025). Further exacerbating this national crisis, some of these aliens find safe havens from federal law enforcement detection in so-called "sanctuary" cities, where they are shielded among innocent Americans—who, all too often, later become their crime victims.

2.  Just this week, New York City's sanctuary policies have reaped tragic consequences. On July 20, 2025, two illegal aliens allegedly ambushed an off-duty Customs and Border Protection officer while he sat in Fort Washington Park.[1] They allegedly tried to rob the officer, shooting him in the face and the leg in the process.[2] Both aliens entered the United States illegally and were repeatedly arrested for criminal behavior since.[3] In fact, after an April 5, 2024, arrest for fourth-degree felony grand larceny and petit larceny, ICE placed an immigration detainer on one of the aliens. *Id.* But the New

---

[1] *Trump administration to 'flood' NYC with more ICE agents after border patrol officer was shot: Homan*, EYEWITNESS NEWS (July 22, 2025), https://abc7ny.com/post/cbp-officer-shooting-ice-agents-expected-flood-nyc-border-patrol-was-shot-washington-heights/17239011/ [https://perma.cc/7VMP-2KGJ].

[2] *Id.*; Video posted by Dep't of Homeland Sec'y (@DHSgov), X.com, *Update: footage shows two assailants, one an illegal alien with criminal charges, ambushing and shooting a @CBP officer yesterday in New York City* (July 20, 2025), https://x.com/DHSgov/status/1946992590496100624 [https://perma.cc/DQR4-CP65].

[3] *Press Release, Second Criminal Illegal Alien with Lengthy Rap Sheet Arrested for Involvement in Ambush and Shooting CBP Officer in New York City* (July 21, 2025), https://www.dhs.gov/news/2025/07/21/second-criminal-illegal-alien-lengthy-rap-sheet-arrested-involvement-ambush-and [https://perma.cc/5ABG-FBAB].

York City Department of Correction ignored the detainer and released him back onto the streets of New York City, leaving him free to continue committing crimes. *Id.* But for New York City's sanctuary policies, this tragedy could have been avoided. Homeland Security Secretary Kristi Noem lamented: "How many more lives will it take, how many more people have to be hurt and victimized before we have public safety be a number one priority in some of our largest cities?"[4]

3.    This national crisis underscores the vital importance of "[e]nforcing our Nation's immigration laws." Executive Order 14,159. This action seeks to put an end to the efforts of the Nation's largest City to impede the Federal Government from doing just that.

4.    The United States brings this declaratory and injunctive action against the City of New York and its subdivisions and officials, to preempt several local provisions of law—namely, the New York City Administrative Code §§ 9-131, 9-205, 14-154, 10-178, and New York City Police Department Operations Order No. 4 (Jan. 18, 2025) ("Sanctuary Provisions" or "challenged provisions")—that are designed to impede the Federal Government's ability to enforce the federal immigration laws. The City's Sanctuary Provisions have worked as intended. And they violate the Supremacy Clause of the Constitution.

5.    The United States has well-established, preeminent, and preemptive authority to regulate immigration, which it exercises primarily through the Department of Homeland Security ("DHS") and DHS's component agencies, including Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP"). This authority derives from the United States Constitution, numerous acts of Congress, and binding U.S. Supreme Court precedent. Indeed, just this year, Congress strengthened that authority with the enactment of the Laken Riley Act, S. 5, 119th Cong. (2025), which "mandates the federal detention of illegal immigrants who are accused of theft, burglary,

---

[4] *Trump administration to 'flood' NYC with more ICE agents after border patrol officer was shot: Homan, supra* note 1.

assaulting a law enforcement officer, and any crime that causes death or serious bodily injury."[5] *See* Laken Riley Act, S. 5, 119th Cong. (2025) (codified at 8 U.S.C. § 1226(c)(1)(E)(ii).

6.    New York City has long been at the vanguard of interfering with enforcing this country's immigration laws. Its history as a sanctuary city dates back to 1989, and its efforts to thwart federal immigration enforcement have only intensified since.

7.    The challenged provisions of New York City law reflect the City's intentional effort to obstruct the United States' enforcement of federal immigration law, by (among much else) impeding the consultation and communication between federal and local law enforcement officials that is necessary for the United States to enforce the law and keep Americans safe.

8.    New York City's Sanctuary Provisions have the purpose and effect of making it more difficult for federal immigration officers to carry out their responsibilities in that jurisdiction. These provisions intentionally obstruct the sharing of information envisioned and affirmatively protected by Congress, including sharing basic information such as release dates, court appearance dates, and custodial status. The challenged provisions also impair federal detention of removable aliens, including dangerous criminals, contrary to federal law. The Sanctuary Provisions further purport to direct federal officials to procure criminal arrest warrants to take custody of removable aliens, even though Congress has made an explicit policy choice that such apprehensions for removal can be effectuated by *civil* arrest warrants for immigration enforcement. The challenged provisions facilitate the release of dangerous criminals into the community by directing city employees to refuse to transfer such aliens to federal officials in a secure environment—thereby resulting in the criminals' release onto the streets, where they all too often reoffend and commit serious crimes, requiring ICE to risk officer safety and expend considerable resources to effectuate arrests in communities. This intentional sabotage of federal

---

[5] *Press Release, President Trump Signs the Laken Riley Act in Law*, DEP'T OF HOMELAND SEC. (Jan. 29, 2025), https://www.dhs.gov/news/2025/01/29/president-trump-signs-laken-riley-act-law [https://perma.cc/VLX7-38PP].

immigration enforcement is unlawful and dangerous.

9.   These Sanctuary Policies have resulted in countless criminals being released into the City who should have been held for immigration removal from the United States. New York City's own data illustrates the problem. In Fiscal Year 2024, the New York City Department of Correction honored only 4% of ICE detainer requests.[6] An immigration detainer is a request from ICE to a local, state, or federal law enforcement agency to notify ICE before releasing an alien suspected of being removable from the United States and to hold the alien for up to 48 hours beyond their scheduled release date. *See* 8 U.S.C. § 1226(a)(2); 8 C.F.R. § 287.7(d). The New York City Police Department ("NYPD") has not honored any ICE detainers since Fiscal Year 2016.[7]

10.   According to ICE's Law Enforcement Statistical Tracking Unit, from Fiscal Years 2021 to 2024, ICE Enforcement and Removal Operations ("ERO") arrested 28,427 aliens[8] in the New York City Area of Responsibility ("AOR")[9]—many of whom were charged with serious crimes. Between April 6 and 12, 2025, ICE and its law enforcement partners apprehended 206 illegal aliens during an enhanced targeted immigration enforcement operation focusing on egregious criminal alien offenders in and around New York City.[10] Over 50% of the apprehended aliens had significant criminal convictions or are currently facing charges for crimes such as murder, assault, arson, sex crimes, drug crimes, and firearms crimes. *Id.* New York City's Sanctuary Provisions restrict cooperation with detainers and information-sharing and allow dangerous criminals to escape the reach of the Federal Government. For example, in April 2023, an alien was arrested for sexually assaulting a woman and

---

[6] *See* Ex. B: *Statistics and Compliance*, *ICE Reports*, NYC Dept. of Correction, https://www.nyc.gov/site/doc/data/statistics-and-compliance.page.

[7] *See* Ex. C: *Stats*, *Civil Immigration Detainers*, NYPD, https://www.nyc.gov/site/nypd/stats/reports-analysis/civil-immigration-detainers.page.

[8] *See* Ex. D: *ICE Administrative Arrest Statistics*, https://www.ice.gov/statistics (last visited July 18, 2025).

[9] The New York City AOR consists of the five boroughs of New York City and the following counties: Duchess, Nassau, Putnam, Suffolk, Sullivan, Orange, Rockland, Ulster, and Westchester. *See ICE Field Offices*, https://www.ice.gov/contact/field-offices?office=16 [https://perma.cc/HQ48-7SNT].

[10] *ICE, law enforcement partners arrest more than 200 alien offenders during enhanced immigration enforcement operation in New York* (Apr. 16, 2025), https://www.ice.gov/news/releases/ice-law-enforcement-partners-arrest-more-200-alien-offenders-during-enhanced [https://perma.cc/XH8N-NZ39].

held at Rikers Island.[11] Federal officials issued a detainer request for the alien. The alien was convicted and released in June 2024, but the detainer was not honored, and he was allowed back into the community. *Id.* Approximately two months later, the alien was arrested for first-degree rape of a homeless woman. *Id.* Mayor Adams described the alien as "the poster child of what's wrong with not doing that coordination [with ICE]. It's clear that he does not deserve to be in our city."[12] It is just as clear that the City's Sanctuary Provisions that led to this tragedy are unlawful.

