UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- X

UNITED STATES OF AMERICA,

                                    Plaintiff,

          -against-

                                  No.: 1:25-cv-04084 (RER)(PK)

CITY OF NEW YORK; ERIC ADAMS, Mayor of The
City of New York, in his official capacity; NEW YORK
CITY COUNCIL; ADRIENNE E. ADAMS, Speaker of the
New York City Council, in her official capacity; NEW
YORK CITY DEPARTMENT OF CORRECTION;
LYNELLE MAGINLEY-LIDDIE, Commissioner of the
New York City Department of Correction, in her official
capacity; NEW YORK CITY DEPARTMENT OF
PROBATION; JUANITA N. HOLMES, Commissioner of
the New York City Department of Probation, in her official
capacity; NEW YORK CITY POLICE DEPARTMENT;
JESSICA S. TISCH, Commissioner of the New York City
Police Department, in her official capacity,

                                  Defendants.

------------------------------------------------------------------------x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF MOTION TO DISMISS COMPLAINT

**MURIEL GOODE-TRUFANT**
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street
New York, New York 10007

December 2, 2025

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND .................................................................................................................... 3

STANDARD OF REVIEW .................................................................................................... 7

ARGUMENT ......................................................................................................................... 8

      I. FEDERAL LAW DOES NOT PREEMPT THE CHALLENGED PROVISIONS ........ 8

          A.    The Complaint Fails to State a Preemption Claim .................................... 9

              1.    There is No Express Preemption ....................................................... 10

              2.    There is No Conflict Preemption ....................................................... 13

              3.    There is No Field Preemption ........................................................... 17

          B.    Plaintiff's Preemption Claim Runs Afoul of the
Anticommandeering Doctrine ................................................................... 19

      II. PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER THE
INTERGOVERNMENTAL IMMUNITY DOCTRINE ............................................ 23

          A.    The Challenged Provisions Do Not Regulate the
Federal Government .................................................................................. 24

          B.    The Challenged Provisions Do Not Discriminate
Against the Federal Government ............................................................... 27

          C.    Plaintiff's Intergovernmental Immunity Claims
Also Fail Under the Anticommandeering Doctrine .................................. 29

CONCLUSION ..................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abriq v. Hall*,
 295 F. Supp. 3d 874 (M.D. Tenn. 2018)...................................................................................15

*Altria Grp., Inc. v. Good*,
 555 U.S. 70 (2008)....................................................................................................................10

*Antonyuk v. James*,
 120 F.4th 941 (2d Cir. 2024) .....................................................................................................9

*Arizona v. United States*,
 567 U.S. 387 (2012).........................................................................................................9, 13, 18

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)....................................................................................................................8

*Barnes v. Glen Theatre, Inc.*,
 501 U.S. 560 (1991)..................................................................................................................13

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007).................................................................................................................7, 8

*Bruce Katz, M.D., P.C. v. Focus Forward, LLC*,
 22 F.4th 368 (2d Cir. 2022) .......................................................................................................7

*Bucklew v. Precythe*,
 587 U.S. 119 (2019)....................................................................................................................9

*Buono v. Tyco Fire Prods., LP*,
 78 F.4th 490 (2d Cir. 2023) ......................................................................................................10

*Castaneda v. Cnty. of Suffolk*,
 No. 17-cv-4267, 2025 U.S. Dist. LEXIS 26726 (E.D.N.Y. Jan. 2, 2025) ..........................15, 20

*Chambers v. Time Warner*,
 282 F.3d 147 (2d Cir. 2002).......................................................................................................8

*City and Cnty. of San Francisco v. Trump*,
 783 F. Supp. 3d 1148 (N.D. Cal. 2025) ....................................................................................22

*City of Chicago v. Barr*,
 961 F.3d 882 (7th Cir. 2020) ....................................................................................................12

*City of El Cenizo v. Texas*,
    890 F.3d 164 (5th Cir. 2018) ....................................................................................17

*City of L.A. v. Sessions*,
    No. CV 18-7347-R, 2019 U.S. Dist. LEXIS 81254 (C.D. Cal. Feb. 15, 2019) ........................12

*City of New York v. United States*,
    179 F.3d 29 (2d Cir. 1999) ....................................................................................20, 21

*City of Philadelphia v. Sessions*,
    309 F. Supp. 3d 289 (E.D. Pa. 2018) ...........................................................................22

*Cmty. Hous. Improvement Program v. City of New York*,
    59 F.4th 540 (2d Cir. 2023) .....................................................................................9

*Cnty. of Ocean v. Grewal*,
    475 F. Supp. 3d 355 (D.N.J. 2020) ........................................................................22, 29

*Colorado v. United States*,
    455 F. Supp. 3d 1034 (D. Colo. 2020) ....................................................................10, 12

*CoreCivic, Inc. v. Governor of N.J.*,
    145 F.4th 315 (3d Cir. 2025) ...................................................................................27

*Cortec Indus. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991) .......................................................................................8

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) .............................................................................................14

*De Canas v. Bica*,
    424 U.S. 351 (1976) .............................................................................................18

*DiFolco v. MSNBC Cable L.L.C.*,
    622 F.3d 104 (2d Cir. 2010) ......................................................................................8

*Doe v. Franklin Square Union Free Sch. Dist.*,
    568 F. Supp. 3d 270 (E.D.N.Y. 2021) ..........................................................................13

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982) .............................................................................................10

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
    373 U.S. 132 (1963) .............................................................................................18

*Galarza v. Szalczyk*,
    745 F.3d 634 (3d Cir. 2014) .................................................................................14, 17

*Goldin v. Baker*,
  809 F.2d 187 (2d Cir. 1987)................................................................................................26

*Goldstein v. California*,
  412 U.S. 546 (1973)..................................................................................................14, 17

*Hancock v. Train*,
  426 U.S. 167 (1976)...........................................................................................23, 24, 27

*Jackson-Mau v. Walgreen Co.*,
  652 F. Supp. 3d 349 (E.D.N.Y. 2023) ...............................................................10, 11

*Kansas v. Garcia*,
  589 U.S. 191 (2020)....................................................................................................9, 17

*Kentucky v. Graham*,
  473 U.S. 159 (1985)...........................................................................................................1

*Massachusetts v. United States*,
  435 U.S. 444 (1978)........................................................................................................26

*McHenry Cnty. v. Raoul*,
  44 F.4th 584 (7th Cir. 2022) ............................................................................... *passim*

*Morales v. Chadbourne*,
  793 F.3d 208 (1st Cir. 2015)........................................................................................15

*Murphy v. NCAA*,
  584 U.S. 453 (2018).............................................................................................. *passim*

*N.Y. Pet Welfare Ass'n v. City of New York*,
  850 F.3d 79 (2d Cir. 2017)....................................................................................14, 16

*N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*,
  612 F.3d 97 (2d Cir. 2010)...........................................................................................13

*N.Y. State Telecomms. Ass'n v. James*,
  101 F.4th 135 (2d Cir. 2024) .............................................................................13, 17, 18

*New York v. Pa. Higher Educ. Assistance Agency*,
  No. 19-cv-9155, 2020 U.S. Dist. LEXIS 77655 (S.D.N.Y. May 1, 2020) ..............................26

*New York v. United States*,
  505 U.S. 144 (1992)..................................................................................................8, 9, 19

*New York v. United States Dep't of Justice*,
  951 F.3d 84 (2d Cir. 2020)...................................................................................21, 22

*Nnebe v. Daus*,
   644 F.3d 147 (2d Cir. 2011)......................................................................................1

*North Dakota v. United States*,
   495 U.S. 423 (1990)........................................................................................ *passim*

*Ocean Cnty. Bd. of Comm'rs v. Attorney General of N.J.*,
   8 F.4th 176 (3d Cir. 2021) ..........................................................................10, 11, 22

*Oregon v. Trump*,
   406 F. Supp. 3d 940 (D. Or. 2019) .........................................................................12

*Orellana v. Nobles Cnty.*,
   230 F. Supp. 3d 934 (D.C. Minn.) ..........................................................................15

*Papasan v. Allain*,
   478 U.S. 265 (1986)...................................................................................................8

*Penn Dairies v. Milk Control Comm'n of Pa.*,
   318 U.S. 261 (1943)............................................................................................24, 26

*People ex rel. Swenson v. Ponte*,
   46 Misc. 3d 273 (Sup. Ct. Kings Cnty. 2014)..........................................................15

*People ex rel. Wells v. DeMarco*,
   168 A.D.3d 31 (2d Dep't 2018) ........................................................................15, 20

*Printz v. United States*,
   521 U.S. 898 (1997)..............................................................................................8, 20

*Puerto Rico Dep't of Consumer Affairs v. ISLA Petroleum Corp.*,
   485 U.S. 495 (1988)..................................................................................................12

*Steel Inst. of N.Y. v. City of New York*,
   716 F.3d 31 (2d Cir. 2013).......................................................................................13

*Travis v. Navient Corp.*,
   460 F. Supp. 3d 269 (E.D.N.Y. 2020) .....................................................................10

