BRETT A. SHUMATE
Assistant Attorney General
DREW C. ENSIGN
Deputy Assistant Attorney General
CHARLES E.T. ROBERTS
Counsel to the Assistant Attorney General
Civil Division
ELIANIS N. PEREZ
Assistant Director
CATHERINE M. RENO
Acting Assistant Director
VICTORIA TURCIOS
SUSAN ANSARI
Trial Attorneys
Office of Immigration Litigation
*Attorneys for the United States*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF NEW YORK; ERIC L. ADAMS, Mayor of The City of New York, in his official capacity; NEW YORK CITY COUNCIL; ADRIENNE E. ADAMS, Speaker of the New York City Council, in her official capacity; NEW YORK CITY DEPARTMENT OF CORRECTION; LYNELLE MAGINLEY-LIDDIE, Commissioner of the New York City Department of Correction, in her official capacity; NEW YORK CITY DEPARTMENT OF PROBATION; JUANITA N. HOLMES, Commissioner of the New York City Department of Probation, in her official capacity; NEW YORK CITY POLICE DEPARTMENT; JESSICA S. TISCH, Commissioner of the New York City Police Department, in her official capacity,<br><br>Defendants. | No. 1:25-cv-4084 (RER) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS**

## TABLE OF CONTENTS

Table of Authorities………………………………………………………………...………..…i

Introduction ………………………………………………………………………...………1

Background…………………………………………………………………………...……..2

    I. Constitutional and Statutory Principles…………………………………………..…2

    II. New York City's Sanctuary Provisions………………………….……………….6

Standard of Review…………………………………………………………………...8

Argument…………………………………………………………………………….......8

    I. The Complaint states claims of violation of intergovernmental immunity principles………..…8

        a. The Complaint states a claim of unlawful regulation…………………………………9

        b. The Complaint states a claim of unlawful discrimination………………...………………14

    II. Federal law preempts New York City's Sanctuary Provisions………………………….18

        a. Certain Sanctuary Provisions are expressly preempted………………………...……18

        b. The Sanctuary Provisions are impliedly preempted…………………………...……….21

            i. The Complaint states a claim of field preemption……………………..………...21

            ii. The Complaint states a claim of conflict preemption…………………..………….22

    III. The Tenth Amendment is not implicated…………………………………………...27

Conclusion……………………………………………………………………...…………30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abel v. United States*, 362 U.S. 217 (1960) ........................................................................24

*Arizona v. California*, 283 U.S. 423 (1931) .........................................................................9

*Arizona v. United States*, 567 U.S. 387 (2012) ..............................................................passim

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................8

*Berger v. New York*, 388 U.S. 41 (1967) ..............................................................................10

*Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014) ........................................... 10, 16

*Carlson v. Landon*, 342 U.S. 524 (1952) ..............................................................................24

*Chamber of Com. of United States v. Whiting*, 563 U.S. 582 (2011) .................................21

*City of Detroit v. Murray Corp. of Am.*, 355 U.S. 489 (1958) ............................................12

*City of New York v. U.S.*, 179 F. 3d 29 (2d Cir. 1999) ...................................................passim

*P. Gas & Elec. Co. v. State Energy Res. Conserv. & Develop. Comm'n*, 461 U.S. 190 (1983) .......................18

*CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315 (3d Cir. 2025) ....................passim

*County of Ocean v. Grewal*, 475 F. Supp. 3d 355 (D.N.J. 2020) .........................................17

*Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87 (2017) .............................. 20, 21

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ................................21, 23, 25

*Cummings v. Missouri*, 71 U.S. (4 Wall.) 277 (1867) ..........................................................13

*Davis v. Elmira Sav. Bank*, 161 U.S. 275 (1896) ...............................................................25

*Dawson v. Steager*, 586 U.S. 171 (2019) ...................................................................... 14, 15

*Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963) ...............................21

*Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995) ............................................................21

*Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) .................................9, 11, 13, 17

i

*Hancock v. Train*, 426 U.S. 167 (1976) ................................................................................................9

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ...............................................................................3, 21, 23, 24

*Johnson v. State of Maryland*, 254 U.S. 51 (1920) ...............................................................................12

*Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709 (2018) ......................................................21

*Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956) ..........................................................................10

*Loughrin v. United States*, 573 U.S. 351 (2014) ..................................................................................21

*Mayo v. United States*, 319 U.S. 441 (1943) ................................................................................... 3, 9

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184 (2d Cir. 2007) ...............................................8

*McCulloch v. Maryland*, 17 U.S. 316 (1819) ............................................................................... 8, 9, 14

*McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022) ..........................................................13, 17, 26

*Miller v. City of Milwaukee*, 272 U.S. 713 (1927) ...............................................................................12

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ....................................................... 18, 19

*Murphy v. NCAA*, 584 U.S. 453 (2018) .................................................................... 19, 20, 25, 29

*Nat'l Meat Ass'n v. Harris*, 565 U.S. 452 (2012) ...............................................................................25

*New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97 (2d Cir. 2010) .......................28

*New York v. U.S. Dep't of Justice*, 951 F.3d 84 (2d Cir. 2020) ................................. 20, 27, 29, 30

*New York v. United States*, 505 U.S. 144 (1992) ........................................................................ 28, 29

*Nielsen v. Preap*, 586 U.S. 392 (2019) .................................................................................................5

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) ......................................................................................30

*North Dakota v. United States*, 495 U.S. 423 (1990)) ............................................ 12, 14, 16, 17

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015) ...............................................................................22

*Perez v. Campbell*, 402 U.S. 637 (1971) ....................................................................................... 2, 26

*Printz v. United States*, 521 U.S. 898 (1997) ..............................................................................28, 29, 30

*Pub. Utils. Comm'n v. U.S.*, 355 U.S. 534 (1958) .......................................................................... 11, 13

ii

*South Carolina v. Baker*, 485 U.S. 505 (1988)........................................................................3

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023)...................13

*United States v. California*, 921 F.3d 865 (9th Cir. 2019) .......................................................18

*United States v. Fresno Cnty.*, 429 U.S. 452 (1977) .................................................................11

*United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025)........................................... 13, 18

*United States v. King Cnty.*, 122 F.4th 740 (9th Cir. 2024)................................................13, 14, 17

*United States v. Kraemer*, 933 F.3d 675 (7th Cir. 2019) ...........................................................21

*United States v. Locke*, 529 U.S. 89 (2000)..............................................................................23

*United States v. Missouri*, 114 F.4th 980 (8th Cir. 2024) .........................................................24

*United States v. New York*, No. 1:25-CV-744 (MAD/PJE), 2025 U.S. Dist. LEXIS 225875 (N.D.NY. Nov. 17, 2025)........................................................................................... 18, 30

*United States v. Washington*, 596 U.S. 832 (2022)...........................................................passim

*Washington v. United States*, 460 U.S. 536 (1983)............................................................ 14, 17

*Wis. Dep't of Indus. v. Gould Inc.*, 475 U.S. 282 (1986).........................................................16

**Statutes**

8 U.S.C. § 1101 .....................................................................................................................3

8 U.S.C § 1101(a)(15)..........................................................................................................20

8 U.S.C. § 1103(a)(3)............................................................................................................4

8 U.S.C. § 1103(a)(11)(B) ...................................................................................................26

8 U.S.C. § 1182 ...................................................................................3, 20, 23, 24

8 U.S.C. § 1225 ...........................................................................................3, 23

8 U.S.C. § 1225(a)(3)...................................................................................24, 27

8 U.S.C. § 1226 ..............................................................................................2, 24

iii

8 U.S.C. § 1226(a) ....................................................................................................3, 4, 9, 24

8 U.S.C. § 1226(c) .......................................................................................................... 4, 5, 24

8 U.S.C. § 1226(d)(1)(A).................................................................................................... 5, 24

8 U.S.C. § 1227 .......................................................................................................................23

8 U.S.C. § 1228 .......................................................................................................................23

8 U.S.C. § 1229a ......................................................................................................................3

8 U.S.C. § 1231 .......................................................................................... 2, 3, 5, 23, 24

8 U.S.C. § 1231(a)(4)(A) ....................................................................................................4

8 U.S.C. § 1231(g)(2).........................................................................................................26

8 U.S.C. § 1357(a)(1).........................................................................................................27

8 U.S.C. § 1357(d) ...............................................................................................................4

8 U.S.C. § 1357(g)(10) ..................................................................................................... 5, 25

8 U.S.C. § 1373 ..............................................................................................................passim

8 U.S.C. § 1373(a).........................................................................................................passim

8 U.S.C. § 1373(c) ........................................................................................................... 5, 21

8 U.S.C. § 1644..............................................................................................................passim

42 U.S.C. § 1983......................................................................................................................30

49 U.S.C. App. § 1305(a)(1) (1988 ed.) ........................................................................ 18, 19

## Regulations

8 C.F.R. § 287.7 .......................................................................................................................16

8 C.F.R. § 287.7(a) ..................................................................................................................4

## Local Provisions

Executive Order [Mamdani] No. 1 .........................................................................................15

N.Y.C. Admin. Code § 9-131...................................................................................................passim

N.Y.C. Admin. Code § 9-205...................................................................................................passim

N.Y.C. Admin. Code § 10-178.................................................................................................passim

N.Y.C. Admin. Code § 14-154.................................................................................................passim

NYPD Ops. Order No. 4..........................................................................................................passim

**INTRODUCTION**

For 36 years, New York City has proudly thwarted federal immigration law. Congress responded, passing legislation to counter its efforts. The Southern District of New York and Second Circuit both repudiated the City's brazen attempt to strike down that legislation as unconstitutional. Yet New York City's commitment to defying the Constitution has only intensified. Since 2011, it has passed a series of laws expressly crafted to halt immigration enforcement in New York City. These laws (collectively, Sanctuary Provisions) have progressively escalated in severity, and the data New York City publicly produces show they are succeeding in their purpose. The New York City Police Department has not honored *any* immigration detainers in nearly a decade. ECF No. 1, Compl., ¶ 56.