11. On May 7, 2025, a bipartisan group of seven New York City Council Members wrote a letter to the Attorney General "seeking [her] assistance in an urgent public safety matter." *See* Ex. A: Letter from David M. Carr, Council Member, *et al.*, to Attorney General Pamela Bondi (May 7, 2025). The Council Members reported: "…New York City's so-called 'sanctuary city laws,' [] shield criminal aliens from federal immigration authorities, place the public at risk and severely undermine efforts by the Department of Homeland Security (DHS) and our own law enforcement agencies to coordinate on issues of national security" (*id.* at 1). Thus, they asked the Department of Justice "to intervene and help keep New Yorkers safe." (*id.* at 2).

## JURISDICTION AND VENUE

12. The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

13. Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b). A substantial part of Defendants' acts or omissions giving rise to this Complaint arose from events occurring within this judicial district, which includes Kings, Queens, and Richmond Counties—three of the five counties that make up the Defendant City of New York. Defendants Mayor Eric Adams, the New York City Council, and Speaker Adrienne Adams govern Kings, Queens, and Richmond Counties. And the

---

[11] Sarah Rumpf-Whitten, *NYPD chief blasts NYC's sanctuary status after illegal migrant charged in knifepoint rape of woman*, FOX NEWS (Aug. 13, 2024), https://www.foxnews.com/us/nypd-chief-blasts-nyc-sanctuary-status-illegal-migrant-charged-knifepoint-rape-woman [https://perma.cc/DEQ5-KYCM].

[12] *Transcript: Mayor Adams Holds In-Person Media Availability*, NYC.gov (Aug. 13, 2024), https://www.nyc.gov/office-of-the-mayor/news/631-24/transcript-mayor-adams-holds-in-person-media-availability [https://perma.cc/K443-Q2BT].

challenged provisions regulate conduct in Kings, Queens, and Richmond Counties. Defendants the NYPD and the New York City Departments of Correction and Probation all operate within Kings, Queens, and Richmond Counties, and are bound to abide by the challenged provisions therein.

14. The Court has the authority to provide the relief requested under 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

## **PARTIES**

15. Plaintiff, the United States of America, regulates immigration under its constitutional and statutory authorities, and enforces federal immigration laws through its Executive agencies, including the Departments of Justice, State, Labor, and Homeland Security ("DHS") as well as DHS's component agencies ICE and CBP.

16. Defendant City of New York is a city in the State of New York, a state of the United States.

17. Defendant Eric Adams is the Mayor of New York City, and is being sued in his official capacity.

18. Defendant New York City Council is the governing board and legislative body of New York City, and is responsible for the management of the affairs of New York City.

19. Defendant Adrienne Adams is the Speaker of the New York City Council, and is being sued in her official capacity.

20. Defendant New York City Department of Correction ("Department of Correction") is the city law enforcement agency responsible for providing for the care and custody of people in New York City ordered to be held by the courts and awaiting trial or who are convicted and sentenced to one year or less of jail time.

21. Defendant Lynelle Maginley-Liddie is the Commissioner of the New York City Department of Correction, and is being sued in her official capacity.

22. Defendant New York City Department of Probation ("Department of Probation") is the city

law enforcement agency that supervises individuals a court has determined can avoid prison or jail and remain in the community. It also provides community-based accountability and support and core services for those individuals. The Department of Probation serves and has offices in the five counties, including Kings, Queens, and Richmond Counties, that make up the City of New York.

23. Defendant Juanita N. Holmes is the Commissioner of the New York City Department of Probation, and is being sued in her official capacity.

24. Defendant New York City Police Department ("NYPD") is the city law enforcement agency responsible for policing New York City, by performing a wide variety of public safety, law enforcement, traffic management, counterterror, and emergency response roles. The NYPD operates within the five counties, including Kings, Queens, and Richmond Counties, that make up the City of New York.

25. Defendant Jessica S. Tisch is the Commissioner of the New York City Police Department, and is being sued in her official capacity.

## CONSTITUTIONAL AND STATUTORY BACKGROUND

26. The Constitution assigns Congress the power to "establish a uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3, and affords the President of the United States the authority to "take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3.

27. The Supremacy Clause of the Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, a state or city enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or if it "discriminate[s] against the United States or those with whom it deals,"

*South Carolina v. Baker*, 485 U.S. 505, 523 (1988).

28. Based in part on its enumerated constitutional and sovereign powers to control and conduct relations with foreign nations, the Federal Government has broad authority to establish immigration laws, the execution of which the States cannot obstruct or take discriminatory actions against. *See Arizona v. United States*, 567 U.S. 387, 394–95 (2012); *accord North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality); *id.* at 444–47 (Scalia, J., concurring).

29. Congress has exercised its authority to make laws governing the entry, presence, status, and removal of aliens within the United States by enacting various provisions of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully in the United States. *See* 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231.

30. In effectuating these provisions, DHS may issue an "immigration detainer" that "serves to advise another law enforcement agency that [DHS] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration "detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody[.]" 8 C.F.R. § 287.7(a).

31. When DHS also issues a detainer to a law enforcement agency, that agency "*shall* maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department." *Id.* § 287.7(d) (emphasis added). And in some instances, DHS is required by statute to issue detainers, and attempt to take custody of certain aliens, including when local officials request that DHS take custody of certain aliens arrested for "violation[s] of any law relating to controlled substances." 8 U.S.C. § 1357(d).

32. Likewise, the Laken Riley Act requires DHS to detain any alien who is unlawfully present in

the United States and "is charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person[.]" *See* Laken Riley Act, S. 5, 119th Cong. (2025) (codified at 8 U.S.C. § 1226(c)(1)(E)(ii).

33. In addition, "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. Absent any cooperation at all from local officials," the immigration system—like other federal programs—"may fail or fall short of [its] goals[.]" *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). Congress has therefore directed that a federal, state, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* § 1644 (same); *see also id.* § 1357(g)(10)(A) (providing for state and local "communicat[ion] with [DHS] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States"). Likewise, "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from," among other things, "[m]aintaining" "information regarding the immigration status, lawful or unlawful, of any individual," or "[e]xchanging such information with any other Federal, State, or local government entity." *Id.* § 1373(b).

34. Critically, Congress passed §1373 to fix a specific problem, after it observed "certain states and localities were restricting their officials' cooperation with federal immigration authorities." *New York v. U.S. Dep't of Justice*, 951 F.3d 84, 96 (2d Cir. 2020); *see City of New York*, 179 F.3d at 35. Thus, in enacting Section 1373, "Congress sought to give state and local officials the authority to communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens, notwithstanding any local laws to the contrary." *New York*, 951 F.3d at 97 (citations

omitted).

35. Congress has also codified basic principles of cooperation and comity between local authorities and the Federal Government. For example, federal law contemplates that removable aliens in local custody who have been convicted of state or local offenses will generally serve their state or local criminal sentences before being subject to removal, but that they will be taken into federal custody upon the expiration of their state prison terms or release from local custody. *See* 8 U.S.C. §§ 1226(c), 1231(a)(1)(B)(iii), (a)(4). And federal authorities must "make available" to state and local authorities "investigative resources … to determine whether individuals arrested by such authorities for aggravated felonies are aliens[.]" 8 U.S.C. § 1226(d)(1)(A).

36. Likewise, federal officials must also "designate and train officers and employees … to serve as a liaison to" state and local officials "with respect to the arrest, conviction, and release of any alien charged with an aggravated felony[.]" *Id.* § 1226(d)(1)(B); *see id.* §§ 1226(c), 1231(a). Congress also authorized states and localities to "cooperate with the [Federal Government] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B).

37. Congress further sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." *Id.* § 1324(a)(1)(A)(iii).

38. DHS, through ICE and CBP, performs significant law enforcement activities in New York City. ICE ERO protects the country through the arrest and removal of those who undermine the safety of our communities and the integrity of our immigration laws.[13] And CBP is responsible for enforcing the immigration laws at international ports of entry, including apprehending attempted

---

[13] *Who We Are*, https://www.ice.gov/about-ice/ero (last visited July 23, 2025) [https://perma.cc/D3MR-5CL2].

entrants with criminal convictions or who are national security concerns

## FACTUAL BACKGROUND

### New York City As a Sanctuary City

39. New York City has long prided itself on being a sanctuary city. Its history of defying federal immigration law began in 1989, when Mayor Ed Koch issued an executive order barring City agencies from "transmit[ting] information respecting any alien to federal immigration authorities" except under limited circumstances. Executive Order [Koch] No. 124. Mayor Koch's successors, David Dinkins and Rudolph Giuliani, reissued the Order. *City of New York*, 179 F.3d at 32.