*United States v. California*,
   921 F.3d 865 (9th Cir. 2019) ..............................................................................17, 30

*United States v. City of Boston*,
   25-cv-12456 (D. Mass. filed Sep. 4, 2025)................................................................2

*United States v. City of Los Angeles*,
   No. 25-cv-05917 (C.D. Cal. filed Jun. 30, 2025)........................................................2

*United States v. City of Newark*,
  25-cv-05081 (D.N.J. filed May 22, 2025) ...............................................................2

*United States v. City of Rochester*,
  No. 25-cv-06226 (W.D.N.Y. filed Apr. 24, 2025).................................................2

*United States v. Cnty. of Fresno*,
  429 U.S. 452 (1977)............................................................................................26

*United States v. Colorado*,
  25-cv-91391 (D. Colo. filed May 2, 2025) ...........................................................2

*United States v. Darby*,
  312 U.S. 100 (1941)............................................................................................19

*United States v. Illinois*,
  No. 25-cv-1285, 2025 U.S. Dist. LEXIS 142735 (N.D. Ill. July 25, 2025) .................... *passim*

*United States v. Minnesota*,
  25-cv-03798 (D. Minn. filed Sep. 29, 2025)...........................................................2

*United States v. Morrison*,
  529 U.S. 598 (2000)............................................................................................13

*United States v. New Mexico*,
  455 U.S. 720 (1982)............................................................................................24

*United States v. New York*,
  No. 25-cv-00205 (N.D.N.Y. filed Feb. 12, 2025)....................................................2

*United States v. New York*,
  No. 25-cv-744, 2025 U.S. Dist. LEXIS 225875 (N.D.N.Y. Nov. 17, 2025) .................. *passim*

*United States v. Salerno*,
  481 U.S. 739 (1987)..............................................................................................9

*United States v. Washington*,
  596 U.S. 832 (2022)......................................................................................23, 26

*Va. Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019)......................................................................................12, 18

*Wachovia Bank, N.A. v. Burke*,
  414 F.3d 305 (2d Cir. 2005).................................................................................10

*Washington v. United States*,
  460 U.S. 536 (1983)......................................................................................27, 28

*Wurtz v. Rawlings Co., LLC,*
    761 F.3d 232 (2d Cir. 2014)..................................................................................10

*Wyeth v. Levine,*
    555 U.S. 555 (2009)...............................................................................................13

**Statutes**

6 U.S.C. § 251...............................................................................................................11

8 U.S.C. § 1182.............................................................................................................16

8 U.S.C. § 1225.............................................................................................................16

8 U.S.C. § 1225(a)(3)....................................................................................................16

8 U.S.C. § 1226.............................................................................................................16

8 U.S.C. § 1227.............................................................................................................16

8 U.S.C. § 1228.............................................................................................................16

8 U.S.C. § 1231.............................................................................................................16

8 U.S.C. § 1357(g)(1) ...................................................................................................14

8 U.S.C. § 1357(g)(9) ...................................................................................................14

8 U.S.C. § 1373.........................................................................................................9, 11

8 U.S.C. § 1373(a) ........................................................................................................11

8 U.S.C. § 1373(b) ........................................................................................................11

8 U.S.C. § 1644.........................................................................................................9, 12

**Federal Rules and Regulations**

8 C.F.R. § 287.7...............................................................................................................4

FED. R. EVID. 201(b) .......................................................................................................8

**New York City Administrative Code**

NYC Admin. Code § 9-131 ..............................................................................6, 16, 24

NYC Admin. Code § 9-205 .........................................................................3, 6, 16, 24

NYC Admin. Code § 10-178 ........................................................................7, 17, 24, 25

NYC Admin. Code § 14-154 ...............................................................................6, 16, 24

**Constitutional Provisions**

U.S. CONST. Amendment X ..................................................................................19

**New York City Charter Provisions**

NYC Charter § 396 ...............................................................................................1

**Other Authorities**

THE FEDERALIST No. 32...........................................................................................14

*Immigration Detainers*, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,
https://www.ice.gov/immigration-detainers ......................................................3, 4

NEW YORK CITY COUNCIL COMMITTEE ON IMMIGRATION, COMMITTEE REPORT AND
BRIEFING PAPERS OF THE JUSTICE DIV., Int. No. 2348 (June 9, 2021), available at
https://legistar.council.nyc.gov/View.ashx?M=F&ID=9486073&GUID=5029EE06
-F5F7-4737-92C1-BC1AEADB5284 ....................................................................4

NEW YORK CITY COUNCIL COMMITTEE ON IMMIGRATION, COMMITTEE REPORT OF THE
GOVERNMENTAL AFFAIRS DIV., Int. No. 982-A (Feb. 26, 2013), available at
https://legistar.council.nyc.gov/View.ashx?M=F&ID=2343261&GUID=C54531C
C-229D-4825-B519-A63D2D59DEF0.....................................................................5

NEW YORK CITY COUNCIL COMMITTEE ON IMMIGRATION, COMMITTEE REPORT OF THE
GOVERNMENTAL AFFAIRS AND HUMAN SERVS. DIVS., Int. No. 656-A (Nov. 2,
2011), available at
https://legistar.council.nyc.gov/View.ashx?M=F&ID=1599492&GUID=84188E2
C-4B64-4C67-A02F-C2789137C70C ................................................................4, 5

NEW YORK CITY COUNCIL COMMITTEE ON IMMIGRATION, COMMITTEE REPORT OF THE
GOVERNMENTAL AFFAIRS AND HUMAN SERVS. DIVS., Int. No. 2348 (Oct. 15,
2014), available at
https://legistar.council.nyc.gov/View.ashx?M=F&ID=3289149&GUID=36294E88
-06D7-4E8E-B90D-F14347207E3D ......................................................................4

NEW YORK CITY COUNCIL COMMITTEE ON IMMIGRATION, COMMITTEE REPORT OF THE
GOVERNMENTAL AFFAIRS AND HUMAN SERVS. DIVS., Int. Nos. 1568, 1566, 1578,
1579, 1558, 1569, 1565 (Apr. 26, 2017), available at
https://legistar.council.nyc.gov/View.ashx?M=F&ID=5131894&GUID=1CC4C3B
2-9E4B-4C5C-A82A-2E3E1EAC1965 ..................................................................5

## PRELIMINARY STATEMENT

This action brought by the United States against the City of New York aims to upend our federalist system of government. Plaintiff seeks to override the lawful policy choices of the City of New York and to conscript local officials into carrying out its aggressive federal immigration enforcement agenda. Plaintiff's claims of sweeping federal authority are lawless: neither federal immigration law nor the Constitution permits the United States to dictate how states and municipalities allocate their own resources.

The Complaint challenges several provisions of the New York City Administrative Code and a New York City Police Department Operations Order that limit the resources the City devotes to assisting with federal immigration enforcement: New York City Administrative Code ("Admin. Code") §§ 9-131, 9-205, 10-178, 14-154 and New York City Police Department Operations Order 4 (collectively, the "Challenged Provisions"). Plaintiff alleges that the Challenged Provisions are barred by the Constitution in three ways. In Count I, Plaintiff asserts that federal law preempts the Challenged Provisions because they "interfere with federal law[] and create obstacles to the enforcement of federal immigration law both on their face and as applied to the [f]ederal [g]overnment." Compl. ¶¶ 89, 90, 94, 105, 106. In Count II, Plaintiff asserts that the Challenged Provisions discriminate against the federal government. *Id.* ¶¶ 99, 110. And in Count III, Plaintiff asserts that the Challenged Provisions unlawfully regulate the federal government. *Id.* ¶¶ 101, 115.

Each of these counts must be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[1] First, the Complaint does not plead a cognizable preemption claim—

---

[1] City agencies are not suable entities, and thus, all claims against the New York City Department of Correction, New York City Probation Department, and New York Police Department must be dismissed. *See* New York City Charter § 396; *Nnebe v. Daus*, 644 F.3d 147, 158 n. 7 (2d Cir. 2011). In addition, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Accordingly, Mayor Eric Adams, New York City Council Speaker Adrienne E. Adams, and Commissioners Lynelle Maginley-Liddie, Juanita N. Holmes, and Jessica S. Tisch must also be dismissed from this case.

under any theory, whether express, conflict or field—because the federal statutes Plaintiff relies upon do not apply to private actors. Furthermore, the Complaint does not allege how the Challenged Provisions, which regulate how City agencies use their resources, conflict with federal immigration law. Indeed, there is no basis for a claim that Congress sought to force states and municipalities to assist with federal immigration enforcement. Federal immigration law casts the cooperation of states as voluntary. Second, the Complaint fundamentally misunderstands the intergovernmental immunity doctrine. An intergovernmental immunity claim arises when a local regulation either regulates or discriminates against the federal government. The Challenged Provisions do neither, as they do not single out federal officials for discriminatory treatment and do not regulate the federal government. Finally, both the preemption and intergovernmental immunity claims cannot circumvent the Tenth Amendment's anticommandeering doctrine, which serves as a bulwark against a federal government that would ignore the sovereign rights of local governments as it seeks to conscript them into its own regulatory agenda.