But the Supremacy Clause forecloses New York City's independent immigration regime. It declares: "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. As the Supreme Court has recognized, "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). The immigration framework that Congress established and federal agencies administer reflects a careful balance of law enforcement, foreign affairs, and public safety concerns—concerns that belong to the Nation as a whole, not a single locality. That framework does not permit local governments to establish their own set of immigration rules, as New York City has done. *See id.* at 408 ("This would allow the State to achieve its own immigration policy … This is not the system Congress created.").

The Complaint adequately articulates four grounds on which the Sanctuary Provisions are invalid under the Supremacy Clause. To begin, New York City's laws restricting detainer compliance directly regulate the Federal Government by preventing the federal immigration authorities from using the tools Congress provided to enforce immigration law (civil immigration detainers and

1

administrative warrants), thus violating the doctrine of intergovernmental immunity. The Sanctuary Provisions also single out and discriminate against "federal immigration authorities." Further, 8 U.S.C. §§ 1373 and 1644 expressly preempt New York City's laws that bar or severely restrict federal immigration authorities' access to critical information. And the Sanctuary Provisions are both conflict- and field-preempted. For instance, they create obstacles to immigration enforcement by adding onerous prerequisites that immigration officials must meet to receive detainer compliance. They must present a judicial warrant and the subject must have been convicted of a specific crime within five years. These extra mandates unduly obstruct immigration enforcement, apprehension, prosecution, and removal priorities and practices—as embodied in 8 U.S.C. §§ 1226 and 1231—which establish a system of civil administrative warrants for arrest and removal, and do not require prior convictions.

The Tenth Amendment provides New York City no shield. Contrary to its suggestions, the Sanctuary Provisions go far beyond a "choice" not to participate in immigration enforcement. New York City law affirmatively restricts the ability of otherwise willing local officials to provide the minimal cooperation needed for federal immigration authorities to exercise their duties. And the Supreme Court has squarely rejected the idea that localities may impede the operation of federal law if they have "some purpose in mind other than one of frustration." *Perez v. Campbell*, 402 U.S. 637, 651–52 (1971). As the Second Circuit has already told New York City, the Tenth Amendment is not a "sword allowing states and localities to engage in passive resistance that frustrates federal programs" and it is not "an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs," including immigration enforcement. *City of New York v. U.S.*, 179 F. 3d 29, 35 (2d Cir. 1999). New York City has arrogated authority exclusively vested with the Federal Government to further its own immigration agenda, and its unconstitutional behavior must end.

**BACKGROUND**

## I. Constitutional and Statutory Principles

2

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona*, 567 U.S. at 399. Just as the Federal Government cannot commandeer a State, so too a State cannot enact laws that conflict with federal policy or regulate or discriminate against the Federal Government. *See Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *South Carolina v. Baker*, 485 U.S. 505, 523 (1988); *Mayo v. United States*, 319 U.S. 441, 445 (1943). When a state does so, the Supremacy Clause provides a clear rule: federal law "shall be the supreme Law of the Land," and the state law must give way. *See* U.S. Const. art. VI, cl. 2; *Arizona*, 567 U.S. at 399.

Setting immigration policy is the exclusive prerogative of the Federal Government. *See* U.S. Const. art. I § 8, cl. 4 (Congress has the power to "establish an uniform Rule of Naturalization"). Congress has exercised this authority through the Immigration and Nationality Act (INA) and related laws, *see* 8 U.S.C. § 1101 *et seq.*, which together make up the framework for the "governance of immigration and alien status," *see Arizona*, 567 U.S. at 395. Those laws confer upon the Executive Branch broad authority to inspect, investigate, arrest, detain, and remove aliens suspected of being— or found to be—unlawfully in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–1229a, 1231. Responsibility for enforcing these laws is vested principally in the U.S. Department of Homeland Security (DHS) and two of its component agencies: Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP).

Congress gave DHS several tools to fulfill its responsibilities under the INA. For example, the INA expressly authorizes federal immigration officials to arrest and detain aliens pursuant to administrative warrants. *See* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."). To obtain an administrative warrant, ICE "must establish probable cause to believe

that the subject is an alien who is removable from the United States."[1]

Relevant here, if an alien DHS seeks is in the custody of another law enforcement agency, DHS may issue an "immigration detainer" to advise that agency that DHS seeks custody "for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see also* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration detainer is "a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a). As a matter of policy, immigration detainers must be accompanied by an administrative warrant—either an alien arrest warrant or a warrant of removal—signed by an ICE immigration officer. ICE Policy No. 10074.2, § 2.4.

In enacting the INA, Congress recognized that an alien subject to federal immigration proceedings may also be subject to state or local criminal law enforcement confinement. Under those circumstances, the INA dictates that federal immigration officials generally "may not remove an alien who is sentenced to [state] imprisonment until the alien is released from [such] imprisonment." 8 U.S.C. § 1231(a)(4)(A). The INA further authorizes—and in some cases requires—federal immigration officials to assume custody immediately upon the alien's release from state or local custody. *See id.* §§ 1226(a), 1226(c).

To fulfill their duties, federal immigration officials rely on law enforcement partners across the country. *See Arizona*, 567 U.S. at 411 ("Consultation between federal and state officials is an important feature of the immigration system."). The INA reflects that expectation of collaboration as several provisions of the statute regulate the manner in which federal, state, and local officials share information about aliens subject to both state criminal law enforcement and federal immigration

---

[1] ICE Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers*, § 2.4 (Mar. 24, 2017), https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf (ICE Policy No. 10074.2).

enforcement. For example, the Federal Government must make resources available to state and local authorities to aid in determining whether those they have arrested for aggravated felonies are aliens. 8 U.S.C. § 1226(d)(1)(A). The INA also directs the Federal Government to designate liaisons to "State[] and local law enforcement and correctional agencies … with respect to the arrest conviction, and release of any alien charged with an aggravated felony[.]"*Id.* § 1226(d)(1)(B). And if state or local officials "seek[] to verify or ascertain the citizenship or immigration status of any individual," the Federal Government must share the requested information. *Id.* § 1373(c).

The INA similarly provides that federal, state, and local government entities "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a); *see also id.* § 1644 (similar); *id.* § 1357(g)(10)(A) (providing that no formal agreement is required for a state or local official to communicate with immigration officials regarding the immigration status of any individual, including knowledge of unlawful presence).

These laws and processes promote public safety. Although "[a] principal feature of the removal system is the broad discretion exercised by immigration officials," *Arizona*, 567 U.S. at 396, Congress was concerned "that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers," *Nielsen v. Preap*, 586 U.S. 392, 398 (2019) (citation omitted). Thus in 1996, Congress amended § 1226 to mandate the detention of certain aliens who, based on their commission of or arrest for specified "predicate crimes," threaten public safety. *See Preap*, 586 U.S. at 398. In 2025, Congress expanded the list of predicate crimes that trigger mandatory detention to include "burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person[.]" 8 U.S.C. § 1226(c)(1)(E)(ii)). Once an alien is ordered removed, removal must take place within 90 days, and the alien must be detained during that "removal period." *Id.* § 1231. If the Federal

Government fails to detain an alien subject to mandatory detention and the alien harms a state or its residents, that state may sue the Federal Government. *Id.* § 1226(f).

## II. New York City's Sanctuary Provisions

New York City has enacted an aggressive and comprehensive regime designed to obstruct and halt federal immigration enforcement within its borders. The United States challenges five particular provisions that control the conduct of the New York City's Department of Correction (N.Y.C. Admin. Code § 9-131), Department of Probation (*id.* § 9-205), and Police Department (NYPD) (*id.* § 14-154, NYPD Operations Order No. 4 ("NYPD Ops. Order No. 4") (*see* Compl., Ex. H, ECF No. 1-10)), in particular, as well set a general "Immigration enforcement" policy for the entire City (N.Y.C. Admin. Code § 10-178).