40. Congress soon responded to provisions like New York City's and sought to preempt state and local attempts to restrict their officials from cooperating with federal immigration authorities. *See generally* H.R. Rep. No. 104-725, at 391 (1996) (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. 2649, 2779 (noting that various state statutes and local laws prevent disclosure of individuals' immigration status to federal officials). In 1996, Congress enacted Section 434 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("Welfare Reform Act"), Pub.L. No. 104–193, 110 Stat. 2105 (1996) (codified at 8 U.S.C. § 1644), and Section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("Immigration Reform Act"), Pub.L. No. 104–208, 110 Stat. 3009 (1996) (codified at 8 U.S.C. § 1373). These laws barred state and local governments from limiting their employees from voluntarily providing information regarding aliens' immigration status to ICE's precursor, the Immigration and Naturalization Service ("INS"). *See* 8 U.S.C. §§ 1644, 1373; *City of New York*, 179 F.3d at 31.

41. The Welfare Reform Act provided: "no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the [INS] information regarding the immigration status" of an alien in the United States. Pub. L. No. 104–193, 110 Stat. 2105 (1996) (codified at 8 U.S.C. § 1644).

42. The Immigration Reform Act expanded the Welfare Reform Act by prohibiting any government entity or official from restricting any other government entity or official from exchanging or maintaining information about the immigration or citizenship status of any individual with the INS or any other federal, state, or local government entity. 8 U.S.C. § 1373; *City of New York*, 179 F.3d at 32–33. The Senate Judiciary Committee's Report explained that the "acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the [INA]." S. Rep. No. 104–249, at 19–20 (1996); *City of New York*, 179 F.3d at 32–33.

43. Eleven days after the Immigration Reform Act became law, New York City sued the United States, claiming the new laws did not invalidate the City's Executive Order because they were facially unconstitutional. *City of New York*, 179 F.3d at 33. The district court granted summary judgment to the United States and the U.S. Court of Appeals for the Second Circuit affirmed. *Id.* The Second Circuit reasoned that "the City's challenge to Sections 434 and 642 is facial and that the Executive Order is on its face a mandatory non-cooperation directive relating solely to a particular federal program"; it held that states do not have "an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs" (*id.* at 35).

44. Undeterred, New York City continued to defy federal law. In direct response to the Welfare Reform Act, the Immigration Reform Act, and the Second Circuit's *City of New York* decision, the 2001 New York City Charter Revision Commission proposed (and voters approved) amendments to the City Charter.[14] The proposal amended the Charter to state, *inter alia*, "each agency shall, to the

---

[14] *Final Report from the 2001 Charter Revision Commission*, New York City Charter Revision Commission, https://www.nyc.gov/assets/charter/downloads/pdf/2001_final_report.pdf [https://perma.cc/X9NE-WVSN] ("2001 Final Report") at 46–47; Robert Worth, *The 2001 Elections: Ballot Questions; All 5 Proposals Approved For Revision of City Charter*, NEW YORK TIMES (Nov. 7, 2001), https://www.nytimes.com/2001/11/07/nyregion/2001-elections-ballot-questions-all-5-proposals-approved-for-revision-city.html [https://perma.cc/JYJ3-M73A].

fullest extent permitted by the laws of the United States and the state of New York, maintain the confidentiality of information in its possession relating to the immigration status or other private information that was provided by an individual to a city employee in the course of such employee's duties."[15] The language was deliberately general in an attempt to circumvent the Second Circuit's holding, while "enabl[ing] immigrants who seek City services to do so without fear of deportation."[16] The proposal also established the Mayor's Office of Immigrant Affairs as a Charter agency within the Executive Office of the Mayor.[17]

45. On May 13, 2003, in an effort to continue frustrating federal immigration enforcement—but also nominally comply with federal law—Mayor Michael Bloomberg issued Executive Order 34, which revoked Mayor Koch's Executive Order 124, and replaced it with a "don't ask" policy that forbade City officers and employees (including law enforcement) from asking about a person's immigration status except under specified circumstances. Executive Order [Bloomberg] No. 34. As the mayor's criminal justice coordinator, John Feinblatt, explained: "The operating principle is you don't ask, so information doesn't get into a note or a database or a file[.]"[18]

46. Mayor Bloomberg went even further on September 17, 2003, issuing Executive Order 41, which (i) prohibited City employees from asking about immigration status unless certain conditions were met, and (ii) required City employees to keep information about immigration status confidential when the individual was not engaged in illegal activity ("other than mere status as an undocumented alien"). Executive Order [Bloomberg] No. 41. It was hailed as "the strongest local confidentiality

---

[15] 2001 Final Report, *supra* note 14 at 49.
[16] 2001 Final Report, *supra* note 14 at 46–47; *id.* at 47 ("Accordingly, one result of developing generalized confidentiality policies would be to improve the City's position in any future court challenges to the federal legislation.").
[17] 2001 Final Report *supra* note 14 at 48.
[18] *See* Susan Sachs, *Mayor's New Immigrant Policy, Intended to Help, Raises Fears*, NEW YORK TIMES (July 23, 2003), https://www.nytimes.com/2003/07/23/nyregion/mayor-s-new-immigrant-policy-intended-to-help-raises-fears.html [https://perma.cc/HKW5-YK2J].

policy in the nation" on immigration information.[19]

### N.Y.C. Admin. Code § 9-131 (Department of Correction)

47. In 2011, New York City further amplified its efforts to interfere with federal immigration enforcement. On November 22, 2011, the New York City Council enacted what became N.Y.C. Admin. Code § 9-131 (Local Law No. 62 [2011] of City of NY), forbidding the Department of Correction from honoring civil immigration detainers by holding a person beyond the time he would otherwise be released or notifying "federal immigration authorities" of his release. Int. No. 656, L.L. 2011/062, codified at N.Y.C. Admin. Code § 9-131(b). The prohibition did not apply when the individual: had been convicted of a crime; had a pending criminal case or an outstanding criminal warrant; or was identified as a known gang member or possible terrorist in a database. *Id.* § 9-131(b)(2)(i). It also did not apply if the individual had an outstanding warrant of removal (per 8 C.F.R. § 241.2) or had previously been subject to a final order of removal (per 8 C.F.R. § 1241.1.) *Id.* § 9-131(b)(2)(ii). The law also mandated reporting regarding its compliance and non-compliance with civil immigration detainers and federal funding requested and received. *Id.* § 9-131(f).

48. But Congress granted the Executive Branch authority to inspect, investigate, arrest, detain, and remove *all* aliens who are suspected of being, or found to be, unlawfully in the United States—not just those aliens who have criminal convictions, are terrorists or gang members, or have final orders of removal. *See* 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231.

49. Just prior to its passage, the NEW YORK TIMES explained that the bill: "would hamper federal authorities' ability to detain, and eventually deport, foreign-born inmates on Rikers Island who are about to be released."[20] Indeed, City Council Speaker Christine Quinn said the bill could keep

---

[19] *See* Albor Ruiz, *Gotta Mean What You Say, Mike*, NEW YORK DAILY NEWS (Sept. 19, 2004), https://www.nydailynews.com/2004/09/19/gotta-mean-what-you-say-mike/ [https://perma.cc/VG26-6TLQ].
[20] Sam Dolnick, *In Change, Bloomberg Backs Obstacle to Deportation*, NEW YORK TIMES (Sept. 30, 2011), https://www.nytimes.com/2011/10/01/nyregion/law-expected-in-new-york-city-would-hamper-inmate-deportations.html [https://perma.cc/U6S7-LE5X].

hundreds of people, perhaps as many as 1,000, from being deported annually. *Id.*

50. Prior to the enactment of the challenged provisions, "ICE ha[d] partnered with [the Department of Correction] to carry out CAP[21] in city jails in an effort to identify and detain individuals for the purpose of potential deportation."[22] "[T]he Department honor[ed] immigration detainers and provide[d] ICE with access to certain computerized information" and "allow[ed] ICE to maintain a trailer on Rikers Island[.]" *Id.* "[B]etween 2004 and 2009," the Department of Correction honored "more than 13,000" ICE detainers, and in Fiscal Year 2010, the Department of Correction honored 80% of ICE detainers. *Id.* at 9.