This action is one of several recent lawsuits brought by the United States to void similar state and local laws around the country.[2] And, unsurprisingly, the first district courts to opine on this series of lawsuits dismissed the complaints based on the same defects that are fatal to Plaintiff's complaint here. *See United States v. New York*, No. 25-cv-744, 2025 U.S. Dist. LEXIS 225875 (N.D.N.Y. Nov. 17, 2025) (dismissing similar claims of preemption, direct regulation, and discrimination); *United States v. Illinois*, No. 25-cv-1285, 2025 U.S. Dist. LEXIS 142735 (N.D.

---

[2] These cases are: *United States v. Illinois*, No. 25-cv-01285 (N.D. Ill. filed Feb. 6, 2025); *United States v. New York*, No. 25-cv-00205 (N.D.N.Y. filed Feb. 12, 2025); *United States v. City of Rochester*, No. 25-cv-06226 (W.D.N.Y. filed Apr. 24, 2025); *United States v. Colorado*, 25-cv-01391 (D. Colo. filed May 2, 2025); *United States v. City of Newark*, 25-cv-05081 (D.N.J. filed May 22, 2025); *United States v. New York*, No. 25-cv-00744 (N.D.N.Y. filed Jun. 12, 2025); *United States v. City of Los Angeles*, No. 25-cv-05917 (C.D. Cal. filed Jun. 30, 2025); *United States v. City of Boston*, No. 25-cv-12456 (D. Mass. filed Sep. 4, 2025); and *United States v. Minnesota*, No. 25-cv-03798 (D. Minn. filed Sep. 29, 2025).

Ill. July 25, 2025) (same). This Court should do the same and dismiss the Complaint in its entirety. For, "while Congress has many enumerated powers, and may even overtake state law, it may not wield States as federal tools." *Illinois*, 2025 U.S. Dist. LEXIS 142735, at *24.

## BACKGROUND

The City of New York has chosen to limit the resources that it devotes to assist the federal government with immigration enforcement. The Challenged Provisions reflect that policy choice.

Sections 9-131, 9-205, and 14-154 of the Admin. Code, each titled "Persons not to be detained," govern the procedure by which the New York City Department of Correction ("Department of Correction"), the New York City Department of Probation ("Department of Probation"), and the New York Police Department ("NYPD"), respectively, may honor civil immigration detainers. A civil immigration detainer is defined in these provisions as "a detainer issued pursuant to 8 CFR § 287.7 or any similar federal request for detention of a person suspected of violating civil immigration law." Admin. Code §§ 9-131(a)(1); 9-205(a); 14-154(a)(1). Typically, an immigration detainer is a request from United States Immigration and Customs Enforcement ("ICE") to a federal, state, or local law enforcement agency that has custody of an individual ICE seeks. An immigration detainer makes two requests: (1) that the law enforcement agency notify the requesting agency before a "removable" noncitizen is released and; (2) that the agency hold that person "for up to 48 hours beyond the time they would ordinarily release them so [the United States Department of Homeland Security] has time to assume custody in accordance with federal immigration law."[3]

---

[3] *Immigration Detainers*, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, https://www.ice.gov/immigration-detainers (last accessed Dec. 1, 2025).

The City's elected officials, recognizing that immigration detainers are voluntary, non-binding requests,[4] and that broadly honoring such detainers expends limited City resources and erodes public trust, enacted a series of local laws that limit the circumstances in which the Department of Correction, the Department of Probation, and the NYPD may honor these detainers. The overarching purpose of these local laws is "to keep immigrant families intact and rebuild the relationship between local law enforcement and immigrant New Yorkers"[5] and act as a "response to the federal government's increased reliance on local authorities to enforce immigration policy."[6] The City concluded that rebuilding this trust and demonstrating that City agencies and City officials were not merely an extension of the federal immigration enforcement apparatus was essential to protecting the health and safety of all of the City's residents. These local laws narrow the scope of civil immigration detainers that are honored by the City, while permitting cooperation with federal immigration authorities when there are public safety concerns and/or when required by federal law.

Of note, before the first of the Challenged Provisions was enacted in 2011, the City spent approximately $17 million dollars a year to honor immigration detainers.[7] Along with the significant financial cost to the City, the City Council found during its consideration of the legislation that a broad policy of honoring immigration detainers deeply eroded public trust in City

---

[4] *See id*; *see also* 8 C.F.R. § 287.7(a).

[5] N.Y. CITY COUNCIL COMM. ON IMMIGR., COMM. REP. OF THE GOVERNMENTAL AFFAIRS DIV., Int. No. 656-A, (Nov. 2, 2011), at 12, https://legistar.council.nyc.gov/View.ashx?M=F&ID=1599492&GUID=84188E2C-4B64-4C67-A02F-C2789137C70C (hereinafter the "Nov. 2, 2011 Report").

[6] N.Y. CITY COUNCIL COMM. ON IMMIGR., COMM. REP. AND BRIEFING PAPERS OF THE JUSTICE DIV., Int. No. 2348 (June 9, 2021), at 6, https://legistar.council.nyc.gov/View.ashx?M=F&ID=9486073&GUID=5029EE06-F5F7-4737-92C1-BC1AEADB5284.

[7] N.Y. CITY COUNCIL COMM. ON IMMIGR., COMM. REP. OF THE GOVERNMENTAL AFFAIRS DIV., Int. No. 486 (Oct. 15, 2014), at 3, https://legistar.council.nyc.gov/View.ashx?M=F&ID=3289149&GUID=36294E88-06D7-4E8E-B90D-F14347207E3D (hereinafter the "Oct. 15, 2014 Report").

law enforcement and City agencies with far-reaching consequences and without a corresponding benefit to public safety.[8] For example, the erosion of trust negatively affected immigrant victims' and witnesses' willingness to report crimes to the NYPD, especially domestic violence survivors who were reluctant to report abuse or press charges fearing that their family would be deported.[9]

While ICE's purported policy is to request immigration detainers for those convicted of crimes who pose a threat to public safety,[10] the City Council determined that many individuals who were transferred to ICE custody from City custody and put into deportation proceedings posed no risk to public safety.[11] For example, the City Council found that about half of these individuals in 2009 and 2010 had no criminal conviction.[12] In 2013, only 0.5% of the individuals held by the City pursuant to a detainer had a felony conviction.[13] By honoring immigration detainers wholesale, without the exercise of any discretion, the City Council found that limited local resources were often used to assist in the detainment and deportation of innocent New Yorkers, including long term legal permanent residents, juveniles, asylum seekers, and victims of human trafficking, domestic violence, and sexual assault.[14] To address these pressing concerns, the Challenged Provisions were adopted.

---

[8] Nov. 2, 2011 Report at 10–11.

[9] N.Y. CITY COUNCIL COMM. ON IMMIGR., COMM. REP. OF THE GOVERNMENTAL AFFAIRS DIV., Int. No. 982-A (Feb. 26, 2013), at 3, https://legistar.council.nyc.gov/View.ashx?M=F&ID=2343261&GUID=C54531CC-229D-4825-B519-A63D2D59DEF0; Nov. 2, 2011 Report at 10-11.

[10] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *supra* note 3.

[11] Nov. 2, 2011 Report at 10-11.

[12] *Id.* at 10.

[13] N.Y. CITY COUNCIL COMM. ON IMMIGR., COMM. REP. OF THE GOVERNMENTAL AFFAIRS AND HUMAN SERVS. DIVS., Int. Nos. 1568, 1566, 1578, 1579, 1558, 1569, 1565 (Apr. 26, 2017), at 13, https://legistar.council.nyc.gov/View.ashx?M=F&ID=5131894&GUID=1CC4C3B2-9E4B-4C5C-A82A-2E3E1EAC1965.

[14] Nov. 2, 2011 Report at 10.

As set forth in Admin. Code Sections 9-131, 9-205, and 14-154, the Department of Correction, Department of Probation, and NYPD may only honor a civil immigration detainer if: (1) they are presented "with a judicial warrant for the detention of the person who is the subject of such civil immigration detainer"; and (2) the person "has been convicted of a violent or serious crime"[15] within the past five years of the immediate arrest or "is identified as a possible match in the terrorist screening database." Admin. Code §§ 9-131; 9-205; 14-154. These laws further mandate that each agency provides annual reports detailing its cooperation with federal immigration enforcement. *Id.* The laws expressly state that they do not stand in conflict with federal law. *See* Admin. Code §§ 9-131(d); 9-205(d); 14-154(d).