The provisions for the Departments of Correction and Probation and NYPD severely restrict the circumstances when employees may comply with valid civil immigration detainers. Specifically, they add requirements beyond those which Congress imposed. They require federal immigration authorities to present a warrant issued by an Article III judge *and* the alien must have been convicted of what the City defines as a "violent or serious crime" (*see* §§ 9-131(a)(7) and 14-154(a)(6)) within the past five years (or be a possible a terrorist). *Id.* § 9-131(b). *See also id.* §§ 9-205(b)(1), (2); 14-154(b)).[2]

New York City restricts the information its employees may share with "federal immigration authorities." The Department of Correction and NYPD provisions bar notifying immigration authorities of an alien's release unless the above-mentioned extra requirements are satisfied. §§ 9-131(b)(1), 14-154(b)(1). Additionally, the Department of Correction law forbids personnel from sharing with "federal immigration authorities" information about "any person's incarceration status,

---

[2] The NYPD "may" honor a civil immigration detainer by holding the alien for up 48 hours if he is a possible match in the terrorist database or "has been convicted of a violent or serious crime *and* has illegally re-entered the country after a previous removal or return." *Id.* § 14-154(b)(2) (emphasis added). But if "federal immigration authorities" do not present a judicial warrant during the 48-hour period, NYPD shall release the alien without notice. *Id*

release dates, court appearance dates, or any other information related to persons in the department's custody" ("other than information related to the person's citizenship or immigration status"), unless the communication "relates to a person convicted of a violent or serious crime or identified as a possible match" in a terrorist database, "is unrelated to the enforcement of civil immigration laws," or "is otherwise required by law." *Id.* § 9-131(h)(1). And it prohibits "federal immigration authorities" from maintaining, on Correction Department land, an office or quarters for investigating immigration law violations. *Id.* § 9-131(h)(2). The NYPD and Correction Department provisions also impose recording and public reporting requirements that include various metrics related to communication and cooperation with "federal immigration authorities." *Id.* §§ § 9-131(f), 14-154(f).

NYPD Operations Order 4 is a "directive [that] serves as a reminder of city and state law that govern [civil immigration enforcement] matters." *Id.* at ¶ 1. It explains "members of service are not permitted to engage in civil immigration enforcement, assist in any manner with civil immigration enforcement, or allow any Department resources to be used in connection with civil immigration enforcement." *Id.* at ¶ 6. Prohibited activities include: "[c]ontacting federal civil immigration authorities to let them know where an individual is located; [d]etaining an individual so that federal civil immigration agents can take that person into custody;" or using "Department facilities" for "civil immigration enforcement." *Id.*

Lastly, N.Y.C. Admin. Code § 10-178 creates a blanket "Immigration enforcement" policy. It states in no uncertain terms: "[n]o city resources … shall be utilized for immigration enforcement" *Id.* § 10-178(c). It defines "immigration enforcement" as "the enforcement of any civil provision of the immigration and nationality act and any provision of such law that penalizes a person's presence in, entry into, or reentry into the United States." *Id.* § 10-178(a). It orders City employees to record requests (and any responses) for support or assistance from non-local law enforcement agencies to further immigration enforcement, to be included in a quarterly report to the speaker of the Council.

7

*Id.* § 10-178(d). It also forbids City agencies "subject[ing] its officers or employees to the direction and supervision of the secretary of homeland security primarily in furtherance of immigration enforcement" *Id.* § 10-178(b). It excepts from these restrictions participation in cooperative agreements with federal law enforcement agencies that are not primarily intended to further immigration enforcement. *Id.* § 10-178(e).[3]

## STANDARD OF REVIEW

To withstand a motion to dismiss under Rule 12(b)(6), a complaint need only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept as true all of the complaint's plausible factual allegations and construe all reasonable inferences in favor of the plaintiff. *Id.*; *see also McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

## ARGUMENT

### I. The Complaint states claims of violation of intergovernmental immunity principles.

As early *McCulloch v. Maryland*, the Supreme Court recognized: "the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." 17 U.S. 316, 436 (1819). Rooted in the Supremacy Clause, the principle is known as the intergovernmental immunity doctrine. It prohibits "state laws that *either* "regulat[e] the United States directly or discriminat[e] against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838–39 (2022) (*Washington II*) (citations omitted). The doctrine is independent from and sweeps more broadly than preemption, since it applies regardless of whether Congress has legislated. *See, e.g., CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 328 (3d Cir. 2025).

---

[3] The Sanctuary Provisions contain intricate public reporting requirements. *See id.* §§ 9-131(f), 9-205(f), 14-154(f).

Further, "when a state law implicates intergovernmental immunity, courts presume that Congress did not intend to allow the state law to be enforced." *Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (en banc) (citing *Washington II*, 596 U.S. at 839 *and Hancock v. Train*, 426 U.S. 167, 179 (1976)). The Complaint sufficiently alleges that the Sanctuary Provisions invalidly regulate *and* discriminate.

### a. The Complaint states a claim of unlawful regulation.

It is well settled under the intergovernmental immunity doctrine that "the activities of the Federal Government are free from regulation by any state." *Mayo*, 319 U.S. at 445. A state law regulates the United States directly when it "places [either] a prohibition" or mandate on the Federal Government. *CoreCivic*, 145 F.4th at 321 (quoting *Hancock*, 426 U.S. at 180). *See also Arizona v. California*, 283 U.S. 423, 451 (1931)) ("The United States may perform its functions without conforming to the police regulations of a state."). "Because federal law is supreme, 'there is a plain repugnance' in letting states 'interfer[e] with or control[ ] the operations of the Federal Government.'" *CoreCivic*, 145 F.4th at 321 (quoting *McCulloch*, 17 U.S. at 431)).

The Sanctuary Provisions unlawfully regulate the Federal Government by forcing federal immigration authorities to meet layers of additional requirements far beyond those that Congress legislated in order to safely obtain custody of an alien before or as he departs City custody. *See* Compl., ¶ 92. Congress provided: "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Administrative warrants require immigration officials to "establish probable cause to believe that the subject is an alien who is removable from the United States." ICE Policy No. 10074.2 § 2.4.

New York City's separate immigration regime deems this procedure insufficient. The City requires federal immigration authorities to present a warrant signed by an Article III judge before it

will hold an alien per a civil immigration detainer.[4] Such warrants require a showing of probable cause that the subject has committed a particular crime of the City's choosing. *See Berger v. New York*, 388 U.S. 41, 55 (1967). The judicial warrant requirement forecloses federal immigration authorities' use of the detention method Congress authorized and directly imposes a new method—with a different and much higher standard—on the Federal Government. *See, e.g.*, Compl., ¶¶ 85–89, 92–93, 112–13. Localities have no such power to prevent federal agents from carrying out their duties "until they satisfy a state officer." *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956); *see also Arizona*, 567 U.S. at 406 (recognizing that "a conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy" (alterations and citation omitted)).

But the Sanctuary Provisions go further. Even if federal immigration authorities present a judicial warrant, City law *still* bars compliance with a civil immigration detainer unless the alien has been convicted—within five years—of a crime the New York City Council deemed "violent or serious" (or the alien is a possible terrorist).[5] *See, e.g.*, Compl., ¶¶ 58–65, 68, 71, 79, 80, 85–89. But Congress does not require a criminal conviction—much less one within the last five years—to subject an alien to immigration apprehension and detention. *See* Compl., ¶ 55 (explaining Congress granted the Executive Branch authority to inspect, investigate, arrest, detain, and remove *all* aliens suspected of being unlawfully in the United States). Furthermore, Congress has mandated that federal agents detain illegal aliens who have committed certain offenses upon their release from state or local custody—but the Sanctuary Provisions prevent federal agents from complying with this mandate. *See* Compl., ¶ 91. Thus, the Sanctuary Provisions regulate federal immigration authorities by precluding them from enforcing federal law. *See* Compl., ¶¶ 112–13. *See Boeing Co. v. Movassaghi*, 768 F.3d 832, 839–40 (9th Cir. 2014) (striking down a state law that required "an application of more stringent

---

[4] N.Y.C. Admin. Code. § 9-131(b)(1)(i); 9-205(b)(1), (2); 14-154(b)(1)(i).
[5] N.Y.C. Admin. Code §§ 9-131(a)(2)(ii), (a)(7), (b)(1); 14-154(a)(2)(ii), (a)(6), (b)(1); 9-205(a), (b)(2).

cleanup standards than federal laws and DOE's cleanup procedures" did); *Geo Grp.*, 50 F.4th at 758 (finding the state law "breach[ed] the core promise of the Supremacy Clause" because "[t]o comply with California law, ICE would have to cease its ongoing immigration detention operations in California and adopt an entirely new approach in the state").