51. The bill's opponents protested that it would improperly tie immigration officers' hands, threaten public safety, and weaken federal law.[23] Councilman Daniel Halloran doubted the bill's legality: "'You're legislating in the realm of the federal government,' he said. 'Do we even have the authority to do this?'" *Id.* The Center for Immigration Studies warned it amounted to "playing Russian roulette with public safety."[24]

52. The bill's opponents were correct. Between March 9 and September 20, 2012, the Department of Correction only honored 20% of ICE detainers.[25] In 2013, the Department of Correction held 3,070 people beyond their ordinary release-time to honor ICE detainers, and between October 1,

---

[21] CAP is ICE's Criminal Alien Program which "focuses on the identification, arrest, and removal of Incarcerated aliens at federal state, and local levels, as well as at-large criminals." *Criminal Alien Program* (Jan. 27, 2025), https://www.ice.gov/identify-and-arrest/criminal-alien-program#:~:text=ICE%20places%20a%20high%20priority,local%20law%20enforcement%20agency%20custody [https://perma.cc/YRU9-VA2N].

[22] Ex. E: Report of the Governmental Affairs Div., Comm. on Immigration, Nov. 2, 2011, at 7–8, https://legistar.council.nyc.gov/View.ashx?M=F&ID=1599492&GUID=84188E2C-4B64-4C67-A02F-C2789137C70C.

[23] Sam Dolnick, *Council Bill Would Curb Assistance by Rikers to Immigration Officials*, NEW YORK TIMES (Aug. 1, 2011), https://www.nytimes.com/2011/08/02/nyregion/nyc-bill-would-curb-jails-role-in-deportation.html [https://perma.cc/GPJ8-3S5A].

[24] *In Change, Bloomberg Backs Obstacle to Deportation*, *supra* note 20.

[25] Ex. F: Report of the Governmental Affairs Div., Comm. on Immigration, Feb. 26, 2013, at 4, https://legistar.council.nyc.gov/View.ashx?M=F&ID=2343261&GUID=C54531CC-229D-4825-B519-A63D2D59DEF0 (internal citation omitted).

2013, and September 30, 2014, that number dropped to 2,061.[26] Publicly available reporting shows that since Fiscal Year 2017, the Department of Correction honored fewer than 10% of ICE detainers and only 4% in Fiscal Year 2024.[27]

53. Had the detainers been honored—or the requested information shared—in these instances, the commission of numerous crimes likely would have been averted. For example, an alien made headlines last summer after allegedly raping a woman at knifepoint in Coney Island.[28] Prior to that heinous crime, he had been accused of raping a transgender woman in a migrant shelter in Gowanus, Brooklyn and was charged with two counts of a criminal sexual act, sexual abuse, forcible touching, sexual misconduct, and unlawful imprisonment as a hate crime. *Id.* ICE lodged a detainer for him. *Id.* But the Department of Correction did not honor the detainer and released the alien without notifying ICE. *Id.* The alien did not show up for his sentencing and, two days later, allegedly committed the Coney Island rape. *Id.* A case like this one "would be a priority for ICE," John Sandweg, a former acting director of ICE told the NEW YORK TIMES. "If ICE got 48 hours, they would have been 100 percent on this." *Id.* The case sparked outrage from some local officials, with Mayor Adams blaming the Sanctuary Provisions for preventing coordination with ICE. John Chell, the NYPD's chief of patrol, lamented that "[f]ailing to act" allows individuals like this alien "to continue victimizing women in our city." *Id.*

## N.Y.C. Administrative Code § 14-154 (NYPD)

54. The NYPD were subject to similar policies. On March 18, 2013, the New York City Council

---

[26] Ex. G: Report of the Governmental Affairs Div., Comm. on Immigration, Oct. 20, 2014, at 8, https://legistar.council.nyc.gov/View.ashx?M=F&ID=3293822&GUID=4DCAD0C9-1105-4EA2-9324-BF73F297F889.

[27] *See* Ex. B: *Statistics and Compliance, ICE Reports*, NYC DEPT. OF CORRECTION, https://www.nyc.gov/site/doc/data/statistics-and-compliance.page (showing 4% compliance in Fiscal Year 2017; 6% in Fiscal Year 2018; 4% in Fiscal Year 2019; 7% in Fiscal Year 2020; 7% in Fiscal Year 2021; 9% in Fiscal Year 2022; 5% in Fiscal Year 2023; and 4% in Fiscal Year 2024).

[28] Chelsia Rose Marcius, Maria Cramer and Wesley Parnell, *How a Migrant Accused of Rape Was Freed and Charged With Rape Again*, NEW YORK TIMES (Aug. 25, 2024), https://www.nytimes.com/2024/08/25/nyregion/migrant-rape-assault-coney-island.html [https://perma.cc/WKE4-ZUDU].

passed what became N.Y.C. Administrative Code § 14-154, limiting the NYPD's ability to cooperate with federal immigration authorities. Local Law No. 21 [2013] of City of NY, codified at Administrative Code § 14-154. This law prohibited the NYPD from honoring a civil immigration detainer—either by holding the person beyond their ordinary release-time or by notifying federal immigration authorities of such person's release, unless restrictive conditions were met. *Id.* § 14-154(b). The prohibition did not apply when the individual had a pending criminal case or an outstanding criminal warrant; or was identified as a known gang member or possible terrorist in a database. *Id.* § 14-154(b)(2)(i). It also did not apply if the person had an outstanding warrant of removal under 8 C.F.R. § 241.2; or was previously subject to a final order of removal under 8 C.F.R. § 1241.1. N.Y.C. Admin. Code § 14-154(b)(2)(ii). The law also mandated reporting regarding compliance and non-compliance with civil immigration detainers. *Id.* § 14-154(f).

55. But Congress granted the Executive Branch authority to inspect, investigate, arrest, detain, and remove all aliens who are suspected of being, or found to be, unlawfully in the United States—not just those aliens who have criminal convictions, are terrorists or gang members, or have final orders of removal. *See* 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231.

56. After N.Y.C. Admin. Code § 14-154 was enacted, cooperation between the NYPD and ICE effectively ceased. Despite ICE lodging thousands of detainers, publicly available reporting shows, beginning in fiscal year 2017, the NYPD has honored zero of them, and it honored only seven total between fiscal years 2013 and 2016.[29]

**Amendments to N.Y.C. Administrative Code § 9-131 and § 14-154**

57. On March 18, 2013, the City Council also amended N.Y.C. Administrative Code § 9-131. Local Law No. 22 [2013] of City of NY. This amendment, *inter alia*, significantly narrowed the population

---

[29] *See* Ex. C: *Stats, Civil Immigration Detainers*, NYPD.

for which the Department of Correction would honor an ICE detainer request.[30]

58. In 2014, New York City "drastically expanded the scope of the sanctuary provisions."[31]

59. On November 14, 2014, the City Council amended N.Y.C. Administrative Codes § 9-131 (Local Law No. 58 [2014] of City of NY) and § 14-154 (Local Law No. 59 [2014] of City of NY) further restricting the already-limited circumstances in which the City would comply with ICE detainers. As Council Speaker Mark-Viverito explained: "If obstructionists in Congress insist on delaying any federal action on fair and just immigration reform, it falls to municipal governments to pick up the slack; that's what we've been doing here in New York City and it's what we continue to do today with these two bills."[32]

60. The amendments added a requirement that immigration detainers would not be honored without a warrant issued by an Article III judge (or magistrate judge) and unless the subject of the detainer had been convicted of a "violent or serious" crime within the past five years or was a possible match on the federal terrorist watch list.[33]

61. The provision that a "violent or serious" conviction must have occurred within the last five years was a momentous narrowing from the prior law, which allowed any felony conviction from any time period, or any misdemeanor conviction within the last ten years, to trigger the NYPD honoring an ICE detainer. *Id.* at 17.

62. The Official Website of the City of New York celebrated the amendments' enactment: "New York City was one of the first cities in the country to enact legislation limiting its response to ICE

---

[30] *See* Ex. F: Report of the Governmental Affairs Div., Comm. on Immigration, Feb. 26, 2013, at 11.

[31] Luis Ferré-Sadurní, *Why New York Is a Sanctuary City, and How That Could Change Under Trump*, NEW YORK TIMES (Jan. 17, 2025), https://www.nytimes.com/2025/01/17/nyregion/sanctuary-city-nyc-trump.html [https://perma.cc/N6M7-8AZJ].

[32] *Hearing State Meeting Before the City Council*, Oct. 22, 2014, at 40 (statement of Melissa Mark-Viverio Speaker of the Council), https://legistar.council.nyc.gov/View.ashx?M=F&ID=3313631&GUID=EE371D1A-543B-405B-9EDA-5CD2C3451FE4.