Section 9-131, applicable to the Department of Correction, also contains subsection (h), entitled "Use of city land or facilities by federal immigration authorities and access to persons in custody," which prohibits federal immigration authorities from maintaining an office on land under the department's jurisdiction for the purpose of investigating possible civil immigration law violations. The legislation ensures that ICE does not have "any special status or special access to detainees different from the status or access given to other public agencies seeking interviews."[16] Subsection (h) further provides that department personnel cannot disclose to federal immigration authorities a person's incarceration status, release date, or court appearance date, or any other information related to persons in the department's custody, other than information related to a person's citizenship or immigration status, unless such disclosure (i) relates to a person who is convicted of a violent or serious crime or is a match in the terrorist screening database, (ii) is unrelated to the enforcement of civil immigration laws, or (iii) is otherwise required by law.

---

[15] Approximately 170 crimes qualify as a "violent or serious crime." *See* Admin. Code §§ 9-131(a)(2); 9-131(a)(7); 9-205(a); 14-154(a)(2); 14-154(a)(6).

[16] Oct. 15, 2014 Report at 21.

Plaintiff also challenges Section 10-178 of the Admin. Code and NYPD Operations Order Number 4. Section 10-178(b) delineates general limitations on the use of City resources to assist with federal immigration enforcement by providing that no City officer or employee can be subjected to the direction and supervision of the secretary of homeland security primarily in furtherance of immigration enforcement. Further, it states that City resources shall not be utilized for immigration enforcement and mandates that the City issue a quarterly report disclosing requests from non-local law enforcement for support or assistance with immigration enforcement. Admin. Code § 10-178(c)–(d). Like the other provisions, Section 10-178 expressly states that it does not stand in conflict with federal law. Admin Code § 10-178(e).[17] Finally, NYPD Operations Order Number 4, a copy of which is attached to the Complaint as Exhibit H (Dkt. No. 1-10), is not a law. It simply provides operational guidance to NYPD personnel and reminds them of City and state law, including Section 10-178. The order is consistent with the City's laws and policy to limit the use of local resources for the purpose of federal immigration enforcement.

## STANDARD OF REVIEW

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint will survive only where it pleads sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a court must "accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor," *Bruce Katz, M.D., P.C. v. Focus Forward, LLC*, 22 F.4th 368, 370 (2d Cir. 2022), it should not credit "mere

---

[17] Admin. Code § 10-178(e) states that "[n]othing in this section shall prohibit city officers and employees from performing their duties in accordance with state and local law by, including, but not limited to: (i) participating in cooperative arrangements with city, state, or federal law enforcement agencies that are not primarily intended to further immigration enforcement or utilizing city resources in connection with such cooperative arrangements and (ii) taking actions consistent with sections 9-205, 9-131, and 14-154. In addition, nothing in this section shall prevent any city officer or employee from complying with federal law or restrict their discretion to take any action if such restriction is prohibited by federal law."

conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nor is a court required to accept a plaintiff's legal conclusions as true. *See Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

In assessing the motion, a court may look to the facts alleged in the complaint, documents attached thereto or incorporated by reference, documents that are "integral" to the plaintiff's claims even if not expressly incorporated by reference, as well as matters of public record and documents in the plaintiff's possession, or that the plaintiff knew of or relied upon, in bringing suit. *Chambers v. Time Warner*, 282 F.3d 147, 152–53 (2d Cir. 2002); *Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 46–48 (2d Cir. 1991). In addition, a court may take judicial notice of facts that are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

## ARGUMENT
### I.   FEDERAL LAW DOES NOT PREEMPT THE CHALLENGED PROVISIONS

The doctrines of preemption and anticommandeering implicate one of the earliest questions underlying the foundation of our nation: how to distribute power between the states and the federal government. "[T]he Framers rejected the concept of a central government that would act upon and through the States, and instead designed a system in which the [s]tate and [f]ederal [g]overnments would exercise concurrent authority over the people." *Printz v. United States*, 521 U.S. 898, 919–20 (1997); *see also New York v. United States*, 505 U.S. 144, 162–66 (1992) (describing the Framers' competing plans regarding how the federal government should exercise its authority). As detailed below, these two doctrines weigh in favor of the City and mandate dismissal of the Complaint. The federal government's stark overreach, in attempting to undermine the will of the

citizens of the City of New York and to conscript City personnel and resources for immigration enforcement, is unsupported by the United States Constitution and prevailing case law.

## A.    The Complaint Fails to State a Preemption Claim[18]

Preemption can take three forms: Congress can enact a statute that expressly preempts state law (express preemption); compliance with both federal and state law is impossible (conflict preemption); or federal regulation in a single field is so pervasive that courts will infer Congress's intent to preempt state law (field preemption). *See Arizona v. United States*, 567 U.S. 387, 399–400 (2012). Nonetheless, "all [forms of preemption] work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy v. NCAA*, 584 U.S. 453, 477 (2018); *see also Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (same). This is because "the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States." *New York*, 505 U.S. at 166. Therefore, a federal statute must regulate private actors for it to have preemptive effect.

Here, Plaintiff claims that the Immigration and Nationality Act ("INA"), Section 434 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (codified at 8 U.S.C. § 1644), and Section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (codified at 8 U.S.C. § 1373) preempt the Challenged Provisions. However, Plaintiff's preemption arguments are all meritless. Moreover, even if Plaintiff had raised a valid preemption

---

[18] Plaintiff asserts both a facial and as-applied challenge to the Challenged Provisions. Compl. ¶ 85. To prevail on its facial challenge, Plaintiff "must 'establish that no set of circumstances exist under which the [Challenged Provisions] would be valid.'" *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 548 (2d Cir. 2023) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). "In other words, '[a] facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications.'" *Antonyuk v. James*, 120 F.4th 941, 983 (2d Cir. 2024) (quoting *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019)), *cert. denied*, 145 S. Ct. 1900 (2025).

claim, its attempt to use federal law to conscript City officers into the federal government's civil immigration enforcement efforts clearly runs afoul of the anticommandeering doctrine.

1.  There is No Express Preemption

"Express preemption 'occurs when Congress withdraws specified powers from the States by enacting a statute containing an express preemption provision.'" *Travis v. Navient Corp.*, 460 F. Supp. 3d 269, 279 (E.D.N.Y. 2020) (quoting *Wurtz v. Rawlings Co., LLC*, 761 F.3d 232, 238 (2d Cir. 2014)). "Preemption is always a matter of congressional intent." *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005) (citing *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152 (1982)). While the text of an express preemption statute contains evidence of Congress's preemptive intent, the presence of such a statute "does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 496 (2d Cir. 2023) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)). In assessing the scope of the displacement, express preemption statutes are to be "narrowly construed." *Jackson-Mau v. Walgreen Co.*, 652 F. Supp. 3d 349, 355 (E.D.N.Y. 2023), *aff'd*, 115 F.4th 121 (2d Cir. 2024). The Supreme Court has also clarified that an express preemption statute—as every other form of preemption—must "impose[] restrictions or confer[] rights on private actors" to be valid. *Murphy*, 584 U.S. at 477. Thus, a federal statute directed solely at governmental conduct cannot have valid preemptive effect.

Plaintiff argues that 8 U.S.C. §§ 1373 and 1644 expressly preempt the Challenged Provisions. Compl. ¶¶ 98, 105. Plaintiff is wrong. Both laws are clear that they solely regulate the policies of governments and government officials and, thus, they can have no preemptive effect. *See Ocean Cnty. Bd. of Comm'rs v. Attorney General of N.J.*, 8 F.4th 176, 181–82 (3d Cir. 2021); *Colorado v. United States*, 455 F. Supp. 3d 1034, 1059 (D. Colo. 2020).

Section 1373(a) states that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to . . . [DHS]¹⁹ information regarding the citizenship or immigration status, lawful or unlawful, of any individual." No part of this statute affects the actions of private citizens. Rather, the plain text of the statute proscribes "government entit[ies] or official[s]," 8 U.S.C. § 1373(a), from taking certain actions. *See Jackson-Mau*, 652 F. Supp. 3d at 355 ("[Express preemption's] scope is determined by preempting language's plain meaning."). Therefore, 8 U.S.C. § 1373(a) is not a valid preemptive provision—and cannot have preemptive effect—because it does not regulate private actors.

Section 1373(b) provides that no "person or agency" may prohibit or restrict a federal, state, or local government entity from sharing information about a person's immigration status with another government entity or maintaining that information. The use of the word "person," however, does not resolve Section 1373's private-actor problem as the word does not encompass individuals acting in their private capacity. *Cf. Murphy*, 584 U.S. at 479–80 (federal law prohibiting state authorization of sports gambling did not confer any federal rights or restrictions on private actors and thus, could not be understood as a regulation of private actors with preemptive effect). Indeed, the title of Section 1373 is "Communication between *government agencies* and the INS," while the heading of subsection (b) is "Additional Authority of *Government Entities*" (emphasis supplied). No person in their private capacity is empowered to enforce restrictions on a federal, state, or local government. *See Ocean Cnty. Bd. of Comm'rs*, 8 F.4th at 182. To hold otherwise would permit private citizens to impinge on the sovereignty of federal and state governments. Recognizing this fact, several courts have found that, the use of "person"

---

¹⁹ After the enactment of the INA, Congress transferred several functions from the U.S. Immigration and Naturalization Service ("INS"), including border patrol and the detention and removal of noncitizens, to DHS. *See* 6 U.S.C. § 251.

notwithstanding, Section 1373(b) does not regulate private actors. *See, e.g.*, *Illinois*, 2025 U.S. Dist. LEXIS 142735, at *41 n.14; *Colorado*, 455 F. Supp. 3d at 1059; *Oregon v. Trump*, 406 F. Supp. 3d 940, 972 (D. Or. 2019). Accordingly, Section 1373(b) is not a valid preemption provision.