These provisions also substantially interfere with a core federal function. Federal law gives federal officials discretion to inspect, apprehend, detain, and remove aliens. *E.g.*, Compl., ¶¶ 5, 8, 28–38, 85–87, 94. New York City's own data reveals the provisions' considerable interference. *E.g.*, Compl. ¶¶ 56 (NYPD has honored zero of the thousands of detainers lodged since fiscal year 2017), 52 (Correction Department honored only 4% of ICE detainers in fiscal year 2024); *see also id.* ¶¶ 9–10, 53 (illustrating the harmful effects of the City's unconstitutional policies). The Sanctuary Provisions severely impair federal immigration authorities' ability to carry out their federally-mandated tasks. *Id.* ¶¶ 95–96. *See also id.* ¶ 91 (New York City's list of "violent and serious" crimes allowing for detainer compliance conflicts with federal law governing inadmissibility and removability). Along the same lines, § 10-178(c)'s blanket prohibition on using any City resources "for immigration enforcement" bars federal agents from accessing and interviewing aliens in City custody, preventing them from complying with the INA. Compl., ¶ 94. Thus, these provisions are invalid. *See Pub. Utils. Comm'n v. U.S.*, 355 U.S. 534, 544–45 (1958) (finding that a state law "place[d] a prohibition on the Federal Government" where it imposed additional processes that would have caused delays that "would seriously hamper or disrupt the military mission for which the shipment was made"). If every state enacted such bans, they would "destroy the federal function." *United States v. Fresno Cnty.*, 429 U.S. 452, 463 n.11 (1977).

The Sanctuary Provisions also regulate federal functions by imposing novel requirements on federal immigration authorities before the City will share vital information. Specifically, they forbid the NYPD and Correction Department from notifying federal immigration authorities about an alien's

release unless the above-listed judicial warrant *and* prior conviction (or terrorist threat) requirements are met. N.Y.C. Admin. Code. §§ 9-131(b); 14-154(b). *See* Compl., ¶ 93. The Correction Department further bars "communicating with federal immigration authorities regarding any person's incarceration status, release dates, court appearance dates, or any other information related to persons in the department's custody" unless the alien has been convicted of a "violent or serious crime" or is a possible terrorist, or the immigration official satisfies a City official that the request "is unrelated to the enforcement of civil immigration laws." N.Y.C. Admin. Code § 9-131(h)(i)–(ii). *See* Compl., ¶¶ 66, 79. But Congress has authorized federal officers to access immigration information from localities without those procedural constraints. *See* 8 U.S.C. § 1373(a). *E.g.*, Compl., ¶¶ 85, 90, 93. Put differently, whereas Congress has prohibited States from "in any way restrict[ing]" the sharing of immigration information—which includes information about an alien's whereabouts—with federal immigration officials, 8 U.S.C. § 1373(a), § 9-131(h)(i) denies immigration officials that information unless they satisfy additional requirements imposed by Defendants that Congress never contemplated. But localities cannot so regulate the Federal Government. *See Johnson v. State of Maryland*, 254 U.S. 51, 57 (1920) (invalidating state law that "lays hold of them in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient").

Defendants' primary argument is that their Sanctuary Provisions "are directed solely at City agencies and employees" and "address how the City allocates its own resources and personnel" (Defs.' Mot. at 23). This position elevates form over substance and defies common sense and caselaw. The Supreme Court has "adopted a functional approach to claims of governmental immunity" (*North Dakota v. United States*, 495 U.S. 423, 435 (1990)) and directed courts to "look through form and behind labels to substance" (*City of Detroit v. Murray Corp. of Am.*, 355 U.S. 489, 492 (1958)). Courts must examine the "'purpose or self-evident operation of a statute' to see if it is used to evade the limits on immunity 'by indirectly achieving the same result.'" *CoreCivic*, 145 F.4th at 322 (quoting *Miller v. City of*

12

*Milwaukee*, 272 U.S. 713, 715 (1927)). *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) (alteration in original) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1867)) ("[W]hat cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows.").

The Third Circuit recently rejected an argument nearly identical to Defendants'. New Jersey claimed its law banning state and local governments and private parties from participating in civil immigration detention contracts did not regulate the Federal Government because its text did not apply to the Federal Government. *CoreCivic*, 145 F.4th at 320, 321–22. The court explained New Jersey was "wrong" and its law "carries the same sting as a law whose text applies expressly to the Federal Government. And the direct-regulation prong accommodates that functionalist reading of what is really going on here." *Id.* at 322. No practical difference exists between New York City's detainer provisions and a hypothetical law declaring that civil immigration detainers are invalid without a judicial warrant and a predicate conviction. The result—a detainer having zero effect without a judicial warrant and a predicate conviction—is exactly the same. Defendants cannot escape the reach of intergovernmental immunity with semantic games; thus, the Sanctuary Provisions are invalid. *See also Pub. Utils. Comm'n*, 355 U.S. at 544 (state law requiring private common carriers to get state approval before charging the Federal Government reduced rates was a "prohibition on the Federal Government" and "clear" Supremacy Clause violation).[6]

---

[6] Defendants' reliance on *McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022) and *United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025) is unavailing. *McHenry County* found that a state law barring state and local government entities from contracting with the Federal Government to house immigration detainees "regulated only State and local entities and law enforcement." 44 F.4th at 586, 593. *See* Defs.' Mot. at 24, 26–27. Since then, courts have held that laws can (invalidly) regulate the Federal Government even though, as here, they purport to operate against others. *See, e.g., Geo Grp*, 50 F.4th 757–58 (state statute phasing out all private detention facilities in the state, as applied to contractor-operated ICE detention facilities, violated intergovernmental immunity); *King Cnty.*, 122 F.4th at 757 (County Order directing local officials to ensure operators leasing space at the County's airport did not service ICE charter flights was unlawful regulation). *United States v. Illinois* offers Defendants no support, *McHenry County* "control[led]" its direct-regulation analysis. 796 F. Supp. 3d at 535. Defendants' laws "directly regulate[] the federal government by telling it how to carry out a core function. It is a direct regulation in everything but name." *CoreCivic*, 145 F.4th at 326 (quoting *King Cnty.*, 122 F.4th at 757).

13

Collectively, the Sanctuary Provisions "'require[] ICE to entirely transform its approach to' its sovereign function of transporting and removing noncitizen detainees." *See United States v. King Cnty.*, 122 F.4th 740, 756 (9th Cir. 2024). *See id.* (local order barring ICE from using certain contractors at county airport violated intergovernmental immunity by regulating and discriminating against ICE). "Because this impermissibly override[s] the federal government's decision, pursuant to discretion conferred by Congress," as to how to effectuate detentions and removals, the Sanctuary Policies are invalid under the intergovernmental immunity doctrine's regulation prohibition. *Id. See also CoreCivic*, 145 F.4th at 328 (quoting *McCulloch*, 17 U.S. at 362) ("The Founding generation 'surely … did not intend' for federal operations and the exercise of federal powers to 'depend upon the discretion of the state governments.'").[7]

### b. The Complaint states a claim of unlawful discrimination.

"[A] state law discriminates against the Federal Government … if it 'single[s them] out' for less favorable 'treatment,' *Washington v. United States*, 460 U.S. 536 (1983) [*Washington I*], or if it regulates them unfavorably on some basis related to their governmental 'status,' *North Dakota*, 495 U.S. at 438 (plurality opinion)." *Washington II*, 596 U.S. at 838–39. *See also King Cnty.*, 122 F.4th at 757 (reiterating this standard). *Any* discriminatory burden on the Federal Government is impermissible. *See Dawson v. Steager*, 586 U.S. 171, 171 (2019). Courts presume that such laws are invalid absent clear congressional authorization for that kind of state regulation. *See Washington II*, 596 U.S. at 839.

New York City's provisions facially target federal immigration authorities in ways that do not apply to any other person or entity. Compl., ¶ 90. For instance, they bar local officials from honoring a "federal request for detention of a person suspected of violating civil immigration law" unless "federal immigration authorities" present a judicial warrant *and* the alien has a specified prior

---

[7] Defendants spill much ink on the uncontested principle that local laws posing an indirect or incidental financial burden on the Federal Government do not violate intergovernmental immunity's direct-regulation prong. Defs.' Mot. at 25–27. As shown, the Sanctuary Provisions effect *direct* regulation on the Federal Government.