[33] *See* Ex. G: Rep. of the Governmental Affairs Div., Comm. on Immigration, Oct. 20, 2014, at 9; N.Y.C. Administrative Code § 9-131 (Local Law No. 58 [2014] of City of NY) and N.Y.C. Administrative Code § 14-154 (Local Law No. 59 [2014] of City of NY).

detainer requests, reducing local law enforcement's cooperation to 60 to 65 percent."[34] It estimated

that the judicial warrant requirement "could bring the percentage of detainers to virtually zero and

would prevent from 2,000 to 3,000 New Yorkers per year from being held in City custody for the

purpose of helping federal immigration officials place them in detention and deportation

proceedings." *Id.*

63. The amendment also eliminated several circumstances under which the Department of

Correction and the NYPD had previously honored an ICE detainer: when the subject (i) has any open

criminal charge; (ii) has an open criminal warrant; (iii) is listed as a gang member in a national database;

or (iv) was convicted of a non-"violent or serious" crime.[35]

64. Significantly, the amendments also removed the exceptions allowing the Department of

Correction and the NYPD to comply with an immigration detainer where federal immigration

authorities presented a judicial warrant and the individual "A. has an outstanding warrant of removal

issue pursuant to 8 C.F.R. 241.2; or B. is or has previously been subject to a final order of removal

pursuant to 8 C.F.R. 1241.1." N.Y.C. Admin. Code § 9-131 (Local Law No. 58 [2014] of City of NY);

N.Y.C. Admin. Code § 14-154 (Local Law No. 59 [2014] of City of NY).

65. Instead, the amended N.Y.C. Admin. Code § 14-154 allowed the NYPD to comply with a civil

immigration detainer only if the individual "has been convicted of a violent or serious crime *and* has

illegally re-entered the country after a previous removal or return" (N.Y.C. Admin. Code § 14-

154(b)(2)(A) (Local Law No. 59 [2014] of City of NY) (emphasis added). The amendment allowed the

NYPD to hold such an individual up to an additional 48 hours (excluding weekends and holidays)

under these circumstances—even without having a judicial warrant at the outset—but also provided:

---

[34] *Mayor Bill de Blasio Signs into Law Bills to Dramatically Reduce New York City's Cooperation with U.S. Immigration and Customs Enforcement Deportations*, NYC.gov (Nov. 14, 2014), https://www.nyc.gov/office-of-the-mayor/news/520-14/mayor-bill-de-blasio-signs-law-bills-dramatically-reduce-new-york-city-s-cooperation-with#/0. [https://perma.cc/3VGD-C92T].
[35] *See* Ex. G: Rep. of the Governmental Affairs Div., Comm. on Immigration, Oct. 20, 2014, at 17; N.Y.C. Admin. Code § 9-131 (Local Law No. 58 [2014] of City of NY) and N.Y.C. Admin. Code § 14-154 (Local Law No. 59 [2014] of City of NY).

"if federal immigration authorities fail to present the department with a judicial warrant for such person within the period described above, such person shall be released and the department shall not notify federal immigration authorities of such person's release." *Id.* § 14-154(b)(2). The amended Department of Correction law contained no parallel provision.

66. Further, the Department of Correction amendment added (h), a provision stating "Department personnel shall not expend time while on duty or department resources of any kind disclosing information that belongs to the department and is available to them only in their official capacity, in response to federal immigration inquiries or in communicating with federal immigration authorities regarding any person's incarceration status, release dates, court appearance dates, or any other information related to persons in the department's custody, other than information related to a person's citizenship or immigration status" (which the City Council conceded federal law prohibited localities from barring[36]). N.Y.C. Admin. Code § 9-131(h) (Local Law No. 58 [2014] of City of NY). It allowed such a communication only when it (i) related "to a person convicted of a violent or serious crime or identified as a possible match in the terrorist screening database; (ii) is unrelated to the enforcement of civil immigration laws; or (iii) is otherwise required by law." *Id.* Previously, Section 9-131 had only prohibited the Department of Correction from notifying federal immigration authorities of such individual's release. *See* Local Law No. 62 (2011) of City of New York § 9-131(b)(1)(ii).

67. Section (h) also prohibited federal immigration authorities from maintaining an office on Department-controlled land "for the purpose of investigating possible violations of civil immigration law" but allowed the mayor to authorize an office "for purposes unrelated to the enforcement of civil immigration." N.Y.C. Administrative Code § 9-131 (Local Law No. 58 [2014] of City of NY).

68. New York City Council members hailed the bill's effects of hampering federal immigration enforcement. Councilwoman Melissa Mark-Viverito boasted: "By further limiting ICE's role in the

---

[36] *See* Ex. G: Rep. of the Governmental Affairs Div., Comm on Immigration, Oct. 20, 2014, at 25.

detention and deportation of immigrant New Yorkers, we set the national standard for the treatment of our immigrant population[.]"[37] Councilman Daniel Dromm stated: "Our national immigration policy is broken. We have a moral obligation to act on the local level to save our families and friends from deportation."[38]

69. The substance of these provisions remains the same today.[39]

70. During the first Trump Administration, the New York City Council strongly objected to the President's efforts to enforce the federal immigration laws and saw the City's Sanctuary Provisions as a bulwark in resisting them. As discussed below, the Council passed additional legislation aimed to thwart efforts to enforce immigration law. Councilman Rafael Espinal stated: "[T]oday the Committee on Immigration will vote on a package of bills [what later became N.Y.C. Admin. Code §§ 9-205 and 10-178] that clearly establish that New York City will not be part of the federal deportation machine."[40]

## N.Y.C. Admin. Code § 9-205 (Department of Probation)

71. On December 1, 2017, the New York City Council enacted N.Y.C. Admin. Code § 9-205 (Local Law No. 226 [2017] of City of NY), which allows the Department of Probation to "only honor a civil immigration detainer by holding a person if" ICE presents a judicial warrant and the subject is listed on a terrorist database or has been convicted of a "violent or serious crime" within the last five years. Int. No. 1558-2017, L.L. 2017/226, codified at N.Y.C. Admin. Code § 9-205. It imposed reporting requirements and required the Department of Probation to publish on its website its policy

---

[37] Matt Flegenheimer, *New York City Proposal Would Limit Detention of Migrants*, NEW YORK TIMES (Oct. 2, 2014), https://www.nytimes.com/2014/10/03/nyregion/city-would-stop-honoring-many-immigrant-detainment-orders.html [https://perma.cc/77HT-TAVS].

[38] *Mayor Bill de Blasio Signs into Law Bills to Dramatically Reduce New York City's Cooperation with U.S. Immigration and Customs Enforcement Deportations*, NYC.GOV (Nov. 14, 2014), https://www.nyc.gov/office-of-the-mayor/news/520-14/mayor-bill-de-blasio-signs-law-bills-dramatically-reduce-new-york-city-s-cooperation-with#/0 [https://perma.cc/3VGD-C92T].

[39] In 2017, both laws' reporting requirements were amended (*see* N.Y.C. Admin. Code § 10-178 Note 1), and a 2018 amendment adjusted the definition of "violent or serious crime" in both provisions, *see* Chap 189/2018 § 16, eff. Nov. 13, 2018.

[40] Transcript of the Minutes of the Comm. on Immigration at 3 (Oct. 30, 2017), https://legistar.council.nyc.gov/View.ashx?M=F&ID=5559586&GUID=D18477E0-7F73-4C39-9755-2BA0345FA07E.

for information requests from federal immigration authorities. *Id.*

### N.Y.C. Admin. Code § 10-178 (Public Safety)

72. The same day, the New York City Council enacted N.Y.C. Admin. Code § 10-178, which bars agencies from "subject[ing] its officers or employees to the direction and supervision of the secretary of homeland security primarily in furtherance of immigration enforcement" Int. No. 1568-2017, L.L. 2017/228, codified at N.Y.C. Admin. Code § 10-178(b). The provision also states, "[n]o city resources…shall be utilized for immigration enforcement" *Id.* § 10-178(c).

73. The provision further requires City employees who receive requests "from a non-local law enforcement agency for the city to provide support or assistance intended to further immigration enforcement," to record the request and any response or actions taken in response, which would then be included in a quarterly report. *Id.* § 10-178(d). The law also amended the reporting requirements of N.Y.C. Admin. Code §§ 9-131 and 14-154. Int. No. 1568-2017, L.L. 2017/228.

### NYPD Operations Order No. 4

74. NYPD Operations Order 4 ("NYPD Ops. Order No. 4") (*see* Ex. H) was issued on January 18, 2025, to "serve[] as a reminder of city and state law that govern [civil immigration enforcement] matters" and to "provide[] operational guidance to members of service in such situations."