Section 1644 is substantively the same as Section 1373 and is not a valid preemption statute for the same reason.[20] Per Section 1644, "no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from [DHS] information regarding the immigration status . . . of an alien in the United States." After the Supreme Court's decision in *Murphy*, all federal statutes must affect private actors to have preemptive effect. *See* 584 U.S. at 479. Section 1644 simply does not regulate private actors, and therefore it cannot serve as a basis for preemption.

Plaintiff's express preemption claim is also wholly inadequate because the Complaint does not allege how Sections 1373 and 1644 preempt the Challenged Provisions. As alleged, the Challenged Provisions limit the circumstances in which the Department of Correction, the Department of Probation, and the NYPD may honor civil immigration detainers, and generally limit the use of City resources for federal immigration enforcement. Yet, the Complaint does not allege how 8 U.S.C. §§ 1373 and 1644 *expressly* preempt these local laws. "Invoking some brooding federal interest . . . should never be enough to win preemption of a state law; a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality opinion) (quoting *Puerto Rico Dep't of Consumer Affairs v. ISLA Petroleum Corp.*, 485 U.S. 495, 503 (1988)). Nor could the Complaint make the necessary allegations, as the cited federal statutes

---

[20] Several courts have analyzed 8 U.S.C. §§ 1373 and 1644 together without distinction. *See, e.g.*, *City of Chicago v. Barr*, 961 F.3d 882, 888 (7th Cir. 2020) (stating the provisions "contain[] essentially the same language"); *Oregon*, 406 F. Supp. 3d at 952 (calling the provisions "functionally equivalent"); *City of L.A. v. Sessions*, No. CV 18-7347-R, 2019 U.S. Dist. LEXIS 81254, at *12 n.1 (C.D. Cal. Feb. 15, 2019) (applying its analysis of § 1373 to § 1644).

plainly do not apply to private actors, a prerequisite for a preemption finding. *See Murphy*, 584 U.S. at 477. Thus, Plaintiff has failed to plead a plausible express preemption claim.

2. There is No Conflict Preemption

As noted above, the private actor requirement applies to all forms of preemption, not just express preemption. Accordingly, as Sections 1373 and 1644 do not regulate private actors, this Court's consideration of Plaintiff's conflict preemption claim (along with field preemption) may end there with respect to those statutes. However, even if the private actor requirement was satisfied (which it is not), Plaintiff cannot establish that the Challenged Provisions impermissibly conflict with federal law.

Conflict preemption occurs where "compliance with both federal and state regulations is a physical impossibility," or "the challenged [] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (cleaned up). But a conflict preemption analysis starts with the presumption that Congress did not intend to displace state law. *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009). This is particularly true, as is the case here, when a local government's police powers are at issue. Indeed, it is well settled that "a local government's legislative exercise of historic police powers of the State is not to be superseded by a federal statute unless it was the clear and manifest purpose of Congress to do so."[21] *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (cleaned up); *see also N.Y. State Telecomms. Ass'n v. James*, 101 F.4th 135, 148 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 984 (2024); *Steel Inst. of N.Y. v. City of New York*, 716 F.3d 31, 36 (2d Cir. 2013).

---

[21] Police powers are the general exercise of governmental authority and have "traditionally encompassed 'the authority to provide for the public health, safety, and morals.'" *Doe v. Franklin Square Union Free Sch. Dist.*, 568 F. Supp. 3d 270, 273 (E.D.N.Y. 2021) (quoting *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991)); *United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."). Clearly the Challenged Provisions are an exercise of the City's police powers.

To determine whether a state or local statute is conflict preempted, courts must "examin[e] the federal statute as a whole and identify[] its purposes and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000); *see also N.Y. Pet Welfare Ass'n v. City of New York*, 850 F.3d 79, 87 (2d Cir. 2017) (The party claiming preemption "must show that the conflict between the federal and state laws is so direct and positive that the two cannot be reconciled or consistently stand together") (citation omitted). An obstacle is not found by a "mere possibility of inconvenience in the exercise of powers, but an immediate constitutional repugnancy that can by implication alienate and extinguish a pre-existing right of [state] sovereignty." *Goldstein v. California*, 412 U.S. 546, 555 (1973) (alteration in original) (citing THE FEDERALIST No. 32, at 243 (Hamilton) (B. Wright ed., 1961)).

In its Complaint, Plaintiff alleges that the Challenged Provisions conflict with federal law because they obstruct the federal government's detention of noncitizens who have been charged with or committed certain offenses, require federal immigration enforcement agents to obtain a judicial warrant before City officials honor a civil detainer request, prevent federal immigration agents from accessing City facilities, and prevent City officials from notifying federal immigration authorities of a noncitizen's release from City custody. *See* Compl. ¶¶ 90–95. These allegations, though, are premised on a fundamental misunderstanding of the federal and City statutes at issue.

First, Plaintiff inappropriately equates the City's decision not to participate in immigration enforcement with obstruction of the INA. Yet, the INA gives states and localities the *option* to participate in immigration enforcement by entering into agreements with the Attorney General. 8 U.S.C. § 1357(g)(1). States and localities are not required to enter into these agreements. *See id.* at (g)(9); *see also Galarza v. Szalczyk*, 745 F.3d 634, 640 (3d Cir. 2014) ("[N]o provisions of the [INA] authorize federal officials to command local or state officials to detain suspected aliens

- 14 -

subject to removal."). Here, the City of New York has elected to direct its limited resources in a manner that ensures the public health, safety and welfare of its citizens. That includes having its law enforcement personnel focus on fighting crime, rather than assisting the federal government with its civil immigration enforcement responsibilities. And critical to that objective is ensuring that its immigrant community members trust that when they call 911, or they cooperate as a witness in a criminal investigation, that City personnel will not turn them over to ICE.

Plaintiff's argument that the City's detainer policy obstructs federal law is the clearest example of how it improperly conflates abstaining from immigration enforcement with obstructing it. Plaintiff claims that the Challenged Provisions conflict with DHS's statutory obligation to detain noncitizens. *See* Compl. ¶¶ 71, 79–80, 90–92. They do not. Detainers are merely "requests," as Plaintiff admits. *See, e.g.*, *id.* at ¶¶ 9, 10, 30, 57, 86; *see also Castaneda v. Cnty. of Suffolk*, No. 17-cv-4267, 2025 U.S. Dist. LEXIS 26726, at *36–37 (E.D.N.Y. Jan. 2, 2025) ("[W]hether a local law enforcement agency assists ICE in its apprehension of aliens pursuant to the INA is voluntary."). As such, the City is free to decline such requests or—as Admin. Code §§ 9-131(b), 9-205(b), and 14-154(b) require—honor them in defined circumstances when accompanied by a judicial warrant.[22]

The Challenged Provisions simply establish the conditions under which a detainer request will be honored; they do not prevent DHS from taking any actions it is authorized to take under

---

[22] New York law "does not authorize state and local officers to effectuate warrantless arrests for civil immigration law violations." *People ex rel. Wells v. DeMarco*, 168 A.D.3d 31, 43 (2d Dep't 2018); *see also Castaneda*, 2025 U.S. Dist. LEXIS 26726, at *36 (endorsing *Wells'* reasoning). New York law authorizes the issuance of arrest warrants in civil matters, like immigration enforcement, only where the issuing authority is a "judicial or quasi-judicial officer of the court." *Wells*, 168 A.D.3d at 42. In addition, federal and New York courts have found local jails can be sued under the Fourth Amendment if they hold immigrants on ICE detainers that are not supported by probable cause. *See, e.g.*, *Morales v. Chadbourne*, 793 F.3d 208, 215–18 (1st Cir. 2015); *Abriq v. Hall*, 295 F. Supp. 3d 874, 879–81 (M.D. Tenn. 2018); *Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 944–46 (D.C. Minn.); *People ex rel. Swenson v. Ponte*, 46 Misc. 3d 273, 278 (Sup. Ct. Kings Cnty. 2014). Therefore, the City's requirement that it will only honor a civil detainer request issued with a judicial warrant also safeguards the City against inadvertent violations of New York law and/or the Fourth Amendment.

federal law. Accordingly, the City's determination to honor detainer requests only under defined circumstances falls far short of obstruction "so direct and positive" that the Challenged Provisions and federal law cannot be "reconciled or consistently stand together." *N.Y. Pet Welfare Ass'n*, 850 F.3d at 87.