14

conviction within the past five years (or is a possible terrorist). N.Y.C. Admin. Code. § 9-131(a)(1), (b)(1)(i)–(ii); 9-205(b)(1)–(2), (2); 14-154(a)(1), (b)(1)(i)–(ii). Likewise, the provisions restrict local officials from sharing release dates and other information about aliens in their custody with "federal immigration authorities," and only federal immigration authorities. N.Y.C. Admin. Code. §§ 9-131(b), (h); 14-154(b). *See* Compl., ¶¶ 66, 79, 93. They do not prevent local officials from sharing this information with state or local officials or even members of the public. *See also* NYPD Ops. Order No. 4, ¶ 6.a–b (barring "Contacting federal civil immigration authorities to let them know where an individual is located" and "Detaining an individual so that federal civil immigration agents can take that person into custody"). Local law enforcement remains free to share information with and facilitate transfers to others, such as state and local criminal law-enforcement officers. New York City's regime thus "singles out" federal immigration authorities for disfavored treatment—exactly what intergovernmental-immunity principles forbid. *Dawson*, 586 U.S. at 178. *See* Compl., ¶ 109.

Further, New York City forbids "federal immigration authorities" (and only federal immigration authorities) from maintaining an office on Correction Department land. *Id.* § 9-131(h)(2). And the restriction is even more severe in practice. Although the provision allows for such an office if an executive order so authorizes ("for purposes unrelated to the enforcement of civil immigration laws")—when such an executive order issued, the City Council sued and obtained an injunction. *See* Compl., ¶¶ 81–83. In any event, Executive Order [Mamdani] No. 1 rescinded that executive order.

The Complaint recounts 36 years of intentional efforts to target and thwart Federal enforcement efforts, culminating in the Sanctuary Provisions. Compl., ¶¶ 39–46 (history), 49 (City Council stating first sanctuary bill would protect up to 1,000 people from deportation), 62 (NYC.gov celebrating that the laws could help 3,000 people escape federal custody), 68 (councilman's "moral obligation to save people from deportation"), 70 (councilman stating "New York City will not be part of the federal deportation machine"). On their face, these provisions specially target cooperation with

15

federal immigration authorities. They thus explicitly seek to "discriminate against the Federal Government" (*Boeing*, 768 F.3d at 839) (quotation marks and brackets omitted). New York City may not "interfere [] with the functions of the federal government." *See id.* at 840.

To the extent that some of the Sanctuary Provisions impose restrictions on "immigration enforcement" (*e.g.*, *id.* §§ 10-178(c), (e)) or "civil immigration detainers"[8] (*e.g.*, § 9-131(b)), they also violate the discrimination prong by "regulat[ing] the[] [Federal Government] unfavorably on some basis related to their governmental 'status[.]'" *Washington II*, 596 U.S. at 839 (quoting *North Dakota*, 495 U.S., at 438 (plurality opinion)). Only the Federal Government issues "civil immigration detainers" (8 C.F.R. § 287.7, Compl., ¶ 30) and New York City defines "immigration enforcement" as "the enforcement of any civil provision of the immigration and nationality act and any provision of such law that penalizes a person's presence in, entry into, or reentry into the United States" (N.Y.C. Admin. Code. § 10-178(a)), which is an exclusively federal activity. These indisputably unfavorable provisions plainly target and regulate the Federal Government based on its exclusive charge of enforcing immigration law. *See Wis. Dep't of Indus. v. Gould Inc.*, 475 U.S. 282, 289 (1986) ("It is the conduct being regulated … that is the proper focus of concern.").

Defendants believe they are free to discriminate with impunity because they assert no similarly situated people or entities exist. *See* Defs.' Mot. at 27–29. They do not point to any similar prohibition of use of land or resources, restriction on communication, or prerequisites to continuing custody that they impose on any other entity, be it federal, state, local, law enforcement or private. But allowing this discrimination to stand would undercut the Supremacy Clause by enabling localities to thwart federal policy so long as that policy were implemented by only one federal agency. *See Washington II*, 596 U.S. at 841 (explaining that absent the prohibition on discrimination, nothing prevents a State

---

[8] The laws define this phrase broadly as "a detainer issued pursuant to 8 C.F.R. § 287.7 or any similar federal request for detention of a person suspected of violating civil immigration law." *Id.* §§ 9-131(a)(1), 14-154(a)(1), 9-205(a).

16

from imposing unduly high costs on the Federal Government for the benefit of the State's own citizens). For example, no one would say that a local measure discriminating against coining money is valid simply because there is no comparator to the U.S. Department of the Treasury.

*McHenry County*, on which Defendants rely, misapprehended the discrimination standard. Its statement that "[d]ifferential treatment is critical to a discrimination-based intergovernmental immunity claim" cited *Washington I* and *North Dakota*.[9] 44 F. 4th at 594. But, as the Supreme Court emphasized, the laws in those cases treated the Federal Government *better* than other entities. *See Washington I*, 460 U.S. at 541–42 ("Thus the Federal Government and federal contractors are both *better off* than other taxpayers…. This hardly seems, on its face, to be the mistreatment of the Federal Government against which the Supremacy Clause protects."). *See also North Dakota*, 495 U.S. at 438 (plurality opinion) ("A regulatory regime which so favors the Federal Government cannot be considered to discriminate against it."). In other words, those cases did not create a comparator requirement, but simply made the common-sense observation that the Federal Government cannot be said to experience discrimination when it receives more favorable treatment than someone else. The Supreme Court's most recent articulation of the discrimination standard contemplates this nuance. *See Washington II*, 596 U.S. at 838–39 (internal citations omitted) ("[A] state law discriminates against the Federal Government or its contractors if it 'single[s them] out' for less favorable 'treatment,' … or if it regulates them unfavorably on some basis related to their governmental 'status[.]'"). Indeed, since *McHenry County*, the Ninth Circuit recognized the *Washington II* framework and struck down a local law that "on its face discriminates against the United States" while acknowledging "the only entity in the business, so to speak, of deporting immigration detainees, is the federal government." *King Cnty.*, 122 F.4th at 757 (citing *Washington II*, 596 U.S. at 839).[10]

---

[9] Only *North Dakota*'s result binds since no rationale was common to a majority of the Justices. *Geo Grp.,* 50 F.4th at 759.
[10] For the same reason Defendants' other cited cases are unavailing. *See* Defs.' Mot. at 28–29. Like *McHenry County*, *County of Ocean v. Grewal*, pre-dated *Washington II*. 475 F. Supp. 3d 355, 372 (D.N.J. 2020). And *Illinois* found *McHenry County*

17

Even if a comparator were required, the provisions themselves provide several. For instance, § 10-178(e) exempts from its blanket bar on using City resources for "immigration enforcement" "participating in cooperative agreements with city, state, or federal law enforcement agencies that are not *primarily* intended to further immigration enforcement." *See* Compl., ¶ 109 (emphasis added). Further, the provisions do not treat all DHS employees the same; instead, they exempt DHS employees not "charged with enforcement of the civil provisions of the immigration and nationality act." N.Y.C. Admin. Code §§ 9-131(a)(4); 14-154(a)(3); 9-205(a). Thus, the provisions treat these groups better than they treat "federal immigration authorities" focused on immigration enforcement.

## II. Federal law preempts New York City's Sanctuary Provisions.

### a. Certain Sanctuary Provisions are expressly preempted.

Express preemption occurs when Congress explicitly supersedes all state enactments in a particular area. *P. Gas & Elec. Co. v. State Energy Res. Conserv. & Develop. Comm'n*, 461 U.S. 190, 203–04 (1983). *See, e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (finding express preemption where the federal law provided that "[N]o State … shall enact or enforce any law … relating to rates, routes, or services of any air carrier" (49 U.S.C. App. § 1305(a)(1) (1988 ed.))). That is precisely what Congress did in crafting 8 U.S.C. §§ 1373 and 1644: "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a).[11]

The Second Circuit has already concluded that §§ 1373 and 1644 are facially valid and held that they overrode a New York City executive order restricting employees' ability to "transmit

---

controlling. 796 F. Supp. 3d at 533–34. In mandating a comparator, *United States v. New York*, No. 1:25-CV-744 (MAD/PJE), 2025 U.S. Dist. LEXIS 225875 (N.D.NY. Nov. 17, 2025), relied on *McHenry County* and *Illinois*; further it relied on *United States v. California*, 921 F.3d 865 (9th Cir. 2019), which pre-dated *Washington II* and *King County*. 2025 U.S. Dist. LEXIS 225875 at *47–48.

[11] Section 1644, phrased slightly differently, is substantively the same. Plaintiff's mentions of § 1373 encompass § 1644.

information respecting any alien to federal immigration authorities." *City of New York*, 179 F.3d 29, 36–37. That decision controls here.