75. The Order explains "members of service are not permitted to engage in civil immigration enforcement, assist in any manner with civil immigration enforcement, or allow any Department resources to be used in connection with civil immigration enforcement." NYPD Ops. Order No. 4 at ¶ 6. Examples of prohibited activities include: "[c]ontacting federal civil immigration authorities to let them know where an individual is located; [d]etaining an individual so that federal civil immigration agents can take that person into custody;" closing streets "to enable civil immigration enforcement;" or using "Department facilities" for "civil immigration enforcement." *Id.*

76. "Members of service" may only assist with civil immigration enforcement action if "the

individuals are engaged in conduct that … poses an immediate threat to public safety." *Id.* at ¶ 8.

77. Despite the above prohibitions and limitations, the Order states "members of service will not take any action that will interfere with or impede civil immigration enforcement taken by federal authorities." *Id.* at ¶ 7.

**N.Y.C. Admin. Code §§ 9-131 (Department of Correction) and 14-154 (NYPD) Today**

78. These provisions remain largely the same as they were after the 2014 amendment.

79. In sum, N.Y.C. Admin. Code § 9-131 prohibits Department of Correction employees from honoring civil immigration detainers (by holding the person or notifying "federal immigration authorities" of his release) unless the detainer is accompanied by a warrant issued by an Article III judge and the individual has been convicted of a "violent or serious crime" within the past five years or is a possible match in a terrorist database. N.Y.C. Admin. Code. § 9-131(b). It also forbids Department personnel from sharing with "federal immigration authorities" information about "any person's incarceration status, release dates, court appearance dates, or any other information related to persons in the department's custody" ("other than information related to the person's citizenship or immigration status"), unless the communication "relates to a person convicted of a violent or serious crime or identified as a possible match" in a terrorist database, "is unrelated to the enforcement of civil immigration laws," or "is otherwise required by law." N.Y.C. Admin. Code. § 9-131(h)(1). And it prohibits "federal immigration authorities" from using Department land for investigating immigration law violations. N.Y.C. Admin. Code. § 9-131(h)(2). Finally, it requires the Department of Correction to annually report on its website various metrics related to cooperation with federal immigration authorities, including, but not limited to, how many detainers were lodged and honored (either by holding someone beyond their ordinary release-time or transferring them to ICE custody) or not honored, detailing the basis for the detainer and why it was or was not honored, the number of requests for an alien's "incarceration status, release dates, court appearance dates, or any other

information related to such person in the Department's custody, and the number of responses honoring such requests[.]" N.Y.C. Admin. Code. § 9-131(f).

80. N.Y.C. Administrative Code § 14-154 imposes the same restrictions on the NYPD regarding honoring civil immigration detainers as N.Y.C. Admin. Code § 9-131. N.Y.C. Admin. Code § 14-154(b)(1). But the NYPD "may" honor a civil immigration detainer by holding the person for up 48 hours if the person is a possible match in the terrorist database or "has been convicted of a violent or serious crime *and* has illegally re-entered the country after a previous removal or return." N.Y.C. Admin. Code § 14-154(b)(2) (emphasis added). If "federal immigration authorities" do not present a judicial warrant during the 48-hour period, NYPD shall release the individual and shall not notify "federal immigration authorities" of the release. *Id.* Finally, it requires the NYPD to annually report on its website various metrics related to cooperation with federal immigration authorities, including, but not limited to, how many detainers were lodged and honored (either by holding someone beyond their ordinary release-time or transferring them to ICE custody) or not honored, the number of requests for an alien's "incarceration status, release dates, court appearance dates, or any other information related to such person in the Department's custody, and the number of responses honoring such requests[.]" N.Y.C. Admin. Code § 14-154(f).

## EXECUTIVE ORDER 50 AND THE RESULTING LAWSUIT

81. More recently, despite some local officials' efforts to use federal immigration resources to assist in keeping New Yorkers safe, the majority of local officials continue to thwart any association with federal immigration authorities whatsoever.

82. On April 8, 2025, First Deputy Mayor Randy Mastro issued Executive Order 50.[41] This order authorized several federal agencies, including Homeland Security Investigations (which it noted was a

---

[41] First Deputy Mayor Randy Mastro issued the order under authority Mayor Adams granted in Executive Order 49. *See* Executive Order [Adams] No. 49, Sec. 2(m) and 2(p).

division of ICE) "to designate personnel to maintain office space on land over which DOC [Department of Correction] has jurisdiction for the purpose of criminal enforcement and criminal investigations only." Executive Order [Mastro] No. 50, Sec. 1, § 2. But it left no doubt that any immigration enforcement was strictly prohibited. It required any participating federal agency to enter into a Memorandum of Understanding that "shall include a recognition that federal law enforcement activities will be limited to purposes unrelated to the enforcement of civil immigration laws, consistent with New York City Administrative Code section 9-131 (h)(2), and a recognition that DOC staff are required to comply with New York City Administrative Code section 10-178." Executive Order [Mastro] No. 50, Sec. 1, § 3. Thus, the order stayed within the confines of existing sanctuary law.

83. Despite N.Y.C. Administrative Code § 9-131(h)(2) expressly allowing for the action taken in Executive Order 50—and despite the Order's strict prohibition of any activity related to immigration enforcement—local officials raced to prevent it from going into effect. On April 15, 2025, the New York City Council filed a lawsuit against Mayor Adams, First Deputy Mayor Mastro, and the Correction Department and sought a preliminary injunction and a temporary restraining order ("TRO") enjoining the defendants from taking any steps to facilitate a federal law enforcement presence on Department of Correction property. *Council of City of New York v. Adams*, -- N.Y.S.3d --, 2025 N.Y. Slip Op. 25141, 2025 WL 1689668, at *3 (Sup. Ct., NY County June 12, 2025).[42] The court issued a TRO on April 21, 2025, which it later extended. *Id.* On June 12, 2025, it granted the preliminary injunction, ordering "Defendants-Respondents, their agents, and all other New York City government officials, officers, personnel and agencies are prohibited from taking any steps towards negotiating, signing, or implementing any Memoranda of Understanding with the federal government regarding federal law enforcement presence on Department of Correction property until the final

---

[42] On April 10, 2025, the City Council approved Resolution 836, which authorized "the Speaker to take legal action on behalf of the Council of the City of New York to defend against the Adams Administration's violation of Sanctuary City Laws and the Trump Administration's attacks on the City of New York." Council of City of NY Res. 836 (Apr. 10, 2025).

resolution of this proceeding" (*id.* at *9). Speaker Adrienne Adams commented: "The Council will continue to use our power and resources to protect New Yorkers from the Trump administration's harmful agenda."[43]

## THE CHALLENGED PROVISIONS' IMPACT ON
## FEDERAL IMMIGRATION ENFORCEMENT

84. Violent crimes committed by aliens in New York City have caused city officials to call for the challenged provisions to be re-examined, suspended, or repealed to protect public safety.[44] "New York City is a prime target for terrorism" and experiencing "a surge of violent crime," several City Council members warned, and the "inability of ICE to cooperate fully with local law enforcement due to existing sanctuary city laws severely hampers our efforts to ensure the safety of our residents."[45] New York City Hall Chief Counsel Lisa Zornberg agreed that N.Y.C. Admin. Code §§ 9-131 and 9-205 create "a bar" on civil immigration enforcement and "place[] strong limitations on the city's ability to cooperate or to provide even just notification to federal authorities[.]"[46]

85. The combined effect of the challenged New York City provisions, N.Y.C. Administrative Code §§ 9-131; 14-154; 9-205; 10-178 and NYPD Ops. Order No. 4—facially and as applied— prohibits even the most basic cooperation with federal officials. Congress, in comity to States, permitted state and local jurisdictions to fully punish aliens for state criminal violations prior to

---

[43] Statement from Speaker Adrienne Adams on Judge Rosado Granting a Preliminary Injunction to Continue Blocking Mayor Adams' Executive Order Inviting Trump's ICE Center on Rikers, NY City Council (June 13, 2025), https://council.nyc.gov/press/2025/06/13/2905/ [https://perma.cc/8PT5-36D5].

[44] *See* Gwynne Hogan & Rachel Holliday Smith, *What Exactly Is A Sanctuary City and What Does That Mean for NYC?*, THE CITY (Feb. 13, 2024), https://www.thecity.nyc/2024/02/13/sanctuary-city-explainer-nyc/ [https://perma.cc/6LA8-QKGS].