Second, Plaintiff's insistence that Admin. Code § 9-131(h) prevents federal immigration agents from accessing City facilities also does not support its conflict preemption claim. *See* Compl. ¶ 94. Section 9-131(h) merely limits the use of City employees' time and the Department of Correction's resources for civil immigration enforcement (which, as noted above, the City is entitled to do as cooperation in immigration enforcement is entirely voluntary). It does not prevent DHS from inspecting noncitizens for admission into the country. *See* 8 U.S.C. § 1225(a)(3). Therefore, there is no conflict between this provision and DHS's statutory responsibilities, let alone one so "direct and positive" that it could constitute a valid conflict preemption claim. *N.Y. Pet Welfare Ass'n*, 850 F.3d at 87.

Third, to the extent the federal government claims that Admin. Code §§ 9-131 and 14-154 impermissibly frustrate 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, and 1231, *see* Compl. ¶¶ 48, 55, it is mistaken. These federal statutes either establish criteria that would render noncitizens ineligible for entry into the country or impose obligations on federal officials. On their face, neither of the cited Admin. Code provisions touch on these subjects.

It bears noting that each of the Admin. Code provisions that Plaintiff challenges explicitly instructs that the provision shall not be applied in a way that would create a "power, duty or obligation" in conflict with federal law, §§ 9-131(d), 9-205(d), 14-154(d), or that "nothing in this section shall prevent any city officer or employee from complying with federal law or restrict their

discretion to take any action if such restriction is prohibited by federal law," § 10-178(e). Thus, the plain text of these provisions avoids the conflict that Plaintiff alleges.

In the end, Plaintiff's conflict preemption allegations have a common theme: it would be easier for the federal government to pursue its immigration enforcement priorities if the City would assist its efforts. But the obstacle giving rise to conflict preemption cannot be the "mere possibility of inconvenience in the exercise of [a state or locality's] powers." *Goldstein*, 412 U.S. at 555. As several circuit courts have already found, a state or local government entity is not bound by the government's "hope or expectation" of assistance. *McHenry Cnty. v. Raoul*, 44 F.4th 584, 592 (7th Cir. 2022); *see also United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019); *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018); *Galarza*, 745 F.3d at 643–44. The City is free to decline the federal government's offer to participate in civil immigration enforcement as it fulfills its own law enforcement responsibilities. *See Kansas*, 589 U.S. at 212 (holding, in the context of state law enforcement against noncitizens, that "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for [conflict] preemption"). And, as evidenced by the Challenged Provisions, the citizens of the City of New York have made their preference clear—they do not want City resources expended on assisting with civil immigration enforcement, which is the responsibility of the federal government.

3. There is No Field Preemption

Plaintiff's half-hearted attempt to allege field preemption in this case fails as a result of clear Supreme Court precedent. Field preemption occurs where "federal law occupies a field of regulation so comprehensively that it has left no room for supplementary state legislation." *Murphy*, 584 U.S. at 479 (cleaned up). However, field preemption is "rare." *Kansas*, 589 U.S. at 208; *see also James*, 101 F.4th at 147. As with conflict and express preemption, courts start with

- 17 -

the assumption that a state's police powers are not superseded by federal law unless the party claiming preemption shows that the "complete ouster of state power . . . was 'the clear and manifest purpose of Congress.'" *De Canas v. Bica*, 424 U.S. 351, 357 (1976) (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146 (1963)). Moreover, courts will only find field preemption in a "narrow subfield[]" that Congress has occupied. *James*, 101 F.4th at 147 (characterizing the claim that the Communications Act of 1934 preempted all state regulation of interstate communication services as "quite stunning").

The Complaint contains one generic reference to "occupy[ing] the field" in paragraph 105. However, Plaintiff does not even clearly identify what the field is. To the extent that Plaintiff now argues that federal law preempts the entire field of immigration (*see* Dkt No. 13, Plaintiff's Pre-Motion Letter Response, dated Sept. 17, 2025, at 2), it is nothing more than a talismanic invocation of "some brooding federal interest" in immigration enforcement. *Va. Uranium*, 587 U.S. at 767 (plurality opinion); *cf. Arizona*, 567 U.S. at 401 (holding that "the Federal Government has occupied the field of alien *registration*") (emphasis added). But this invocation is insufficient to displace a state or locality's historic and inherent police powers, particularly in the context of law enforcement and public safety.

In any event, and more fundamentally, the Challenged Provisions are not within the scope of the purportedly occupied field, because they do not regulate immigration. Rather, they seek to ensure that the City allocates its resources in an efficient manner that reflects the priorities of its citizens. *See supra* BACKGROUND.

**B.**    **Plaintiff's Preemption Claim Runs Afoul of the Anticommandeering Doctrine**

Plaintiff's preemption claim must fail for an independent and fundamental reason: enforcement of federal law to compel the City's participation in immigration enforcement would violate the anticommandeering doctrine rooted in the Tenth Amendment.

The Tenth Amendment provides, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X; *see also United States v. Darby*, 312 U.S. 100, 124 (1941) ("The amendment states but a truism that all is retained which has not been surrendered."). The anticommandeering doctrine "is simply the expression of a fundamental structural decision incorporated in the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the states." *Murphy*, 584 U.S. at 470. Under the anticommandeering doctrine, "[t]he Federal Government may not command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Murphy*, 584 U.S. at 473 (cleaned up); *see also New York*, 505 U.S. at 166 ("We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.").

Plaintiff's interpretation of federal law simply cannot be squared with the anticommandeering doctrine. The Complaint alleges that the INA and associated provisions of federal law require the City to honor civil immigration detainer requests with or without a judicial warrant, Compl. ¶¶ 80, 92; provide federal authorities with access to its detention facilities, *id.* at ¶¶ 79, 93; and provide the release dates of noncitizens to DHS, *id.* Each of these actions, however, would require the City to expend its resources in service of the federal government's immigration enforcement responsibilities. The anticommandeering doctrine forbids such conscription. *See, e.g.*,

- 19 -

*Murphy*, 584 U.S. at 471 ("[C]onspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States."); *Printz*, 521 U.S. at 925 ("[T]he Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs"). Indeed, in considering whether the INA permitted New York law enforcement officers to arrest noncitizens without a judicial warrant, New York courts have highlighted that imputing such preemptive authority to the INA would raise Tenth Amendment concerns. *See Castaneda*, 2025 U.S. Dist. LEXIS 26726, at *36–37; *Wells*, 168 A.D.3d at 52.

In *United States v. New York*, the Northern District of New York recently found that the anticommandeering doctrine provides New York with a "permissible choice not to participate in federal civil immigration enforcement." 2025 U.S. Dist. LEXIS 225875 at *51. There, the court found, among other things, that requiring New York to allow ICE agents access to New York courthouses would "[c]ompel[] New York to allow federal immigration authorities to reap the benefits of the work of state employees" and that this is "no different than permitting the federal government to commandeer state officials directly in furtherance of federal objectives." *Id.* at *53; *see also United States v. Illinois*, 2025 U.S. Dist. LEXIS 142735, at *46 (holding that Sections 1373 and 1644 impermissibly "invert[] the structure of state and local governance" by stripping states and localities of control over their own employees' actions and instead permitting line-level employees to decide whether to communicate with DHS). The same is true here.

Second Circuit precedent does not compel a different conclusion. In *City of New York v. United States*, the Second Circuit previously found that, on its face, neither 8 U.S.C. §§ 1373 nor 1644 implicated the anticommandeering doctrine. 179 F.3d 29 (2d Cir. 1999). However, the holding in that 1999 case turned on the fact that Sections 1373 and 1644 prohibited states and localities from taking certain actions, which the court contrasted with the statutes at issue in *Printz*

and *New York* requiring states and localities to affirmatively take certain actions. *City of New York*, 179 F.3d at 34–35; *see also id.* at 37 ("Essentially, the foregoing discussion relating to the power of states to command passive resistance to federal programs governs the analysis here."). The Supreme Court's subsequent decision in *Murphy* abrogated this distinction, reasoning: "[i]t was a matter of happenstance that the laws challenged in *New York* and *Printz* commanded 'affirmative' action as opposed to imposing a prohibition. The basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event." 584 U.S. at 475. *Murphy*'s reasoning is particularly relevant because the statute at issue in *Murphy* functioned in the exact same manner as Sections 1373 and 1644; the former barred states and localities from authorizing sports gambling while the latter bars states and localities from controlling their communications with federal officers. Therefore, *City of New York*'s analysis is no longer valid after *Murphy*.

After *Murphy*, the Second Circuit in *New York v. United States Dep't of Justice* analyzed Sections 1373 and 1644 but cabined its holding to the federal government's authority under the Spending Clause to place terms on federal grants. *See* 951 F.3d 84, 114–16 (2d Cir. 2020). In that case, the Second Circuit found that Congress's conditioning of the Edward Byrne Memorial Justice Assistance Grant Program funds on compliance with 34 U.S.C. § 10153(a) was a lawful exercise of its Spending Clause power and did not violate the anticommandeering doctrine. *Id.* at 114–16. This analysis focused on Congress's spending power and the construction of the statute, *i.e.*, whether the conditions were authorized; it did not address preemption. Because the Second Circuit found that the funding loss at issue was not sizable enough to raise coercion concerns, it concluded New York had a "legitimate choice" whether to accept the federal grants conditioned on compliance with Section 1373 or to turn down the grant money. It thus concluded that states and

local governments were not compelled to cooperate with the federal immigration conditions set by the Attorney General—they could simply opt out. *Id.* at 115–16.