The Complaint alleges that these federal statutes expressly preempt the Sanctuary Provisions' restrictions on information sharing with federal immigration authorities by forbidding even voluntary communication with federal immigration authorities. *See, e.g.*, Compl., ¶¶ 90 (articulating, for example, how N.Y.C. Admin. Code § 9-131(h) forbids expending any City time or resources "disclosing information … in response to federal immigration inquiries"); 98 (explaining that City's policy of barring detainers and administrative warrants from being placed in the alien's file or City databases violates § 1373); 105 (stating the Sanctuary Provisions undermine federal immigration law's protections for information sharing).[12]

Defendants do not seriously contest this premise. Instead, they argue §§ 1373 and 1644 are directed solely at government conduct, rather than private actors, so they have no preemptive effect. Defs' Mot. at 10–12. *City of New York* still controls here. And Supreme Court precedent undercuts Defendants' position in any event. Merely because the language of a federal statute *appears* to be directed at government actors does not mean the federal statute lacks preemptive effect. *See Murphy v. NCAA*, 584 U.S. 453, 478–79 (2018). The Supreme Court explained this in *Murphy* when discussing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992). In *Morales*, the Court was considering the preemptive effect of a provision in the Airline Deregulation Act of 1978 which stated "*no State or political subdivision* thereof ... shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any [covered] air carrier." 49 U.S.C. App. § 1305(a)(1) (1988 ed.) (emphasis added). *Murphy* instructed: "[t]his language might appear to operate directly on the States, but it is a mistake to be confused by the way in which a preemption

---

[12] Thus, Defendants' contention that the Complaint does not allege *how* these statutes preempt the Sanctury Provisions (Defs.' Mot. at 12) is unfounded. In addition to the above-cited paragraphs, the Complaint identifies 8 U.S.C. §§ 1373 and 1644 (Compl. ¶¶ 4, 47–80) and alleges how they expressly preempt Sanctuary Provisions (*id.* ¶¶ 74–77, 84–106).

provision is phrased … [because] 'we do not require Congress to employ a particular linguistic formulation when preempting state law.'" 584 U.S. at 478 (quoting *Coventry Health Care of Mo., Inc. v. Nevils,* 581 U.S. 87, 99 (2017)). Indeed, "if we look beyond the phrasing employed in the Airline Deregulation Act's preemption provision, it is clear that this provision" operates like other preemptive provisions because it confers on "private entities (*i.e.,* covered carriers) a federal right to engage in certain conduct subject only to certain (federal) constraints." *Murphy*, 584 U.S. at 479.

The same is true of 8 U.S.C. §§ 1373 and 1644. These INA provisions, and the scheme they support, do *not* purport to regulate the states, rather they govern the actions of private individuals: aliens. Courts have recognized this nuance and declined to disturb the bedrock Supremacy Clause principle that state and local laws that obstruct federal laws "regulat[ing] private actors" are "preempt[ed]." *Murphy*, 584 U.S. at 476–77. In *Murphy*, the Government sought to legislate in a domain traditionally reserved to the state police power. *Id.* at 458–60 (describing the history of state regulation of gambling dating to the nineteenth century). But here, because the Federal Government seeks to regulate private individuals—aliens—and is operating in a realm of Federal rather than state authority, the INA's provisions withstand scrutiny and their preemptive force cannot be cast aside.

In any event, the Second Circuit has already observed that "§ 1373 is one provision of a larger statute, the INA, which certainly confers rights and places restrictions on large numbers of private persons." *New York v. U.S. Dep't of Justice*, 951 F.3d 84, n.27 (2d Cir. 2020). Thus, the question is whether the *INA as a whole* regulates private actors—aliens—and not whether §§ 1373 and 1644, when read (absurdly) narrowly, do so. There can be no dispute that the INA, which specifies who may enter and on what conditions, regulates private actors. *See, e.g.,* 8 U.S.C § 1101(a)(15) (classes of nonimmigrants who may seek to enter temporarily); *id.* § 1153 (classes of immigrants); *id.* § 1182 (inadmissible aliens); *id.* § 1188 (temporary agricultural workers). Sections 1373 and 1644 relate to information sharing with federal immigration officers to facilitate immigration policy and are thus just

20

one part of the overall statutory scheme. Those sections are valid preemption statutes.[13]

### b. The Sanctuary Provisions are impliedly preempted.

State law must yield to a federal statute—even absent an express preemption provision—when Congress "intends federal law to 'occupy the field'" (field preemption) or when the state law conflicts with a federal statute (conflict preemption). *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citations omitted). Implied "conflict preemption" occurs when a party cannot comply with both state law and federal law (impossibility preemption), *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963) or when the state law creates an obstacle to a federal statutory purpose (obstacle preemption), *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995). All types are present here.

### i. The Complaint states a claim of field preemption.

Congress intended to occupy the field of apprehension and detention of aliens, but Defendants' enactment of the Sanctuary Provisions attempts to invade and regulate within this field. Under its "broad, undoubted power over the subject of immigration and the status of aliens," *Arizona*, 567 U.S. at 394, Congress enacted the INA. Through the INA, Congress established a "comprehensive federal statutory scheme for regulation of immigration and naturalization[.]" *Chamber of Com. of United States v. Whiting*, 563 U.S. 582, 587 (2011). *See, e.g.*, Compl., ¶ 29 (explaining Congress exercised this broad authority to make laws governing the inspection, investigation, arrest, detention, and removal of aliens suspected of being unlawfully in the United States). *See also Hines*, 312 U.S. at 68 ("[T]he power to restrict, limit, regulate, and register aliens as a distinct group is not an equal and continuously

---

[13] Amici's reading of § 1373 ignores the realities of how removals are effectuated. A piece of information that governs whether and when an alien is subject to removal from the United States is plainly "information regarding … immigration status," especially because words such as "regarding" "generally ha[ve] a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *See Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018). When Congress "employs the phrase," it intends "to reach any subject that has 'a connection with, or reference to' the topics the statute enumerates." *United States v. Kraemer*, 933 F.3d 675, 679 (7th Cir. 2019) (quoting *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017) (quoting another source)). Indeed, in another subsection of the same section, Congress requires DHS to respond to information requests "seeking to verify or ascertain the citizenship or immigration status of any individual." 8 U.S.C. § 1373(c). The absence of "regarding" in (c) underscores the need to give effect to the breadth the word carries in § 1373(a). *See Loughrin v. United States*, 573 U.S. 351, 358 (2014).

existing concurrent power of state and nation, but that whatever power a state may have is subordinate to supreme national law.").

Here, Defendants have enacted and advanced their own alien apprehension and detention regime despite and contrary to the comprehensive system Congress created. As thoroughly explained, *supra* Section I. a., the Complaint alleges that the Sanctuary Provisions explicitly prohibit communication and cooperation with federal immigration enforcement authorities or add requirements well beyond what Congress has expressly required for cooperation to happen. Likewise, the judicial warrant and prior conviction requirements foreclose federal immigration authorities' use of the detention method Congress authorized and directly imposes a new method—with a different and much higher standard—on the Federal Government. *See, e.g.*, Compl., ¶¶ 85–89, 92–93, 112–13. And while Defendants claim that their laws do not operate within the field of immigration, the Sanctuary provisions are specifically designed to frustrate enforcement of federal immigration law. *See* Defs.' Mot. at 18. Their scheme is field-preempted.

In evaluating field-preemption, the Supreme Court has "emphasize[d] the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015) (emphasis in original). The Challenged Provisions expressly and exclusively target civil immigration detainers,[14] "federal immigration authorities,"[15] and "immigration enforcement"[16]—rebutting the notion that the Sanctuary Provisions' aim is only to regulate local resources. Because the Sanctuary Provisions regulate in the field of apprehension and detention of aliens, they are field-preempted.

### ii. The Complaint states a claim of conflict preemption.

State laws cannot "stand[] as an obstacle to the accomplishment and execution of the full

---

[14] *See* N.Y.C. Admin. Code § 9-131(b)(1); 14-154(b); NYPD Ops. Order No. 4.
[15] *E.g.*, N.Y.C. Admin. Code § 9-205(b); 9-131(a), (b), (h); 14-154(a), (b).
[16] *Id.* §§ 10-178(a), (b), (d).

purposes and objectives of Congress." *Hines*, 312 U.S. at 67. Thus, "state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby*, 530 U.S. at 372. The Sanctuary Provisions stand as obstacles to federal immigration officers' ability to inspect, detain, and remove aliens as required by the INA. *See e.g.*, 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231.

Preliminarily, the "assumption of nonpreemption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000). Defendants baldly declare the presumption applies here because their "police powers" are implicated. But they do not connect the generic notions of "public health, safety, and morals" to the Sanctuary Provisions. Defs.' Mot. at 13, n.21. Nor could they; as the Complaint shows, the Sanctuary Provisions have made New York City more dangerous and allowed heinous crimes that would otherwise have been prevented. *E.g.*, Compl. ¶¶ 2, 10, 11, 53, 84.[17] Defendants cite the New York City Council's disagreement with Congress's determinations of which aliens may be apprehended and removed. *See* Defs.' Mot. 4–5. But the "United States has broad, undoubted power over the subject of immigration and the status of aliens" and localities are powerless to override Congress's decisions in this arena. *Arizona*, 567 U.S. at 396.