[45] Christian Wade, *New York City Council Members Seek Suspension of Sanctuary Law*, THE CENTER SQUARE (Sept. 9, 2024), https://www.thecentersquare.com/new_york/article_b09b2d6c-6ec4-11ef-b1c5-973aaaf47939.html [https://perma.cc/P7TL-FB2G] (describing recent violent crimes "including incidents involving migrant gangs in Central Park and Queens parks—where they have been reported to be raping, robbing, assaulting, and even shooting at police officers—demands immediate and decisive action."); New York City Common Sense Caucus @NYCCCommonSense, X (Sep. 8, 2024, at 8:32 AM), https://x.com/NYCCCommonSense/status/1832758995922096540 [https://perma.cc/MB3Y-78SK].

[46] David Propper, *Eric Adams Proposes U-Turn On NYC's Controversial Sanctuary City Status After Migrant Crime Wave Grips Big Apple*, NEW YORK POST (Feb. 27, 2024), https://nypost.com/2024/02/27/us-news/adams-calls-nyc-to-cooperate-with-ice-over-migrants-accused-of-serious-crimes/ [https://perma.cc/W73C-SQ9X].

removal. *See* 8 U.S.C. § 1231(a)(4)(A) (providing that, subject to limited exceptions, federal agents "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment"). But Congress crafted a statutory scheme that clearly envisioned the Federal Government being able to detain and remove those aliens, once their state proceedings and sentences concluded. *See* 8 U.S.C. § 1231(a)(4)(A).[47]

86.   Namely, Congress specified that the removal period begins immediately upon release from state criminal custody, *id.* § 1231(a)(1)(B)(iii), and detention during that period is mandatory, *id.* § 1231(a)(2); *see also* 8 U.S.C. § 1226(c)(3), *id.* § 1357(d) (directing immigration officers to obtain a detainer to facilitate the transfer of criminal aliens from state to federal custody). In addition, state agencies must detain aliens for at least 48 hours upon request. 8 C.F.R. § 287.7(d). Congress granted this permission expecting that states would then facilitate, or at the very least not obstruct, detention of criminal aliens by federal immigration authorities. If ICE lacks knowledge of criminal aliens' release dates from state custody, ICE cannot exercise its statutory responsibility of effecting an arrest upon the alien's release.

87.   Furthermore, federal law contemplates that DHS will be able to inspect all applicants for admission, and take all appropriate action against those found to be inadmissible to the United States, even those transferred to state or local custody pending prosecution. *See id.* 8 U.S.C. §§ 1182, 1225(b)(2); 8 C.F.R. § 235.2. And 8 U.S.C. § 1357(a)(1) authorizes ICE "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States."

88.   But New York City's Sanctuary Provisions limit access to Department of Correction detainees. Unless there is a judicial warrant, and a database shows that the alien has been convicted of a specified violent or serious crime within the past five years or that he may be a match in the terrorist screening

---

[47] DHS may administratively arrest and detain aliens who have been released from state criminal custody prior to the completion of their state criminal case. *See, e.g.,* 8 U.S.C. § 1226(c).

database, Defendants are legally prohibited from honoring a detainer. N.Y.C. Admin. Code § 9-131(b)(1). The Department of Probation and NYPD provisions contain the same restriction. N.Y.C. Admin. Code §§ 9-205(b), 14-154(b). New York City law also prohibits the use of city property for immigration enforcement, effectively removing access to detention facilities, probation centers, and police departments, which previously provided ICE agents with safe and secure facilities for transfer of custody. N.Y.C. Admin. Code § 10-178(c).

89. These Sanctuary Provisions block access to ICE agents, and are a direct obstacle to immigration enforcement, and in particular 8 U.S.C. § 1357(a)(1).

90. A number of the challenged provisions also run directly afoul of 8 U.S.C. § 1373 by forbidding city officers from "expend[ing] time while on duty or department resources of any kind disclosing information in response to federal immigration inquiries or in communicating with federal immigration authorities regarding any person's incarceration status, release dates, court appearance dates, or any other information related to persons in the department's custody[.]" N.Y.C. Admin. Code § 9-131; *see also* §§ 14-154 (prohibiting the NYPD from "honor[ing] a civil immigration detainer by … notifying federal immigration authorities of such person's release[.]"); 10-178(c) (forbidding the use of "city resources, including, but not limited to, time spend by employees, officers, contractors, or subcontractors while on duty, or the use of city property, [] for immigration enforcement."); NYPD Ops. Order No. 4 at ¶ 6 (stating "[c]ity law prohibits use of city resources for 'enforcement of any civil provision of the [INA.]'" (citing § 10-178)). Nor can New York City point to its purported savings clauses to avoid that reality. The savings clauses allow officers and employees to undertake those activities "when required under federal law," N.Y.C. Admin. Code §§ 9-131(d) and 14-154(d), or to "comply[] with federal law," N.Y.C. Admin. Code § 10-178(e), but federal law does not *require* local governments to share and maintain that information, it only prohibits *restrictions* on those activities precisely like those restrictions set out in the Sanctuary Provisions. Indeed, New York City's position

directly contravenes the Second Circuit's decision in *City of New York*, a case in which it was a party. *See* 179 F.3d at 35 ("We therefore hold that states do not retain under the Tenth Amendment an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs.").

91. New York City's exceptions to its prohibition on cooperation with federal immigration agents for certain recent criminal convictions conflict with federal law governing what constitutes a predicate for inadmissibility or removability. *See* 8 U.S.C. §§ 1182(a)(2), 1227(a)(2). Federal agents are required to detain illegal aliens who have committed certain offenses upon their release from state or local custody. Congress not only recently reaffirmed its commitment to this mandate, but it also augmented the authority of federal agents in this space by adding more predicate charges that trigger this detention requirement and requiring the issuance of detainers in these circumstances, *id.* §§ 1226(c), (c)(3), 1357(d); *see also* Laken Riley Act, S. 5, 119th Cong. (2025).

92. The restrictions on providing ICE access to removable aliens in their custody, *see* N.Y.C. Admin. Code §§ 9-131; 9-205; 14-154; and NYPD Ops. No. 4, also conflict with federal law, which establishes a system of civil administrative warrants as the basis for immigration arrest and removal, and does not require or contemplate use of a judicial warrant for civil immigration enforcement, *see* 8 U.S.C. §§ 1226(a), 1231(a). By contrast, New York City's Sanctuary Provisions explicitly require "a judicial warrant" issued by an Article III judge or magistrate judge to honor a civil immigration detainer. N.Y.C. Admin. Code §§ 9-131(b)(i); 9-205(b); 14-154(b).

93. Further, because of the challenged provisions, DHS lacks the ability to readily obtain from local law enforcement the release date of aliens whom DHS has reason to believe are removable from the United States as well as lacks access to such aliens to facilitate the transfer of custody, even where DHS presents a Congressionally authorized civil administrative warrant of arrest or removal, *see* 8 U.S.C. §§ 1226(a), 1231(a), or has transferred those aliens to local law enforcement in the first instance

to permit their prosecution for a state crime.[48]

94. New York City law limits federal immigration authorities' ability to access and interview individuals in City custody (*see* N.Y.C. Admin. Code § 9-131(h)), even though the INA expressly provides that aliens in this country "*shall* be inspected by immigration officers." 8 U.S.C. § 1225(a)(3) (emphasis added). Likewise, it limits the circumstances in which federal immigration officers may interrogate illegal aliens, even though the text of the INA itself imposes no such limitations. *See id.* § 1357(a)(3).

95. By restricting basic information sharing and barring DHS access to aliens in local custody upon their release as provided by federal law (*e.g.*, an administrative warrant), New York City's Sanctuary Provisions require federal immigration officers to engage in difficult and dangerous efforts to re-arrest aliens who were previously in local custody, endangering immigration officers, the particular alien, and others who may be nearby.

96. The impact of New York City's Sanctuary Provisions has been profound and frequently puts ICE officers in considerable risk of physical danger. Border Czar Tom Homan made clear: "[W]e would love to work in local jails, but sanctuary cities won't allow us into those jails. It's much easier to arrest a public safety threat in the safety and security of a public jail than out in the street, because the officer is safer that way, the alien's safer that way, the community is safer that way.… [W]hen we go to the community and find that person, find that criminal alien, it's probably going to be with others … we'll have to arrest. So it's not safe for the community, not safe for the officers, not safe for anybody."[49] These provisions also have a considerable financial impact on ICE's operational costs as it now takes more time and more officers to effect arrests over the same number of aliens. As ICE

---

[48] Ex. B: *Statistics and Compliance, ICE Reports*, NYC DEPT. OF CORRECTION (showing ICE transferred to the Department of Correction custody of 16 aliens in Fiscal Year 2024, 12 in Fiscal Year 2023, 20 in Fiscal Year 2022, 21 in Fiscal Year 2021, 30 in Fiscal Year 2020, and 27 in Fiscal Year 2019).