This case, by contrast, is not about receipt of federal funds, but rather seeks an injunction barring enforcement of the Challenged Provisions. The City has made the considered choice to refrain from expending its resources to participate in federal immigration enforcement. Unlike in *New York v. U.S. Dep't of Justice*, where the Second Circuit found that there was no anticommandeering concern with the funding conditions because the City had a "legitimate choice" whether to accept such conditions, here Plaintiff openly argues that the City should have no choice. This is precisely what *Murphy* found to be unconstitutional.

Other courts have addressed this issue over the past several years and have concluded that an attempt by the federal government to use Sections 1373 and 1644 to prohibit states and local governments from opting out of participating in federal immigration enforcement would violate the anticommandeering doctrine. *See City and Cnty. of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1194–96 (N.D. Cal. 2025); *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 376–79 (D.N.J. 2020), *aff'd on other grounds sub nom.*, *Ocean Cnty. Bd. of Comm'rs v. Attorney General of N.J.*, 8 F.4th 176 (3d Cir. 2021); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 329–31 (E.D. Pa. 2018), *aff'd on other grounds*, 916 F.3d 276 (3d Cir. 2019).

At bottom, the Court need not reach the serious anticommandeering concerns raised by Plaintiff's Complaint because the Challenged Provisions are not preempted by federal law. However, even if preemption were implicated, requiring the City to spend its resources to participate in civil immigration enforcement would necessarily conscript the City into implementing a federal regulatory program—an outcome clearly prohibited by *Printz* and *Murphy*.

*     *     *

Plaintiff has failed to state any sort of preemption claim. Its express preemption allegation relies solely on statutes that do not—and cannot—have preemptive effect. Its assertion of conflict preemption depends on a manufactured conflict between the Challenged Provisions and federal law that does not exist. Its field preemption claim mischaracterizes the Challenged Provisions as immigration regulations when they are not. And even if these claims had merit, Plaintiff's attempt to leverage the INA and the Supremacy Clause to strong-arm the City into participating in immigration enforcement would violate the Tenth Amendment. Thus, Count I must be dismissed.

## II.   PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER THE INTERGOVERNMENTAL IMMUNITY DOCTRINE

The intergovernmental immunity doctrine prohibits state laws that (1) directly regulate the federal government or (2) discriminate against it. *United States v. Washington*, 596 U.S. 832, 838 (2022) ("*Washington II*"); *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion). The doctrine is a narrow restraint, however, and does not prohibit state or local laws that only incidentally affect federal operations. Indeed, the Supreme Court has affirmed that "[n]either the Supremacy Clause nor the Plenary Powers Clause bars all state regulation which may touch the activities of the [f]ederal [g]overnment." *Hancock v. Train*, 426 U.S. 167, 179 (1976).

The intergovernmental immunity doctrine has no application to the Challenged Provisions. Plaintiff has not—and cannot—allege that these provisions impose requirements on federal officers or single out federal activities for differential treatment. To the contrary, these provisions are directed solely at City agencies and employees. They address how the City allocates its own resources and personnel, leaving federal authorities free to carry out their functions using federal personnel and resources. *See supra*, BACKGROUND. Though the Complaint alleges that the Challenged Provisions make immigration enforcement more difficult, that is irrelevant; the

- 23 -

intergovernmental immunity doctrine does not obligate municipalities to assist with federal immigration enforcement. Accordingly, both Counts II and III must be dismissed.

## A.    The Challenged Provisions Do Not Regulate the Federal Government

A local law directly regulates the federal government only when it "places a prohibition on the [f]ederal [g]overnment," *Hancock*, 426 U.S. at 180, or "impose[s] a tax 'directly upon the United States,'" *McHenry Cnty.*, 44 F.4th at 592  (quoting *United States v. New Mexico*, 455 U.S. 720, 733 (1982)). To determine whether local laws directly regulate the federal government, courts look to what entity the laws "operate against" and whether there is "direct interference" with the federal government. *North Dakota*, 495 U.S. at 437 (Scalia, J., concurring). To constitute direct interference, the local laws must regulate "the performance, by federal officers and agencies, of governmental functions." *Penn Dairies v. Milk Control Comm'n of Pa.*, 318 U.S. 261, 269 (1943). As the Seventh Circuit has explained, while "States may not regulate the federal government directly," a regulation prohibiting state or local government cooperation with the federal government "regulates only State and local entities and law enforcement—not the federal government." *McHenry Cnty.*, 44 F.4th at 592–93.

The Challenged Provisions regulate only City employees and resources. None of the Challenged Provisions directs the conduct of federal officers or agencies. Their plain text applies solely to the conduct of *City* agencies and officials, and the provisions detail the circumstances in which *City* officials may spend time and resources assisting the federal government with immigration enforcement. *See* Admin. Code §§ 9-131, 9-205, and 14-154 (directed at the Department of Correction, the Department of Probation, and the NYPD, respectively); Admin. Code § 10-178 (directed at City agencies); NYPD Operations Order No. 4 (directed at the NYPD). For example, Section 10-178 states, in part, that "[n]o [city] agency shall subject its officers or

- 24 -

employees to the direction and supervision of the secretary of homeland security primarily in furtherance of immigration enforcement," and "[n]o city resources, including, but not limited to, time spent by employees, officers, contractors, or subcontractors while on duty, or the use of city property, shall be utilized for immigration enforcement." As the text makes clear, the provision neither prevents nor forbids the federal government from carrying out its immigration mandate.

Plaintiff nevertheless alleges that the Challenged Provisions regulate the government by directing City officials to "refus[e] to honor civil detainers and warrants expressly authorized by Congress[,]" and restricting access to City detention facilities by federal officers. Compl. ¶¶ 113–14. In other words, Plaintiff complains about the City's decision to refrain from taking actions that are not, and cannot be, required. The Complaint further alleges these regulations "reject[] congressionally authorized means of enforcing federal immigration law" which "constitute[s] . . . direct regulation of the [f]ederal [g]overnment." Compl. ¶ 101. Aside from these bald and conclusory statements—which in any event concern the ways the Challenged Provisions affect the conduct of City employees—the Complaint does not even attempt to allege that these laws regulate the conduct of the federal government. For this reason alone, Count III should be dismissed.

Lacking a theory of direct regulation, Plaintiff repeatedly complains that it is more challenging and expensive to enforce immigration laws if the City will not voluntarily assist it. *See, e.g.*, Compl. ¶¶ 7, 8, 86, 88, 93, 95, 96. That is insufficient to state a claim as a matter of law. Whether the Challenged Provisions offer or withhold local assistance for the federal government's pursuit of its own civil immigration priorities is not a factor under the operative caselaw: the Supreme Court has decisively rejected the argument "that any state regulation which indirectly regulates the [f]ederal [g]overnment's activity is unconstitutional." *North Dakota*, 495 U.S. at 434 (citations omitted). Originally, the intergovernmental immunity doctrine was understood as

- 25 -

"barring any state law whose 'effect . . . was or might be to increase the cost to the Federal Government of performing its functions,'" but the doctrine has since evolved to require direct regulation or discrimination against the federal government. *Washington II*, 596 U.S. at 838 (citing *United States v. Cnty. of Fresno*, 429 U.S. 452, 460 (1977)); *see also New York v. Pa. Higher Educ. Assistance Agency*, No. 19-cv-9155, 2020 U.S. Dist. LEXIS 77655, at *20 (S.D.N.Y. May 1, 2020) ("The Supreme Court has 'thoroughly repudiated' the view that 'any state regulation which indirectly regulates the federal government's activity is unconstitutional.'") (quoting *North Dakota*, 495 U.S. at 434–35). Even prior to *North Dakota*, the Second Circuit has recognized that the effect of an economic burden on governmental functions is "not a sufficient basis for sustaining a claim of immunity." *Goldin v. Baker*, 809 F.2d 187, 191 (2d Cir. 1987) (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978)). These alleged burdens are merely the "normal incidents of the operation . . . of a dual system of government." *Penn Dairies*, 318 U.S. at 271.

The Northern District of Illinois recently found that similar sanctuary policies did not violate the intergovernmental immunity doctrine. *Illinois*, 2025 U.S. Dist. LEXIS 142735. The court explained that, like the Challenged Provisions, the sanctuary laws at issue there "control[] the actions of [Illinois'] own agents and agencies" and therefore do not "regulate ICE operations or meddle with the contractual rights of private individuals working with ICE." *Id.* at *75–76. The same is true here: the Challenged Provisions "simply decline to ease the burden of civil immigration enforcement by permitting . . . local government agents to assist." *Id.* at *72–73.