The Complaint clearly alleges conflicts between the Sanctuary Provisions and the INA. First, the Sanctuary Provisions prohibit honoring a detainer or "any similar federal request for detention of a person suspected of violating civil immigration law" unless federal immigration authorities present a judicial warrant and the alien has a specified prior conviction within the past five years. *E.g.*, N.Y.C. Admin. Code § 9-131(a)(1), (b); 14-154(a)(1), (b)(1); 9-205(a), (b)(1).[18] These provisions create an

---

[17] Defendants' conjecture that complying with federal law is too costly (Defs.' Mot. at 4) is puzzling. Although they allege spending $17 million a year honoring immigration detainers before 2011, the City has spent *over $7 billion* housing and caring for illegal aliens over the last few years according to New York City's Commissioner of Immigrant Affairs. *See* Dan Krauth, *Watchdog questions high cost of sanctuary in NYC*, ABC7 (Apr. 7, 2025), https://abc7ny.com/post/watchdog-questions-high-cost-sanctuary-new-york-city/16122940/.

[18] Defendants argue that under New York law (and its view of the Fourth Amendment of the U.S. Constitution), "warrantless civil arrests for civil immigration law violations" are not authorized. *See* Defs.' Mot. at 15, n.22. But Congress

23

obstacle to Congress's objective because federal law authorizes officers to arrest and detain aliens pursuant to administrative warrants. Compl., ¶¶ 85–89, 92–93, 112–13.[19] Likewise, the prior-conviction limitation is contrary to the authority Congress provided to detain and remove aliens in a broader set of circumstances. *See, e.g.*, 8 U.S.C. § 1226(a), 1226(c), 1231, 1182. Compl., ¶¶ 58–65, 68, 71, 79, 80, 85–89. The Sanctuary Provisions also serve as an obstacle for Congress's order to detain illegal aliens who have committed certain offenses upon their release from local custody. *See* Compl., ¶ 91; 8 U.S.C. § 1226(c). An alien's release from state or local custody—a process solely under that locality's control—must occur before the Federal Government can assume custody. *See* Compl. ¶ 30. But the Sanctuary Provisions forbid local personnel from complying with information requests. This leaves federal agents to facilitate congressionally-authorized arrests without the most basic information about the alien and creates an obstacle to Congress's "full purposes and objectives," as articulated in the INA. *Hines*, 312 U.S. at 67. *See* Compl. ¶¶ 8, 95.

According to Defendants, § 9-131(h) only controls City resources and does not stop DHS from inspecting aliens for admission. Defs.' Mot. at 16 (citing 8 U.S.C. § 1225(a)(3)). Not so. The information-sharing restrictions interfere with "an important feature of the immigration system": the flow of information between federal, state, and local authorities. *See Arizona*, 567 U.S. at 411; *see also* 8 U.S.C. § 1373(a). Specifically, § 9-131(h)(1) prohibits the Correction Department from "expend[ing]

---

established a system of civil administrative warrants as the basis for immigration arrests. *See* 8 U.S.C. §§ 1226(a), 1231(a); Compl., ¶¶ 92, 93; *see e.g.*, *Abel v. United States*, 362 U.S. 217, 232–34 (1960) (discussing constitutional validity of administrative arrest procedure); *Carlson v. Landon*, 342 U.S. 524, 538 (1952) (similar). And states cannot simply opt out by refusing to recognize otherwise valid federal law without running afoul of the Supremacy Clause. *See, e.g., United States v. Missouri*, 114 F.4th 980, 986 (8th Cir. 2024) ("That Missouri may lawfully withhold its assistance from federal law enforcement, however, does not mean that the State may do so by purporting to invalidate federal law.").

[19] The INA's allowance for state criminal custody to be completed before removal is premised on the assumption that the Federal Government will be able to learn such aliens' release dates and seamlessly take them into state custody. That assumption is consistent with the general structure of federal immigration law, which anticipates cooperation in various ways, including the sharing of information between federal and state officials. *See* 8 U.S.C. §§ 1226(d)(1)(A), 1373. Congress did not contemplate that, as a consequence of letting state detention proceed first, federal officers who sought to detain an alien for immigration purposes would need to stake out or race to the front of a local detention facility and seek to effectuate an arrest before the alien manages to escape. Here, Defendants obstruct federal immigration enforcement by forbidding compliance with the system Congress designed regarding the apprehension, prosecution, and removal of aliens—as embodied in 8 U.S.C. §§ 1226 and 1231.

time while on duty or department resources of any kind disclosing information that belongs to the department … in response to federal immigration inquiries or in communicating with federal immigration authorities." *See also* NYPD Ops. Order No. 4. By prohibiting information sharing with federal immigration authorities, Defendants have "substitute[d] a new regulatory scheme for the one" Congress designed, serving to inhibit enforcement of federal law, and is thus conflict preempted. *See Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 460 (2012).

Defendants' insistence that their laws are not obstacles[20] distorts the real issue. Defs.' Mot. at 14–15. Localities are not obligated to participate in federal programs, but they cannot actively obstruct them. *See Arizona*, 567 U.S. at 406 ("a state law to the contrary is an obstacle to the regulatory system Congress chose"). To ensure the INA's successful implementation, Congress anticipated coordination among federal, state, and local officials. *E.g.*, Compl., ¶¶ 33–34. Defendants' across-the-board bar on such cooperation is an obstacle to the entire "extensive and complex" statutory scheme for the "governance of immigration and alien status," that regulates individual aliens. *Arizona*, 567 U.S. at 395. *See Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896) (state laws cannot "impair[] the efficiency of th[o]se agencies of the federal government" in the "discharge [of] the[ir] duties"); *Murphy*, 584 U.S. at 477 (state law preempted where "it impose[s] a duty that [i]s inconsistent—i.e., in conflict—with federal law").

States have some flexibility in the degree to which they assist federal officials in enforcing the immigration laws, but the question is whether the particular manner in which Defendants are doing so is compatible with the federal scheme. A grant of some discretion does not imply that all exercises of that discretion are permissible. *See, e.g., Crosby*, 530 U.S. at 366 (finding a statute limiting who state agencies can contract with preempted). The notion that Congress, when it expressly delineated how

---

[20] The Complaint never asserts that local governments must enter into § 1357(g)(1) agreements.

25

(via administrative warrants and detainers) and when (after release) aliens should be taken into federal custody and detained, also contemplated that states could impede the implementation of that system, strains credulity.[21]

Defendants aver the Sanctuary Provisions reflect a decision to refrain from cooperating with immigration enforcement. Defs.' Mot. at 17. But such a conclusion is impossible when the Sanctuary Provisions actively stymie Plaintiff's ability to enforce immigration law, a responsibility exclusively delegated to the Federal Government. *See* U.S. Const. art. I § 8, cl. 4; *Arizona*, 567 U.S. at 394. Indeed, even where, unlike here, a state law effectuates "some state interest or policy[,] other than frustration of the federal objective," it remains a "controlling principle that any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause." *Perez*, 402 U.S. at 652. This is not a case where ICE is conducting an immigration operation and local police choose not to help plan it. It is an across-the-board locality-created immigration policy that bans any local official from cooperating with the Federal Government, even if they want to. What the Federal Government seeks here is not that Defendants *enforce* federal immigration laws, but rather that they *abstain* from unlawfully *obstructing* their implementation. Even in *Arizona*, 567 U.S. 387, the Supreme Court held that state enactments unilaterally *seeking to help* enforce federal immigration law can be preempted, in light of the Federal Government's exclusive authority to set federal immigration policy and the comprehensive scheme set out in the INA. It follows *a fortiori* that Defendants' *efforts to thwart* the Federal Government's enforcement of federal immigration law are preempted.

---

[21] Defendants' reliance on *McHenry Cnty. v. Raoul*, 44 F.4th 584 (7th Cir. 2022) is unavailing. Defs.' Mot. at 17. It addressed a state law barring state and local entities from participating in immigration-detention agreements. 44 F.4th at 585. Although Congress expected the Government to explore cooperative agreements to use such facilities, *see* 8 U.S.C. §§ 1231(g)(2), 1103(a)(11)(B), it did not *require* it to do so. *See McHenry County*, 44 F.4th at 591–92. That court determined that a state could thus decline to assist without *interfering* with the operation of the federal scheme. *See id.* The factors that led to the *McHenry County* result counsel the opposite conclusion here. Here, Defendants are interfering with Congress's direction to federal officials to take custody of aliens at the end of local custody. By taking criminal aliens into custody and then interfering with the Federal Government's ability to assume custody as Congress contemplated, Defendants are not choosing to "refrain from participation" in the federal system of alien detention and removal. *McHenry*, 44 F.4th at 592. Rather, they participate in it—but only on their terms. In doing so, they obstruct accomplishment of Congress's purposes.