[49] *Transcript: Tom Homan on "Face the Nation with Margaret Brennan," Jan. 5, 2025*, CBS NEWS (Jan. 5, 2025), https://www.cbsnews.com/news/tom-homan-face-the-nation-transcript-01-05-2025/ [https://perma.cc/2YJL-WT7T].

has explained, "Local jurisdictions that choose to not cooperate with ICE are likely to see an increase in ICE enforcement activity, as ICE the agency has no choice but to conduct more at-large arrest operations…. Additionally, once these criminals are out on the street, confirming their whereabouts is often time consuming and resource intensive."[50] ICE has even had to seek assistance from other federal law enforcement partners to effectuate arrests.[51]

97. New York City has no lawful interest in assisting removable aliens' evasion of federal law enforcement.

98. Upon information and belief, New York City does not permit their employees to place a detainer or administrative warrant in the alien's file or to enter its existence in their databases, such that if an alien is transferred to another law enforcement agency—even within New York City—that agency cannot act on the undisclosed detainer or administrative warrant or learn about and share that alien's immigration status with other law enforcement, including the Federal Government. This policy has dire consequences. For example, ICE lodged an immigration detainer for the alien who allegedly raped a woman on Coney Island (*supra* at ¶ 53), and that detainer could have been honored even under New York City's Sanctuary Provisions.[52] But a spokesman from the Department of Correction reported that there was no record of a detainer in his files. *Id.* This policy runs directly afoul of Congress's express prohibition on any federal, state, or local government entity or official from prohibiting, or in any way restricting, any government entity or official from maintaining and exchanging "information regarding the immigration status, lawful or unlawful, of any individual" with

---

[50] *NYC sanctuary policies continue to shield criminal aliens*, ICE (Jan. 24, 2020), https://www.ice.gov/news/releases/nyc-sanctuary-policies-continue-shield-criminal-aliens [https://perma.cc/V452-7LYK].

[51] *ICE agents in NYC area take at least 20 people into custody in early morning operation, sources say*, CBS NEWS (Jan. 28, 2025), https://www.cbsnews.com/newyork/news/nyc-ice-raid-immigration-enforcement/ [https://perma.cc/CR5Y-7Z3T] (noting participation by ICE, DHS, the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the Drug Enforcement Administration in recent arrest operation).

[52] Chelsia Rose Marcius, Maria Cramer and Wesley Parnell, *How a Migrant Accused of Rape Was Freed and Charged With Rape Again*, New York Times (Aug. 25, 2024), https://www.nytimes.com/2024/08/25/nyregion/migrant-rape-assault-coney-island.html [https://perma.cc/WKE4-ZUDU].

other law enforcement entities. 8 U.S.C. § 1373(b).

99. New York City singles out the Federal Government for its disfavored treatment. *See* N.Y.C. Admin. Code §§ 9-131; 9-205; 14-154; 10-178; NYPD Ops. No. 4. The challenged provisions facially target federal immigration authorities in ways that do not apply to any other person or entity. *See, e.g.,* N.Y.C. Admin. Code § 9-131(h)(1) (forbidding Department of Correction personnel from "expend[ing] time while on duty or department resources of any kind…in communicating with federal immigration authorities regarding any person's incarceration status, release dates, court appearance dates, or any other information related to persons in the department's custody, other than information related to a person's citizenship or immigration status").

100. These provisions are an obstacle to the Federal Government's enforcement of the immigration laws and discriminate against federal immigration enforcement and thus expressly violate 8 U.S.C. § 1373.

101. In rejecting congressionally authorized means of enforcing federal immigration law, including detainers and administrative warrants, these provisions constitute unlawful direct regulation of the Federal Government.

## CLAIMS FOR RELIEF
## COUNT ONE – VIOLATION OF THE SUPREMACY CLAUSE
## (PREEMPTION)

102. Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

103. The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

104. The challenged provisions (N.Y.C. Administrative Code §§ 9-131; 14-154; 9-205; 10-178 and

NYPD Ops. Order No. 4) constitute and create obstacles to the enforcement of federal immigration law.

105. Further, the challenged provisions also undermine federal immigration law's protections for information sharing and thus are preempted under both express and conflict preemption principles. *E.g.*, 8 U.S.C. §§ 1373(a), 1644; *see Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) ("Preemption may be either expressed or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose'") (citation omitted). Express preemption occurs when Congress explicitly precludes state or local regulation in a particular area. *See, e.g., Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (finding express preemption where the federal law provided that "[N]o State…shall enact or enforce any law…relating to rates, routes, or services of any air carrier" (49 U.S.C. App. § 1305(a)(1) (1988 ed.)). Even without an express provision for preemption, state law must yield to a congressional Act when Congress intends federal law to "occupy the field,"  and state law is naturally preempted to the extent it conflicts with a federal statute. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (internal citations omitted). Federal immigration law therefore preempts the challenged provisions.

106. Accordingly, these provisions violate the Supremacy Clause, interfere with federal law, and create obstacles to the enforcement of federal immigration law both on their face and as applied to the Federal Government.

## <u>COUNT TWO – VIOLATION OF THE SUPREMACY CLAUSE<br>(UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)</u>

107. Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

108. Defendants' enforcement of the challenged provisions (N.Y.C. Administrative Code §§ 9-131; 14-154; 9-205; 10-178 and NYPD Ops. Order No. 4) discriminates against the Federal Government.

109. The challenged provisions single out federal immigration authorities, expressly and implicitly, for unfavorable and uncooperative treatment when other law enforcement officials are not so treated.

110. Accordingly, the challenged provisions violate the Doctrine of Intergovernmental Immunity and additionally violate the Supremacy Clause on that basis.

## COUNT THREE – VIOLATION OF THE SUPREMACY CLAUSE (UNLAWFUL REGULATION OF FEDERAL GOVERNMENT)

111. Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

112. Defendants' enforcement of the challenged provisions (N.Y.C. Administrative Code §§ 9-131; 14-154; 9-205; 10-178 and NYPD Ops. Order No. 4) effects direct regulation of the Federal Government.

113. By refusing to honor civil detainers and warrants expressly authorized by Congress, Defendants have unlawfully eliminated these means for federal immigrations officials to carry out their statutory functions.

114. Likewise, by restricting access to detention facilities and the aliens within them (*see* N.Y.C. Admin. Code §§ 9-131(h); 10-178(c)), Defendants unlawfully prevent the Federal Government from carrying out the INA's command that aliens in this country "*shall* be inspected by immigration officers." 8 U.S.C. § 1225(a)(3). The challenged provisions limit the circumstances in which federal immigration authorities may interrogate illegal aliens, even though the text of the INA itself imposes no such limitations. *See id.* § 1357(a)(3).

115. Accordingly, the challenged provisions of the N.Y.C. Administrative Code and NYPD Ops. Order No. 4 effect regulation of the Federal Government and additionally violate the Supremacy Clause on that basis.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests the following relief:

1. That this Court enter a judgment declaring that the challenged provisions (N.Y.C. Administrative Code §§ 9-131; 14-154; 9-205; 10-178 and NYPD Ops. Order No. 4) violate the Supremacy Clause and are therefore invalid;

2. That this Court enter a judgment declaring that the challenged provisions (N.Y.C. Administrative Code §§ 9-131 and 14-154 ; 9-205; 10-178 and NYPD Ops. Order No. 4) violate 8 U.S.C. § 1373 and are therefore invalid;

3. That this Court issue a permanent injunction that prohibits Defendants as well as their successors, agents, and employees, from enforcing N.Y.C. Administrative Code §§ 9-131; 14-154; 9-205; 10-178 and NYPD Ops. Order No. 4;

4. That this Court award the United States its costs and fees in this action; and

5. That this Court award any other relief it deems just and proper.

DATED: July 24, 2025

BRETT A. SHUMATE
Assistant Attorney General
DREW C. ENSIGN
Deputy Assistant Attorney General
CHARLES E.T. ROBERTS
Counsel to the Assistant Attorney General
Civil Division

ELIANIS N. PEREZ
Assistant Director

AMANDA B. SAYLOR
Trial Attorney

/s/ Catherine M. Reno
CATHERINE M. RENO
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 353-8557
Fax: (202) 305-7000
Email: catherine.m.reno@usdoj.gov

*Attorneys for the United States*