The *Illinois* court cited the Seventh Circuit's decision in *McHenry County*, which is likewise instructive. *McHenry County* considered a state law that prohibited local governments from contracting with the federal government to detain immigrants. 44 F.4th at 586. Applying the Supreme Court's "direct regulation" analysis, a unanimous panel found that the state law

- 26 -

"impose[d] no direct regulation on any federal official or agency" even though the intended "consequence of the [state law] . . . [wa]s that the federal government will not be able to use cooperative agreements to house immigration detainees in [state or local] facilities." *Id.* at 592–93 (first citing *North Dakota*, 495 U.S. at 434; then citing *Hancock*, 426 U.S. at 180). The panel concluded that "[the Illinois law] directly regulate[d] only State and local entities and law enforcement—not the federal government." 44 F.4th at 593.

Here, because the Challenged Provisions control the conduct of City actors alone, they do not directly regulate the federal government, regardless of any downstream consequences for the federal government.[23] While the Challenged Provisions may "indirectly affect ICE's operations in [the City], they directly regulate only state and local law enforcement entities." *Illinois*, 2025 U.S. Dist. LEXIS 142735, at *74. And any such indirect effect on the federal government does not give rise to an intergovernmental immunity claim. *See North Dakota*, 495 U.S. at 435; *Hancock*, 426 U.S. at 179. At bottom, the Challenged Provisions regulate only City personnel and resources, not the federal government. Plaintiff does not (and cannot) allege that the Challenged Provisions regulate the federal government, and Count III must accordingly be dismissed.

**B.      The Challenged Provisions Do Not Discriminate Against the Federal Government**

Plaintiff's discrimination claim fares no better. A locality "does not discriminate against the [f]ederal [g]overnment . . . unless it treats someone else better than it treats them." *Washington v. United States*, 460 U.S. 536, 544–45 (1983) ("*Washington I*"). That a regulation "affects an

---

[23] Plaintiff's pre-motion letter relies on *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315 (3d Cir. 2025), to urge a different result. Dkt. No. 13, at 3. *CoreCivic* dealt with a state law that prohibited local governments and private parties from contracting with the federal government to detain persons for civil immigration violations. However, as the dissent explained, the majority did not correctly apply the direct regulation test. *See id.* at 332–42 (Ambro, J., dissenting). The *CoreCivic* majority also relied on the federal government's right to choose "how and through whom [it] will carry out a core federal function," *id.* at 325, which is not a consideration here because the federal government has no such right when it comes to state and local actors under the Tenth Amendment. *See supra*, Section I(B).

exclusively federal domain" is insufficient to state an intergovernmental immunity claim, absent a showing of disparate treatment of "similarly situated" actors. *See McHenry Cnty.*, 44 F.4th at 594. "[F]ailure to identify a comparator ends the inquiry." *United States v. New York*, 2025 U.S. Dist. LEXIS 225875, at *48; *see also Illinois*, 2025 U.S. Dist. LEXIS 142735, at *70 ("[A] comparator is necessary.").

The Complaint fails to allege that the Challenged Provisions treat any other class better than the federal government. Indeed, although the Complaint makes the conclusory assertion that the Challenged Provisions "single out federal immigration authorities . . . for unfavorable and uncooperative treatment when other law enforcement officials are not so treated," Compl. ¶ 109, Plaintiff fails to plead who these unspecified law enforcement officials are. In fact, Plaintiff's pre-motion letter appears to abandon the allegation that a comparable law enforcement agency exists. *See* Dkt No. 13, at 3 (stating that "[b]ecause only 'federal immigration authorities' have the power to carry out civil immigration enforcement, there can be no 'similarly situated' entity."). In any event, such a conclusory assertion is fatally deficient. Plaintiff cannot plead a discrimination claim without alleging that a specific comparator was treated more favorably. *See Washington I*, 460 U.S. at 544–45 (explaining that a state or locality "does not discriminate against the [f]ederal [g]overnment . . . unless it treats someone else better than it treats them"); *McHenry Cnty.*, 44 F.4th at 594 (explaining that it is insufficient to allege that a challenged provision "affects an exclusively federal domain"—no discrimination claim lies absent a showing of disparate treatment of "similarly situated" actors); *Illinois*, 2025 U.S. Dist. LEXIS 142735, at *71 (dismissing the government's discrimination claim because the complaint did not "identif[y] any specific [non-federal] law enforcement agency or explain[] how it is similarly situated to ICE").

Other courts have dismissed similar discrimination claims where the federal government failed to establish that state and local laws treated similarly situated agencies differently. For example, in *County of Ocean v. Grewal*, the court rejected a claim that the New Jersey Attorney General discriminated against the federal government by issuing a directive limiting local, state, and county cooperation with federal civil immigration enforcement. 475 F. Supp. 3d at 361, 364–65. The court concluded that neither the plaintiff, nor the federal government as *amicus*, "suggested that New Jersey permits its law enforcement to share nonpublic personal identifying information or [an] inmate's release dates with any similarly situated law enforcement agency." *Id.* at 385. The *Illinois* court rejected a nearly identical discrimination claim to that asserted here because Plaintiff failed to identify "any specific law enforcement agency" that the challenged provisions treated more favorably or explain how such an agency "is similarly situated to ICE." *Illinois*, 2025 U.S. Dist. LEXIS 142735, at *75. Moreover, the court held that a state or local entity's "refusal to cooperate in the immigration context—a possibility contemplated by the relevant federal statutes—does not constitute discrimination against the federal government." *Id.* (quoting *McHenry Cnty.*, 44 F.4th at 594 n.7). And most recently, following *Illinois*, the Northern District of New York found that state executive orders did not discriminate against the federal government merely because they declined to ease the federal government's burden of civil immigration enforcement. *United States v. New York*, 2025 U.S. Dist. LEXIS 225875, at *48–49. The same result is warranted here. Accordingly, Count II must be dismissed.

## C. Plaintiff's Intergovernmental Immunity Claims Also Fail Under the Anticommandeering Doctrine

In addition to their other shortcomings, Plaintiff's intergovernmental immunity claims, if accepted, would also violate the Tenth Amendment's anticommandeering doctrine. Were the Court to allow Plaintiff's claims, the City would be required to affirmatively assist the federal

government in enforcing immigration laws. For the reasons discussed in more detail *supra*, Section I(B), such an outcome would run head-first into the Tenth Amendment's anticommandeering doctrine.

The intergovernmental immunity doctrine does not give the federal government license to infringe upon a state or local government's Tenth Amendment rights. *See California*, 921 F.3d at 891 (holding that even if a state singles out the federal government by refusing to assist its immigration enforcement efforts, such a decision is within the state's Tenth Amendment rights); *see also United States v. New York*, 2025 U.S. Dist. LEXIS 225875, at *53 ("Finding that these same provisions constitute discrimination or impermissible regulation would provide an end-run around the Tenth Amendment. It would allow the federal government to commandeer states under the guise of intergovernmental immunity – the exact type of direct regulation of states barred by the Tenth Amendment."); *Illinois*, 2025 U.S. Dist. LEXIS 142735, at *76 (same).

As explained *supra*, Section I(B), the anticommandeering doctrine prohibits the federal government from dispossessing states and localities of their right to manage their employees and resources in the manner they see fit. Therefore, Plaintiff cannot use the intergovernmental immunity doctrine to impose a result contrary to the Tenth Amendment. Accordingly, Counts II and III must be dismissed.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss should be granted, together with such other and further relief as this Court deems just and proper.

Dated: New York, New York
        December 2, 2025

Respectfully submitted,

MURIEL GOODE-TRUFANT
Corporation Counsel of the City of
    New York
*Attorney for Defendants*
100 Church Street
New York, New York 10007
(212) 356-2208
kselvin@law.nyc.gov

By: ____/s/ Karen B. Selvin____
    Karen B. Selvin
    Andrew T. Steffan
    Emeline Kong
    *Assistant Corporation Counsels*


SHER TREMONTE LLP

Alison Moe
Courtney Gans
Benjamin J. Shack Sackler
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, New York 10004
                          *Of Counsel*

- 31 -

**CERTIFICATION UNDER LOCAL CIVIL RULE 7.1(c)**

In accordance with Local Civil Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, promulgated pursuant to 28 U.S.C. § 2071 and FED. R. CIV. P. 83, the undersigned certifies that the word count in this memorandum of law (not including the caption, table of contents, table of authorities, and signature block as well as this certification), as established using the word count function on the word-processing system used to prepare it, complies with the word-count limitations of this Court and is 10,078 words.

Dated: New York, New York
       December 2, 2025

Respectfully submitted,

MURIEL GOODE-TRUFANT
Corporation Counsel of the City of
   New York
*Attorney for Defendants*
100 Church Street
New York, New York 10007
(212) 356-2208
kselvin@law.nyc.gov

By: _____/s/  Karen B. Selvin_____
    Karen B. Selvin
    *Assistant Corporation Counsel*