Furthermore, simultaneous compliance with federal law and many of the Sanctuary Laws is impossible. For instance, the Sanctuary Provisions bar City employees from allowing federal immigration authorities to access and interview aliens in City custody. N.Y.C. Admin. Code §§ 9-131(h), 10-178(c)). But federal law authorizes federal authorities to interrogate any alien, even those in local custody. 8 U.S.C. § 1357(a)(1); 1225(a)(3). *E.g.*, Compl., ¶ 94, 114.

Finally, Defendants argue that the Challenged Provisions cannot be preempted because they each except conduct *required* by federal law. N.Y.C. Admin. Code §§ 9-131(d), 9-205(d), 14-154(d), 10-178(e). Defs.' Mot. at 16–17. But this again misconstrues the problem with the Sanctuary Provisions. The issue is not Defendants' compliance with federal statutes *requiring* compliance. The issue is that 8 U.S.C. §§ 1373 and 1644 prohibit *restrictions* on sharing information with federal immigration authorities—precisely like those restrictions set out in the Sanctuary Provisions. Compl., ¶ 90. Further, if Defendants' interpretation were correct, the savings clauses they cite would serve no purpose.

### III. The Tenth Amendment is not implicated.

The Tenth Amendment's prohibition on commandeering has no application here. As discussed, Defendants are interfering with a comprehensive federal scheme by imposing a different scheme governing the federal apprehension and detention of aliens. That has precisely the preemptive effect that the Supreme Court has explained remains unaffected by commandeering cases.

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Accordingly, it "prohibits the federal government from compelling the States to enact or administer a federal regulatory program." *New York v. U.S. Dep't of Justice*, 951 F.3d at 112; *see City of New York*, 179 F.3d at 35 (rejecting a facial commandeering challenge to 8 U.S.C. § 1373). "A commandeering challenge to a federal statute depends on there being pertinent authority 'reserved to the States.'" *New York v. U.S. Dep't of Justice*, 951 F.3d at 113.

27

Although certain rights are reserved to the States, under the Supremacy Clause, federal law is the "supreme Law of the Land" U.S. Const. art. VI, cl. 2, and "state and local laws that conflict with federal law are 'without effect.'" *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103 (2d Cir. 2010) (internal citation omitted). Thus, it is a well-settled concept underpinning our system of government that local governments do not have "an untrammeled right to forbid all voluntary cooperation by [their] officials" with federal immigration officials. *City of New York*, 179 F.3d at 35.

To begin, Defendants' arguments hinge on a fundamental mischaracterization of Plaintiff's claims and of §§ 1373(a) and 1644. They misstate Plaintiff's position as *requiring* their participation in immigration enforcement. Defs.' Mot. at 19, 29. But the cited paragraphs describe the provisions (Compl., ¶¶ 79, 80) and how they conflict with and impair enforcement of federal law (*id.* ¶¶ 92, 93). Plaintiff is not seeking to compel participation in immigration enforcement—an authority afforded exclusively to the Executive—but rather to remove Defendants' express and implicit obstacles to the Executive's duty to carry out its immigration enforcement duties. *See* Compl. ¶ 7–8, 90. And §§ 1373 and 1644 only forbid *restricting* assistance to immigration authorities—they do not mandate any action—and they leave states free to control how employees keep data and spend their time—so long as employees remain permitted to voluntarily share information with federal immigration authorities.[22]

A comparison to *Printz v. United States*, 521 U.S. 898 (1997) and *New York v. United States*, 505 U.S. 144 (1992) is illuminating. In those cases, the states or their employees were conscripted into enacting or administering federal programs. *See Printz*, 521 U.S. at 917–18 (distinguishing federal directives to states that only mandate providing information to the Federal Government from those that force the States to participate in the actual administration of a federal program—regardless of the fact that both types leave states with no choice but to comply). As the Second Circuit explained: "The

---

[22] Defendants' contentions that invalidating the discriminatory provisions of their policies on intergovernmental immunity grounds would create a back-end anticommandeering problem (Defs.' Mot. at 29–30) fail for the same reasons.

28

central teaching of these cases is that 'even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.'" *City of New York*, 179 F.3d at 34 (quoting *New York*, 505 U.S. at 166). But §§ 1373(a) and 1644 do not compel state or local governments to enact or administer a federal program—instead they bar state and local governments from restricting voluntary exchanges of information with federal immigration authorities. *City of New York*, 179 F.3d at 35 (citing *Printz*, 521 U.S. at 917–18). Indeed, the Second Circuit rejected a challenge to these provisions because it "asks us to turn the Tenth Amendment's shield against the federal government's using state and local governments to enact and administer federal programs into a sword allowing states and localities to engage in passive resistance that frustrates federal programs." *City of New York*, 179 F.3d at 35. *See also New York v. U.S. Dep't of Justice*, 951 F.3d at 113 (finding "it is doubtful that States have reserved the power to adopt … immigration policies *contrary* to those preferred by the federal government" and set forth in statutes such as § 1373) (internal quotations and citation omitted).

Defendants simply declare this Second Circuit precedent is no longer valid. They point to *Murphy*'s statement of the "basic principle—that Congress cannot issue direct order to state legislatures—applies" whether the challenged law "commanded 'affirmative' action as opposed to imposing a prohibition." Defs.' Mot. at 20–21 (citing *Murphy*, 584 U.S. at 475). But the analysis underpinning *City of New York* remains intact. The Second Circuit said so itself: "*Murphy* may well have clarified that prohibitions as well as mandates can manifest impermissible commandeering. But the conclusion that § 1373, on its face, violates the Tenth Amendment does not follow." *New York v. U.S. Dep't of Justice,* 951 F.3d 84 at 112. This is because "[a] commandeering challenge to a federal statute depends on there being a pertinent authority reserved to the States." *Id.* (internal quotations omitted).

In order to find that §§ 1373 and 1644 violate the anticommandeering doctrine the court must identify what power is reserved to the States to enact laws or policies "prohibiting their officials and

29

agencies from engaging in even voluntary communications about citizenship and immigration status with federal authorities." *New York v. U.S. Dep't of Justice*, 951 F.3d at 113. The Second Circuit explained that "[a] court undertaking that inquiry would have to recognize, as the Supreme Court has, that '[c]onsultation between federal and state officials is an important feature of the immigration system' established by the INA." *Id.* at 114 (quoting *Arizona*, 567 U.S. at 411). Indeed, *Arizona* discussed the INA's information sharing provisions and held that the federal scheme left room for a State policy *requiring* information sharing. *Id.* (quoting *Arizona*, 567 U.S. at 413). But "[t]he same conclusion may not be so easy to reach … with respect to a State policy *prohibiting* information sharing." *Id.* Defendants have not specifically explained how the power they seek—barring information sharing—is reserved to them beyond general prerogatives to direct local resources and build community trust (Defs.' Mot. at 1, 13, 15, 27, 30). But these vague invocations are not enough to warrant 12(b)(6) dismissal.

Defendants also rely on *New York*. But the cited passages address a State law "restrict[ing] certain federal activities in state courthouse and facilities"—which was upheld based on a finding of a "state common law privilege against courthouse civil arrests." 2025 U.S. Dist. LEXIS 225875, at *36, *50–51, *53. Defendants have not articulated any such common-law right here. *E.g.*, Compl., ¶ 97. In any event, "disclosing information that belongs to the department" to federal immigration authorities (N.Y.C. Admin. Code § 9-131(h)(1)) is "purely ministerial" and is not commandeering. *See Printz*, 521 U.S. at 936 (O'Connor, J., concurring) (federal requirement that local law-enforcement agencies report missing children to Justice Department was not impermissible commandeering).[23]

## CONCLUSION

For the foregoing reasons the Court should deny Defendants' Motion to Dismiss.

---

[23] Defendants seek to dismiss several Defendants because they are not "suable agencies." Defs.' Mot. at 1, n.1. But New York City Charter § 396 addresses "[a]ll actions and proceedings for the recovery of penalties." Plaintiff here seeks injunctive and declaratory relief. Compl., ¶¶ 35–36, so § 396 is inapplicable. Additionally, *Nnebe v. Daus* applies only to 42 U.S.C. § 1983 actions. 644 F.3d 147, 158 n.6 (2d Cir. 2011). Further, the attempt to collapse the official-capacity Defendants into their entities is unavailing. Plaintiff seeks prospective relief against the official-capacity Defendants and has alleged their specific involvement in enforcing the Sanctuary Provisions. *E.g.*, Compl. ¶¶ 21, 23, 39, 44–47, 54, 83.

DATED: January 21, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

CHARLES E.T. ROBERTS
Counsel to the Assistant Attorney General
Civil Division

ELIANIS N. PEREZ
Assistant Director

VICTORIA TURCIOS
SUSAN ANSARI
Trial Attorneys

/s/ Catherine M. Reno
CATHERINE M. RENO
Acting Assistant Director
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 353-8557
Fax: (202) 305-7000
Email: catherine.m.reno@usdoj.gov

*Attorneys for the United States*

A