# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA,

              Plaintiff,

              v.

CITY OF NEW YORK *et al.*,

              Defendants.

Case No. 1:25-cv-4084 (RER)

**PROPOSED BRIEF OF *AMICI CURIAE* THE LEGAL AID SOCIETY, BRONX DEFENDERS, NEW YORK LEGAL ASSISTANCE GROUP, UNLOCAL, INC., LATINOJUSTICE PRLDEF, IMMIGRANT DEFENSE PROJECT, NEW YORK COUNTY DEFENDER SERVICES, BROOKLYN DEFENDER SERVICES, NEIGHBORHOOD DEFENDER SERVICE OF HARLEM, AND MAKE THE ROAD NEW YORK IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Date: December 9, 2025

Meghna Philip
Hasan Shafiqullah
Paula Garcia Salazar
Brian Perbix
Evan Henley
THE LEGAL AID SOCIETY
49 Thomas Street, Floor 10
New York, NY 10013
Phone: (212) 577-3367
mphilip@legal-aid.org

Rosa Cohen-Cruz
THE BRONX DEFENDERS
360 E. 161st Street
Bronx, NY 10451
Phone: (718) 508-3402
rosac@bronxdefenders.org

*Additional counsel listed in signature block*

## CORPORATE DISCLOSURE STATEMENTS

1.  The Legal Aid Society is a nonprofit corporation with no parent corporation. No publicly held corporation owns ten percent or more of its stock.

2.  The Bronx Defenders is a nonprofit corporation with no parent corporation. No publicly held corporation owns ten percent or more of its stock.

3.  The New York Legal Assistance Group (NYLAG) is a nonprofit corporation with no parent corporation. No publicly held corporation owns ten percent or more of its stock.

4.  UnLocal, Inc. is a nonprofit corporation with no parent corporation. No publicly held corporation owns ten percent or more of its stock.

5.  LatinoJustice PRLDEF has no parent company. No publicly held corporation owns ten percent or more of its stock.

6.  The Immigrant Defense Project is a nonprofit organization with no parent corporation. No publicly held corporation owns ten percent or more of its stock.

7.  New York County Defender Services has no parent company.

8.  Brooklyn Defender Services is a nonprofit corporation with no parent corporation. No publicly held corporation owns ten percent or more of its stock.

9.  Neighborhood Defender Service of Harlem is a nonprofit corporation with no parent corporation. No publicly held corporation owns ten percent or more of its stock.

10. Make the Road New York has no corporate parent and no publicly held corporation directly or indirectly owns 10% or more of its stock.

i

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENTS ............................................................... i

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF INTEREST ................................................................................... 2

ARGUMENT ........................................................................................................... 2

    I.    THE TENTH AMENDMENT PROTECTS NEW YORK CITY'S RIGHT TO ENACT THE SANCTUARY LAWS AND TO DECLINE TO PARTICIPATE IN THE FEDERAL GOVERNMENT'S DEPORTATION AGENDA. ............................................... 2

        A.    New York City Has the Right to Decline to Assist the Trump Administration's Lawless Immigration Enforcement Actions. ........................................ 4

        B.    The Federal Government Seeks to Commandeer New York City's Resources to Implement Its Mass Deportation Agenda. ............................................. 8

    II.    NEW YORK CITY'S SANCTUARY LAWS PROTECT NEW YORKERS' RIGHTS WITHIN THE CRIMINAL LEGAL SYSTEM. ................................................ 11

    III. THE SANCTUARY LAWS PROTECT NEW YORKERS' RIGHT TO ACCESS PUBLIC SERVICES AND FACILITIES. ................................................................ 15

CONCLUSION ...................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*A. A. R. P. v. Trump*, 605 U.S. 91 (2025)................................................................................ 6

*Abrego Garcia v. Noem*, No. 25-1404, 2025 U.S. App. LEXIS 9237 (4th Cir. Apr. 17, 2025)..... 7

*Aliessa v. Novello*, 754 N.E.2d 1085 (N.Y. 2001) ................................................................ 15

*Arizona v. United States*, 567 U.S. 387 (2012)...................................................................... 4

*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991) ............................................................ 3, 16

*California v. United States*, 921 F.3d 865 (9th Cir. 2019).................................................... 4

*Castaneda v. Cnty. of Suffolk*, No. 17-CV-4267, 2025 U.S. Dist. LEXIS 26726 (E.D.N.Y. Jan. 2, 2025) ...................................................................................................................... 9

*City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020).......................................................... 8

*County of Ocean v. Grewal*, 475 F. Supp. 3d 355 (D.N.J. 2020) .................................... 5, 10

*Escobar Molina v. Dep't of Homeland Security*, No. 25-3417, 2025 U.S. Dist. LEXIS 234930 (D.D.C. Dec. 2, 2025) ......................................................................................................... 5

*Farm Lab. Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir. 2002) ................ 19

*G.F.F. v. Trump*, 781 F. Supp. 3d 195 (S.D.N.Y. 2025) ...................................................... 7

*Graham v. Richardson*, 403 U.S. 365 (1971) ...................................................................... 6

*J.A.V. v. Trump*, 781 F. Supp. 3d 535 (S.D. Tex. 2025) ...................................................... 7

*Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953).............................................................. 6

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ...................................................... 12

*Manigault v. Springs*, 199 U.S. 473 (1905) ........................................................................ 3

*Mayor of New York v. Miln*, 36 U.S. 102 (1837).................................................................. 4

*McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022) ...................................................... 4

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018) .................................... 3, 8

*New York v. United States*, 505 U.S. 144 (1992)................................................................ 8

*People ex rel. Wells v. DeMarco*, 88 N.Y.S.3d 518 (N.Y. App. Div. 2018) ...................... 9, 12, 13

*Printz v. United States*, 521 U.S. 898 (1997)..................................................................... 3

*Ramirez Ovando v. Noem*, No. 25-cv-03183, 2025 U.S. Dist. LEXIS 234204 (D. Colo. Nov. 25, 2025) ........................................................................................................................ 5

*Tucker v. Toia*,  371 N.E.2d 449 (N.Y. 1977)................................................................... 15

*Turner v. Louisiana*, 379 U.S. 466 (1965) ...................................................................... 12

*United Farm Workers v. Noem*, 785 F. Supp. 3d 672 (E.D. Cal. 2025) ........................... 5

*United States v. California*, 314 F. Supp. 3d 1077 (E.D. Cal. 2018)................................ 8

United States v. California, 921 F.3d 865 (9th Cir. 2019)................................................. 8

*United States v. New York*, No. 1:25-CV-744 (MAD/PJE), 2025 U.S. Dist. LEXIS 225875 (N.D.N.Y. Nov. 17, 2025) ......................................................................................... 4, 8, 10

**Statutes**

42 U.S.C. § 2000d............................................................................................................. 19

8 U.S.C. § 1357................................................................................................................... 8

8 U.S.C. § 1373................................................................................................................. 10

8 U.S.C. § 1644................................................................................................................. 10

8 USC § 1621.................................................................................................................... 15

N.Y. Civ. Rights Law § 40 ............................................................................................... 19

N.Y. Exec. Law § 296........................................................................................................ 19

N.Y. Soc. Serv. Law § 122 ............................................................................................... 15

N.Y.C. Admin. Code § 14-154 .............................................................................. 3, 11, 14

N.Y.C. Admin. Code § 9-205 ................................................................................ 3, 11, 14

N.Y.C. Admin. Code. § 10-178 ....................................................................... 3, 10, 16, 17

N.Y.C. Admin. Code. § 9-131 ............................................................................... 3, 11, 14

NYC Admin. Code § 8-107 ............................................................................................... 19

**Constitutional Provisions**

N.Y. Const. art. I, §6....................................................................................................... 12

N.Y. Const. art. XVII, § 1.............................................................................................. 15

N.Y. Const. art. XVII, § 3.............................................................................................. 16

U.S. Const. amend. V............................................................................................... 6, 12

U.S. Const. amend. VI ................................................................................................... 12

U.S. Const. amend. XIV ........................................................................................... 6, 12

**Charter Provisions**

N.Y.C. Charter § 8 .................................................................................................... 4, 10

**Other Authorities**

Aarti Shahani, *New York City Enforcement of Immigration Detainers*, Justice Strategies (Oct. 2010), https://immigrantjustice.org/sites/default/files/NYC%20Detainer%20Report.pdf ....... 12

*About NYC Health + Hospitals*, NYC Health + Hospitals, https://www.nychealthandhospitals.org/about-nyc-health-hospitals/ ..................................... 16

Amy Finkelstein et al., *The Oregon Health Insurance Experiment: Evidence from The First Year*, 127 Q. J. Econ. 1057 (2012) ...................................................................................... 17

Brian Bennett, *Trump Set to Ratchet Up His Immigration Crackdown During Next 100 Days*, Time (Apr. 28, 2025), https://time.com/7281034/trumpimmigration-crackdown-executive-orders/ .................................................................................................................... 5

Committee Report of the Governmental Affairs and Human Services Divisions, Prop. Int. Nos. 1558, 1565, 1566, 1568, 1569, and 1578 (Apr. 26, 2017), https://shorturl.at/faIjU ................. 18

Dana Goldstein & Irene Casado Sanchez, *Immigration Raids Add to Absence Crisis for Schools*, N.Y. Times (June 16, 2025), https://www.nytimes.com/2025/06/16/us/immigration-raids-school-absences-deportation-fears.html.................................................................... 17

Dani Anguiano, *California: Officials Investigate after Second Shooting by ICE Agents in a Week*, The Guardian (Oct. 30, 2025), https://www.theguardian.com/us-news/2025/oct/30/ice-agents-southern-california-shooting .............................................................................. 6

Daniela Alulema & Jacquelyn Pavilon, Ctr. For Migration Studies, *Immigrants' Use of New York City Programs, Services, and Benefits: Examining the Impact of Fear and Other Barriers to Access* (Jan. 2022).................................................................................................. 17

Daniella Silva, *Judge Dismisses Charges against Chicago Woman Shot by Border Patrol*, NBC News (Nov. 20, 2025), https://www.nbcnews.com/news/us-news/chicago-woman-shot-border-patrol-marimar-martinez-charges-dismissed-rcna244979 ........................................... 6

Debbie Nathan, *ICE Held an NYC Child Incommunicado at Secret Hotels, then Deported Him*, The Intercept (Aug. 18, 2025), https://theintercept.com/2025/08/18/ice-children-hotel-detention-nyc-deported/ ................................................................................................ 14

Donald J. Trump, Truth Social, https://truthsocial.com/@realDonaldTrump/posts/114690267066155731 (Jun. 15, 2025)........ 5

Edward Vargas & Maureen Pirog, *Mixed-Status Families and WIC Uptake: The Effects of Risk of Deportation on Program Use*, 97 Soc. Sci. Q. 555 (Sept. 2016) .......................................... 17

Executive Order 41 (Sept. 17, 2003) ..................................................................................... 16, 19

Francisco Pedraza et al., *Cautious Citizenship: The Deterring Effect of Immigration Issue Salience on Health Care Use and Bureaucratic Interactions among Latino US Citizens*, 42 J. Health Politics, Pol'y & L. 925 (Oct. 2017), https://escholarship.org/uc/item/9p48r4jt .......... 19

General Information Systems Message from Valerie Figueroa, Deputy Comm'r Emp't & Income Support Programs, N.Y. Off. of Temp. & Disability Assistance (May 12, 2023), https://otda.ny.gov/policy/gis/2023/23DC039.pdf...................................................................... 15

Gwynne Hogan, *Federal Raid Outside Row Hotel Migrant Shelter Rattles Residents*, The City (updated Oct. 18, 2025), https://www.thecity.nyc/2025/10/17/row-hotel-ice-raid-shelter/ ....... 9

Gwynne Hogan, *Video: Federal Agents Bust Into Queens Apartment, Pointing Guns at Mother and Her Four Kids*, The City (Nov. 19, 2025), https://www.thecity.nyc/2025/11/19/queens-ice-raid-guns-children-mother/ ...................................................................................... 6

Julia Rock & Isabelle Taft, *ICE Detainees in New York Jails Can't Talk to Their Lawyers*, N.Y. Focus (Oct. 6, 2025), https://nysfocus.com/2025/10/06/ice-detention-jails-legal-phone-access-new-york ............................................................................................................................... 14

Julie Bosman, *Officials Move to Drop Case Against Drivers in Chicago Immigration Clash*, N.Y. Times (Nov. 20, 2025), https://www.nytimes.com/2025/11/20/us/charges-drivers-chicago-immigration-clash.html ................................................................................................. 6

Lena Graber & Krsna Avila, Immigr. Legal Res. Ctr., *Growing the Resistance: How Sanctuary Laws and Policies Have Flourished During the Trump Administration* 9 (Dec. 2019), https://tinyurl.com/28amwr6c ................................................................................................. 3

Marcella Alsan & Crystal Yang, *Fear and the Safety Net: Evidence from Secure Communities*, 106 Rev. Econ. & Statistics 1427 (2024)................................................................................. 17

Maria Sacchetti, Carol D. Leonnig, and Marianne LeVine, *ICE memo Outlines Plan to Deport Migrants to Countries Where They Are Not Citizens*, Wash. Post (Jul. 13, 2025), https://www.washingtonpost.com/immigration/2025/07/12/immigrants-deportations-trump-ice-memo............................................................................................................................ 7

Melissa Sanchez et al., *"I Lost Everything": Venezuelans Were Rounded Up in a Dramatic Midnight Raid but Never Charged With a Crime*, Pro Publica (Nov. 13, 2025), https://www.propublica.org/article/chicago-venezuela-immigration-ice-fbi-raids-no-criminal-charges ................................................................................................................................ 5

N.Y.C. Bar Ass'n, *Report on the Trump Administration's 2025 Changes to Immigration Law* (last updated Oct. 10, 2025), https://www.nycbar.org/wp-content/uploads/2025/03/20221419-TrumpAdminChangesImmigrationLaw.pdf .............................................................................. 5

N.Y.C. Criminal Justice Agency, *NYC Pretrial Data*, https://www.nycja.org/people-prosecuted ................................................................................................................................ 11

N.Y.C. Exec. Order No. 41 (2021), https://www.nyc.gov/assets/immigrants/downloads/pdf/eo-41.pdf (last visited Dec. 3, 2025) ................................................................................ 16

N.Y.C. Hum. Res. Admin., *Community Guide to HRA Public Benefits for Immigrants*, https://www.nyc.gov/assets/hra/downloads/pdf/services/language/benefits_guide_immigrants/hra_benefits_en.pdf ................................................................................................ 16

Natashi Korecki, *Chicago Residents Say Immigration Enforcement is Leading to Children Getting Tear-Gassed*, NBC News (Nov. 5, 2025), https://www.nbcnews.com/news/us-news/chicago-immigration-enforcement-children-tear-gas-border-patrol-rcna241629 ............. 5

NYPD Operations Order No. 4 ............................................................................. 3, 16

Press Release, *UN Experts Alarmed by Resumption of US Deportations to Third Countries, Warn Authorities to Assess Risks of Torture*, United Nations Hum. Rts. Off. High Comm'r (Jul. 8, 2025), https://www.ohchr.org/en/press-releases/2025/07/un-experts-alarmed-resumption-us-deportations-third-countries-warn ................................................................. 7

Proclamation No. 10903, Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua, 90 Fed. Reg. 13033 (Mar. 14, 2025), https://www.whitehouse.gov/presidentialactions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/ .............................. 6

Sam Dolnick, *Report Questions the System Used to Flag Rikers Island Inmates for Deportation*, N.Y. Times (Nov. 10, 2010), https://www.nytimes.com/2010/11/11/nyregion/11rikers.html. 13

Sarah Suiter & Meredith Meadows, *Educational Attainment and Educational Contexts as Social Determinants of Health*, 50 Primary Care: Clinics in Off. Practice 579 (2023) ....................... 17

Tara Watson & Jonathon Zars, *100 Days of Immigration under the Second Trump Administration*, Brookings (Apr. 29, 2025), https://www.brookings.edu/articles/100-days-of-immigration-under-the-second-trump-administration/ ................................................ 5

Tara Watson, *Inside the Refrigerator: Immigration Enforcement and Chilling Effects in Medicaid Participation*, 6 Am. Econ. J.: Econ. Pol'y 313 (2014) ........................................... 17

Testimony of Bronx Defenders, Hearing Testimony before the Council of the City of N.Y. on Int. 486-2014 and Int. 0487-2014 (Oct. 15, 2014), https://shorturl.at/wHvFI ........................... 12

Testimony of Brooklyn Defender Services, Hearing Testimony before the Council of the City of N.Y. on Int. 486-2014 and Int. 0487-2014 (Oct. 15, 2014) , https://shorturl.at/wHvFI ........... 12

Testimony of Make the Road N.Y., Hearing Testimony before the Council of the City of N.Y. on Int 1568-2017 (Apr. 26. 2017), https://shorturl.at/faIjU ......................................................... 18

Testimony of Michael Clarke, NYPD, Hearing Testimony before the Council of the City of N.Y. on Int 0158-2022 (Feb. 15, 2023), https://tinyurl.com/2vuewhjn................................................ 8

Testimony of Sanctuary for Families, Hearing Testimony before the Council of the City of N.Y. on Int 1568-2017 (Apr. 26. 2017), https://shorturl.at/faIjU ...................................................... 18

The Federalist No. 39 (C. Rossiter ed. 1961) (J. Madison) ........................................................... 3

Tiffany J. Lieu, *The Accountability Deficit: When Immigration Detention Obstructs One's Day in Criminal Court*, 125 Colum. L. Rev. 1631 (2025) ............................................................... 14

Tom Wong et al., U.S. Immigr. Pol'y Ctr., *How Interior Immigration Enforcement Affects Trust in Law Enforcement* (Apr. 3, 2019),  https://usipc.ucsd.edu/publications/usipc-working-paper-2.pdf ....................................................................................................................................... 19

U.S. Dep't of Health & Human Services, *Civil Rights Requirements — Title VI of the Civil Rights Act of 1964*, https://www.hhs.gov/civil-rights/for-individuals/special-topics/needy-families/civil-rights-requirements/index.html .......................................................................... 19

Vera Inst. of Justice, *Diversion Programs, Explained*, https://www.vera.org/diversion-programs-explained ................................................................................................................................... 13

William K. Rashbaum et al., *How Dr. Phil and a Top Adams Aide Helped Ease ICE's Path into New York*, N.Y. Times (Jun. 18, 2025), https://www.nytimes.com/2025/06/18/nyregion/ice-kaz-adams-nyc-immigration.html ....................................................................................... 9

Ximena Castillo & Polina Lytvynova, *U.S. Deports Dozens of Migrants to Ukraine Amid War*, NPR (Nov. 18, 2025), https://www.npr.org/2025/11/18/g-s1-98262/ukraine-deportations-war 7

## PRELIMINARY STATEMENT

New York City's sanctuary laws protect the legal rights of immigrant New Yorkers and ensure that the use of City resources helps all New Yorkers thrive. Over three million immigrants live in New York City ("the City"), accounting for thirty-eight percent of its population. Immigrants comprise an indelible part of New York's social and economic fabric. So, the City has a significant interest in protecting immigrants' rights and encouraging their full participation in society. Its sanctuary laws enable immigrant communities to freely access government institutions, particularly in the face of aggressive and unconstitutional federal immigration enforcement tactics. With this lawsuit, the federal government seeks to gut the sanctuary laws' protections and commandeer the City's municipal government to advance its mass deportation regime.

The sanctuary laws generally prohibit the use of municipal resources for immigration enforcement. *Amici* have seen firsthand how these laws protect New Yorkers' constitutional rights and guarantee access to local services. This brief draws on our expertise in the intersection of criminal, immigration, and other civil laws to explain the sanctuary laws' secure constitutional footing and the untold harm and suffering that would result if they were invalidated.

Accepting the federal government's preemption claims would force City officials to violate the state constitution, turn City services into an information-gathering mechanism for purposes of immigration enforcement, and impede millions of New Yorkers' access to critical municipal services. Because the Tenth Amendment protects New York City's right to ensure its limited resources are not used for these purposes, empowers it to decide how best to serve its residents, and prevents the federal government from forcing the City to act as its instrument, this Court should reject the federal government's claims.

1

**STATEMENT OF INTEREST**

The *amici* submitting this brief are legal services providers, advocacy organizations, and a member-based organization.[1] Together, we represent New Yorkers who benefit from the sanctuary laws. We collectively share an interest in ensuring that New Yorkers may freely and safely exercise their constitutional rights and access the municipal services they need to live safe, healthy, and productive lives.

**ARGUMENT**

Given the overriding importance of immigrants and their communities to New York City, its local government has chosen to enact a slate of sanctuary policies, relied on by *amici*'s clients and members, that promote the participation of immigrants in all areas of civic life and safeguard access to essential services—from the criminal legal system to schools, public health services, housing programs, and domestic violence shelters. These important public policy goals are unrelated to immigration and benefit the entire city. And faced with the federal government's current lawless mass deportation regime, the sanctuary laws also stand as an indispensable constitutional bulwark protecting immigrant New Yorkers' rights. The Court should affirm the City's authority to make this choice.

**I. THE TENTH AMENDMENT PROTECTS NEW YORK CITY'S RIGHT TO ENACT THE SANCTUARY LAWS AND TO DECLINE TO PARTICIPATE IN THE FEDERAL GOVERNMENT'S DEPORTATION AGENDA.**

Millions of immigrant New Yorkers and their families and communities rely on the City's sanctuary laws to safeguard their rights, and the City has the authority to enact and enforce these laws. The Constitution's system of dual sovereignty confers on Congress "only certain enumerated

---

[1] A description of each amicus appears in Appendix A to this brief, which lists the identity and interest of each amicus. No party's counsel authored the brief in whole or in part; no party or a party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than *amici*, their counsel, or their members—contributed money that was intended to fund preparing or submitting the brief.

2

powers"; the Tenth Amendment reserves "all other legislative power" to the States, which "retain[] 'a residuary and inviolable sovereignty.'" *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470–71 (2018) (quoting The Federalist No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison)); U.S. Const. amend. X. The Tenth Amendment's federalism guarantees extend to municipal governmental entities. *See Printz v. United States*, 521 U.S. 898, 931 n.15 (1997). Pursuant to its "inviolable sovereignty," New York City's local government retains the right to enact its sanctuary laws and policies in the exercise of its "police power," the "sovereign right of the government to protect the lives, health, morals, comfort, and general welfare of the people." *Manigault v. Springs*, 199 U.S. 473, 480 (1905); *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991) ("The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals.").

To accomplish its goal of promoting access to local services and institutions, the City has enacted a general policy that prevents the use of City resources for immigration enforcement. N.Y.C. Admin. Code. § 10-178 (c).[2] It has also carefully delineated the conditions under which its law enforcement, correctional, and probation agencies and officers may honor detainers from federal immigration authorities by requiring—consistent with the Fourth Amendment and New York state law—a judicial warrant to arrest or hold someone beyond their release date and preventing the disclosure of non-public information regarding an individual's release unless the individual has previously been convicted of a violent or serious crime or appears on the federal terrorist screening database. *See* N.Y.C. Admin. Code. §§ 9-131 (b), 9-205(b), and 14-154; *see*

---

[2] New York City is far from alone in restricting the use of its resources for immigration enforcement. According to a 2019 nationwide survey of county-level policies, at least 715 counties had policies against holding individuals on ICE detainers alone, while at least 176 counties generally prohibited the use of local resources for immigration enforcement, and at least 196 counties restricted the circumstances under which they would notify ICE of an imminent release. *See* Lena Graber & Krsna Avila, Immigr. Legal Res. Ctr., *Growing the Resistance: How Sanctuary Laws and Policies Have Flourished During the Trump Administration* 9 (Dec. 2019), https://tinyurl.com/28amwr6c.

*also* NYPD Operations Order No. 4. These information-sharing prohibitions comport with the City's Charter, which also requires City employees to maintain the confidentiality of private information obtained during their official duties, including information relating to a person's immigration status. N.Y.C. Charter § 8(g). These sanctuary laws reflect decades of careful consideration and democratic decision-making regarding governmental functions.

The sanctuary laws also express the City's decisions about how best to allocate its resources, protect New Yorkers' rights within the criminal legal system, and ensure access to public services. They are a classic exercise of the City's police power. When a state or local government exercises its police power, the Tenth Amendment's protections are at their zenith. *See Arizona v. United States*, 567 U.S. 387, 400 (2012); *Mayor of New York v. Miln*, 36 U.S. 102, 103 (1837) (stating that "the authority of a state is complete, unqualified and exclusive" as to powers related to "municipal legislation" or "internal police").

**A.    New York City Has the Right to Decline to Assist the Trump Administration's Lawless Immigration Enforcement Actions.**

The federal government's complaint rests on a vacuous conception of states' rights that is fundamentally at odds with the Tenth Amendment's guarantees. In its view, nothing less than unstinting compliance with civil immigration enforcement efforts is required. *See, e.g.*, Compl. ¶ 4 (comparing the City's requirement that immigration officials present a warrant before honoring a detainer to "intentional sabotage"). This view is wrong. New York City has the right to decline to assist immigration enforcement efforts. *See, e.g.*, *McHenry Cnty. v. Raoul*, 44 F.4th 581, 594 n.7 (7th Cir. 2022); *California v. United States*, 921 F.3d 865, 889 (9th Cir. 2019); *United States v. New York*, No. 1:25-CV-744 (MAD/PJE), 2025 U.S. Dist. LEXIS 225875, at *48–49, 57 (N.D.N.Y. Nov. 17, 2025) ("The United States repeatedly conflates the INA's codification of comity with a requirement that States facilitate federal immigration enforcement. This is incorrect.

4

Comity by definition is not a legal requirement."). The sanctuary laws express the City's legitimate refusal to help with immigration enforcement. *See County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 379 (D.N.J. 2020).

The City's decision not to participate in federal civil immigration enforcement efforts has particular gravity during this Administration, which has pursued immigration enforcement on a massive scale[3] in an often lawless, violent, and gratuitously cruel manner. Federal courts around the country have rebuked the Trump Administration for disregarding the Fourth Amendment and statutory requirements constraining immigration authorities' ability to make warrantless arrests. *See, e.g.*, *Escobar Molina v. Dep't of Homeland Security*, No. 25-3417, 2025 U.S. Dist. LEXIS 234930, at *94–97 (D.D.C. Dec. 2, 2025); *Ramirez Ovando v. Noem*, No. 25-cv-03183, 2025 U.S. Dist. LEXIS 234204, at *42–44 (D. Colo. Nov. 25, 2025); *United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 734–35, 742–44 (E.D. Cal. 2025). ICE and Border Patrol agents have used excessive force and violent tactics, including conducting a mass raid on an apartment building in Chicago—during which they rappelled down walls from helicopters, knocked down doors without presenting warrants, and terrorized its residents—and employing tear gas and chemical agents in residential neighborhoods and near schools, sickening children.[4] After a Border Patrol agent shot a Chicago

---

[3] *See generally* N.Y.C. Bar Ass'n, *Report on the Trump Administration's 2025 Changes to Immigration Law* (last updated Oct. 10, 2025), https://www.nycbar.org/wp-content/uploads/2025/03/20221419-TrumpAdminChangesImmigrationLaw.pdf; Tara Watson & Jonathon Zars, *100 Days of Immigration under the Second Trump Administration*, Brookings (Apr. 29, 2025), https://www.brookings.edu/articles/100-days-of-immigration-under-the-second-trump-administration/; Brian Bennett, *Trump Set to Ratchet Up His Immigration Crackdown During Next 100 Days*, Time (Apr. 28, 2025), https://time.com/7281034/trumpimmigration-crackdown-executive-orders/ (noting that "[t]he number of immigration arrests at workplaces has tripled" in Trump's first 100 days and quoting Trump's border czar Tom Homan as saying, "It's going to triple again."); Donald J. Trump, Truth Social, https://truthsocial.com/@realDonaldTrump/posts/114690267066155731 (Jun. 15, 2025) (describing "the largest Mass Deportation Operation . . . in History," and the aim to "expand efforts to . . . America's largest Cities, such as Los Angeles, Chicago, and New York").

[4] Melissa Sanchez et al., *"I Lost Everything": Venezuelans Were Rounded Up in a Dramatic Midnight Raid but Never Charged With a Crime*, Pro Publica (Nov. 13, 2025), https://www.propublica.org/article/chicago-venezuela-immigration-ice-fbi-raids-no-criminal-charges; Natashi Korecki, *Chicago Residents Say Immigration Enforcement is Leading to Children Getting Tear-Gassed*, NBC News (Nov. 5, 2025), https://www.nbcnews.com/news/us-news/chicago-immigration-enforcement-children-tear-gas-border-patrol-rcna241629.

motorist five times and claimed she and another motorist rammed and boxed-in his vehicle, federal prosecutors dismissed the cases against them after witness statements contradicted the agent's version of events.[5] ICE agents in California shot multiple people over the course of several weeks in October 2025.[6] And recently, ICE agents and United States Marshals busted into a Queens family's apartment in a pre-dawn raid, did not show a warrant, dragged the mother by her hair, and pointed an assault rifle at a child.[7] They were looking for a cousin who had not lived in the apartment for years.[8]

At the same time, the Trump Administration has repeatedly demonstrated that it does not believe that due process should be afforded to noncitizens, despite the Supreme Court's settled holdings that the Fifth and Fourteenth Amendment guarantees of due process apply equally to noncitizens, and particularly "in the context of removal proceedings." *A. A. R. P. v. Trump*, 605 U.S. 91, 94 (2025); *see also, e.g.*, *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953); *Graham v. Richardson*, 403 U.S. 365, 371 (1971). The Administration's extreme disregard for due process is especially evident in its repeated and unprecedented use of the wartime Alien Enemies Act ("AEA"), 50 U.S.C. §§ 21–24, to claim, without evidence, that noncitizen Venezuelans over the age of 14 years are Tren de Aragua members and thus "alien enemies," paving the way for their immediate deportation, with no notice or opportunity to respond to these baseless allegations.[9]

---

[5] Daniella Silva, *Judge Dismisses Charges against Chicago Woman Shot by Border Patrol*, NBC News (Nov. 20, 2025), https://www.nbcnews.com/news/us-news/chicago-woman-shot-border-patrol-marimar-martinez-charges-dismissed-rcna244979; Julie Bosman, *Officials Move to Drop Case Against Drivers in Chicago Immigration Clash*, N.Y. Times (Nov. 20, 2025), https://www.nytimes.com/2025/11/20/us/charges-drivers-chicago-immigration-clash.html.

[6] Dani Anguiano, *California: Officials Investigate after Second Shooting by ICE Agents in a Week*, The Guardian (Oct. 30, 2025), https://www.theguardian.com/us-news/2025/oct/30/ice-agents-southern-california-shooting.

[7] Gwynne Hogan, *Video: Federal Agents Bust Into Queens Apartment, Pointing Guns at Mother and Her Four Kids*, The City (Nov. 19, 2025), https://www.thecity.nyc/2025/11/19/queens-ice-raid-guns-children-mother/.

[8] *Id.*

[9] *See* Proclamation No. 10903, Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua, 90 Fed. Reg. 13033 (Mar. 14, 2025), https://www.whitehouse.gov/presidentialactions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/.

Multiple federal courts—including the United States Supreme Court—have issued orders to rein in the Trump Administration's circumvention of due process. *See, e.g.*, *A. A. R. P.*, 605 U.S. at 95–99 (2025); *J.A.V. v. Trump*, 781 F. Supp. 3d 535, 564–65 (S.D. Tex. 2025) (granting district-wide permanent injunction against use of the AEA by proclamation).

Moreover, by its mass removal of noncitizens to El Salvador's notorious Terrorism Confinement Center, the Trump Administration has asserted a right to "stash away residents of this country in foreign prisons without the semblance of due process that is the foundation of our constitutional order" and claimed that it could do nothing to effectuate the residents' return. *Abrego Garcia v. Noem*, No. 25-1404, 2025 U.S. App. LEXIS 9237, at *1 (4th Cir. Apr. 17, 2025); *see also G.F.F. v. Trump*, 781 F. Supp. 3d 195, 202 (S.D.N.Y. 2025). The same disregard for due process and human suffering and lack of concern for torture are evident in the Trump Administration's third-country removal policy. In a drastic departure from prior policy and practice, the Trump Administration has sanctioned the deportation of noncitizens "to countries other than their own, with as little as six hours' notice, even if officials have not provided any assurances that the new arrivals will be safe from persecution or torture."[10] It has removed people, including *amici*'s clients and members, to conflict-torn war zones, such as South Sudan and Ukraine, and has made agreements with other "countries with notorious human rights records," including Libya, Eswatini, Rwanda, and El Salvador.[11]

---

[10] Maria Sacchetti et al., *ICE Memo Outlines Plan to Deport Migrants to Countries Where They Are Not Citizens*, Wash. Post (Jul. 13, 2025), https://www.washingtonpost.com/immigration/2025/07/12/immigrants-deportations-trump-ice-memo/; Press Release, *UN Experts Alarmed by Resumption of US Deportations to Third Countries, Warn Authorities to Assess Risks of Torture*, United Nations Hum. Rts. Off. High Comm'r (Jul. 8, 2025), https://www.ohchr.org/en/press-releases/2025/07/un-experts-alarmed-resumption-us-deportations-third-countries-warn.

[11] Ximena Castillo & Polina Lytvynova, *U.S. Deports Dozens of Migrants to Ukraine Amid War*, NPR (Nov. 18, 2025), https://www.npr.org/2025/11/18/g-s1-98262/ukraine-deportations-war.

Whether courts ultimately uphold the Trump Administration's actions or not, the City is not required to facilitate federal action that it deems incompatible with its policy priorities.[12] "[R]efusing to help is not the same as impeding," *United States v. California*, 314 F. Supp. 3d 1077, 1104 (E.D. Cal. 2018), *aff'd in pertinent part*, 921 F.3d 865 (9th Cir. 2019), and the City has good reasons to refuse to help.

**B.    The Federal Government Seeks to Commandeer New York City's Resources to Implement Its Mass Deportation Agenda.**

The anticommandeering doctrine prevents the federal government from overriding the City's choice not to participate in immigration enforcement efforts. *See California*, 921 F.3d at 891; *see also City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020) ("The federal government cannot merely conscript the police forces of the state or local governments to achieve its ends; that would eviscerate the principles of federalism that rest at the very foundation of our government."). Because Congress's enumerated powers do not include the power to "issue direct orders to the governments of the States," it "'may not conscript state governments as its agents.'" *Murphy*, 584 U.S. at 471–72 (quoting *New York v. United States*, 505 U.S. 144, 178 (1992)). Here, the Trump Administration attempts to do precisely what the Tenth Amendment forbids: press municipal agencies and officers into the service of its violent and lawless mass deportation regime. *See New York*, 2025 U.S. Dist. LEXIS 225875, at *58 ("As the complaint makes abundantly clear, commandeering is the entire purpose of this lawsuit.").

Simply put, the federal government cannot force local police, correctional, and probation agencies to do its bidding. The INA's provisions regarding collaboration do not authorize local entities or officials to take actions that state law prohibits. *See, e.g.*, 8 U.S.C. § 1357(g)(1)

---

[12] *See* Testimony of Michael Clarke, NYPD, Hearing Testimony before the Council of the City of N.Y. on Int 0158-2022 at 1 (Feb. 15, 2023), https://tinyurl.com/2vuewhjn ("At the outset, it is important to state unequivocally that the NYPD does not engage in immigration enforcement. Period, full stop.").

(authorizing the Attorney General to enter into written agreements with states and localities to perform immigration officer functions, "to the extent consistent with State and local law"). While the federal government might wish it were otherwise, *see, e.g.*, Compl. ¶¶ 92, 113, the City's arrest or detention of people based on federal civil immigration detainers alone would clearly violate the state's constitutional and statutory proscriptions against unreasonable seizures. *See People ex rel. Wells v. DeMarco*, 88 N.Y.S.3d 518, 530–532 (2d Dep't 2018) (holding that New York law does not authorize state and local law enforcement officers to effectuate civil arrests for federal immigration law violations); *see also Castaneda v. Cnty. of Suffolk*, No. 17-CV-4267, 2025 U.S. Dist. LEXIS 26726, at *18–20, 39 (E.D.N.Y. Jan. 2, 2025) (agreeing with *Wells*). New York City's police commissioner therefore properly declined to provide NYPD support for the Trump Administration's plan to conduct "massive raids on city-funded hotels housing thousands of migrants" because such coordination would violate New York law.[13]

Nor may the federal government require that information held in the databases maintained by the City's criminal justice, educational, public benefits, health, or emergency service agencies be put to the use of its deportation agenda. While the federal government complains that the sanctuary laws restrict information sharing for the purposes of immigration enforcement, *see, e.g.*, Compl. ¶¶ 44, 66, 79–80, 90, 95, and that the Department of Correction no longer provides "ICE with access to certain computerized information," *id.* ¶ 50, the City acts within the Tenth Amendment's guarantees when it exercises its police power to restrict the sharing of such

---

[13] William K. Rashbaum et al., *How Dr. Phil and a Top Adams Aide Helped Ease ICE's Path into New York*, N.Y. Times (Jun. 18, 2025), https://www.nytimes.com/2025/06/18/nyregion/ice-kaz-adams-nyc-immigration.html; *see also* Gwynne Hogan, *Federal Raid Outside Row Hotel Migrant Shelter Rattles Residents*, The City (updated Oct. 18, 2025), https://www.thecity.nyc/2025/10/17/row-hotel-ice-raid-shelter/.

information for the purpose of assisting immigration enforcement.[14] Implicit in the City's right to manage its own law enforcement agencies and to guarantee access to City services is the right—and the obligation—to safeguard confidential information. As New York City's Charter recognizes, the City "has the power to determine the duties of its employees, and it is essential to the workings of city government that the city retain control over information obtained by city employees in the course of their duties." N.Y.C. Charter § 8 (g). Accordingly, each City agency must "maintain the confidentiality of information in its possession relating to the immigration status or other private information that was provided by an individual to a city employee in the course of such employee's duties." *Id.* As discussed below, *see* Points II & III, *infra*, these confidentiality policies are necessary to protect immigrants' rights in the criminal legal system and ensure full access to municipal services.

Accepting the federal government's rationale for invalidating the sanctuary laws would, in effect, require the City to make warrantless arrests, indiscriminately share information, and otherwise participate in the enforcement of federal immigration law. The Constitution precludes this naked attempt to impermissibly commandeer the City's resources. *See County of Ocean*, 475 F. Supp. 3d at 378–79 (rejecting analogous arguments against state sanctuary provisions because they would "require state and local law enforcement agencies to share *any* information about" a noncitizen, "giving the state no choice but to participate in the enforcement of federal immigration law").

"[A]nticommandeering is a bulwark against abuse of government power." *New York*, 2025 U.S. Dist. LEXIS 225875, at *57. Its application in this case has heightened importance because

---

[14] The sanctuary laws explicitly do not impose any restriction forbidden by federal law and thus comply with 8 U.S.C. §§ 1373 and 1644. N.Y.C. Admin. Code § 10-178 (e).

the sanctuary laws advance the City's paramount interest in protecting the constitutional rights, health, welfare, and safety of its residents. The Court should reject the federal government's attempt to wield the City's criminal legal system and public benefits, health, and services infrastructure as federal tools. *See id.*

## II. NEW YORK CITY'S SANCTUARY LAWS PROTECT NEW YORKERS' RIGHTS WITHIN THE CRIMINAL LEGAL SYSTEM.

New York City's criminal legal system is sprawling and complex. Over 120,000 people were arrested and prosecuted in New York City in 2024.[15] *Amici* represent thousands of people in their criminal proceedings. Given the City's demographics, many are immigrants. Many more immigrants interact with the criminal legal systems, whether they are complainants, witnesses, impacted family members, or are under some form of pre-trial or post-conviction supervision. *Amici* have firsthand experience advising noncitizen clients and members on the possible impacts of criminal arrests and convictions and attempting to mitigate the consequences. In *amici*'s experience serving immigrant clients and communities, the sanctuary laws promote fairness within the criminal legal system in New York City, which benefits all New Yorkers.

New York City Administrative Code §§ 9-131 (b), 9-205(b), and 14-154 limit how the New York City Department of Correction (local jails) ("DOC"), Department of Probation ("DOP"), and NYPD may cooperate with ICE. These laws prohibit ICE from maintaining an office on DOC property for immigration enforcement and mandate that City law enforcement agencies may only honor federal immigration detainers for specific "violent or serious crimes" and if ICE presents the agencies with a signed judicial warrant. N.Y.C. Admin. Code §§ 9-131(b), 9-205(b), 14-154. The sanctuary laws are an exercise of New York City's police power, and they advance public health and safety by protecting the rights of those in contact with the City's criminal legal

---

[15] N.Y.C. Criminal Justice Agency, *NYC Pretrial Data*, https://www.nycja.org/people-prosecuted.

system and promoting access to justice. They also safeguard New Yorkers' statutory rights to be free from warrantless arrests and the coextensive state and federal constitutional rights to due process, a fair trial, and counsel. *See* U.S. Const. amends. V, VI, XIV; N.Y. Const. art. I, §6; *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428–430 n.5 (1982); *Turner v. Louisiana*, 379 U.S. 466, 472–473 (1965); *Wells*, 88 N.Y.S.3d at 528–32.

Before the sanctuary laws, noncitizens in New York's criminal legal system faced a deeply unequal, two-tiered system of justice. Unlike United States citizens, noncitizen New Yorkers could not meaningfully participate in the criminal legal process without fear of being funneled by local authorities into immigration detention and deportation. Clients detained in DOC custody who otherwise would have been eligible for pre-trial release were forced to choose between fighting their criminal case from Rikers Island or being immediately handed over to immigration authorities for removal proceedings.[16] Criminal defense attorneys would thus often ask judges to set bail on their clients who were subject to an immigration detainer in order to ensure they remained in City custody during the pendency of their criminal case.[17] Additionally, immigrants who could benefit from drug or mental health treatment outside of DOC custody were deterred from paying bail or accepting court dispositions involving such programming because they feared being handed over to ICE by DOC upon release.[18] This delayed the appropriate resolution of cases: before the passage of the sanctuary laws, people subject to ICE detainers spent, on average, 73 days longer in jail than those without immigration detainers.[19] And ICE's presence on Rikers Island before the sanctuary

---

[16] *See e.g.*, Testimony of Bronx Defenders, Hearing Testimony before the Council of the City of N.Y. on Int. 486-2014 and Int. 0487-2014 at 88–90 (Oct. 15, 2014), https://shorturl.at/wHvFI [hereinafter "Bronx Defenders Hearing Testimony 10/15/14"].

[17] *See id.*

[18] *See, e.g.*, Testimony of Brooklyn Defender Services, Hearing Testimony before the Council of the City of N.Y. on Int. 486-2014 and Int. 0487-2014 at 66–67 (Oct. 15, 2014) , https://shorturl.at/wHvFI [hereinafter "BDS Hearing Testimony 10/15/14"].

[19] Aarti Shahani, *New York City Enforcement of Immigration Detainers* 1, Justice Strategies (Oct. 2010), https://immigrantjustice.org/sites/default/files/NYC%20Detainer%20Report.pdf.

laws made it virtually impossible to be released from custody there without being immediately placed in deportation proceedings. Federal authorities showed little discretion in whom they chose to deport, and a study at the time suggested that ICE was "simply tagging people who show[ed] up" at Rikers, targeting nearly half of noncitizens detained pre-trial on misdemeanor charges.[20]

Since the City adopted the sanctuary laws, noncitizens have been able to access alternatives to incarceration and supportive programming, in accordance with the City's policy choices. Thanks to the sanctuary laws, *amici*'s noncitizen clients and members can now exercise their right to pre-trial release and benefit from alternatives to jail sentences without fear that they will be transferred to ICE custody. For example, in 2025, ICE placed a detainer on a Legal Aid client while he was incarcerated pre-trial at Rikers. His attorneys contacted DOC to ensure they were aware that the sanctuary laws forbid it from honoring detainers without a judicial warrant, which was not present. DOC did not honor the detainer, and the attorneys secured the client's release to a diversion program. This allowed the client to participate in drug treatment, which would have been impossible if he had been transferred to ICE custody. And the diversion program's treatment services benefited both the client and the community: diversion programs have proven successful at improving long-term public safety by reducing recidivism and boosting health and employment outcomes for the individual.[21]

The sanctuary laws have also promoted fairness in the City's criminal legal system by safeguarding noncitizen defendants' constitutional and statutory rights. New York law "does not authorize state and local officers to effectuate warrantless arrests for civil immigration law violations." *Wells*, 168 A.D.3d at 43. Thus, the sanctuary laws—which only permit detainer

---

[20] *See* Sam Dolnick, *Report Questions the System Used to Flag Rikers Island Inmates for Deportation*, N.Y. Times (Nov. 10, 2010), https://www.nytimes.com/2010/11/11/nyregion/11rikers.html.

[21] Vera Inst. of Justice, *Diversion Programs, Explained*, https://www.vera.org/diversion-programs-explained (last visited Dec. 5, 2025).

13

requests to be honored, *inter alia*, where immigration authorities obtain a judicial warrant, *see* N.Y.C. Admin. Code §§ 9-131 (b), 9-205(b), and 14-154—prevent City agencies and officers from violating state law. The sanctuary laws further promote fairness by limiting immigration detention during a criminal proceeding, which denies noncitizen defendants their day in court and interferes with their right to counsel.[22]

These protections are now more important than ever given the Trump administration's lawless and violent mass deportation regime. *See* Point I.A., *supra*. Without them, ICE's unfettered and unconstitutional enforcement tactics would subject even larger numbers of our noncitizen clients to constitutional deprivations and impede their ability to secure justice in their criminal cases. New Yorkers whom ICE apprehends are often held incommunicado for extended periods of time; their families and counsel cannot find or contact them.[23] As a result, *amici*'s ability to represent immigrants apprehended by ICE before the resolution of their criminal cases is severely hampered, eroding clients' right to counsel. *Amici*'s ability to provide effective representation is further impaired by what amounts to a complete inability to secure release from immigration detention for some clients with open criminal matters. Immigration judges routinely deny bond to *amici*'s clients with unresolved criminal cases;[24] at the same time, ICE often refuses to produce the person in state court to move their criminal hearings along, making it impossible to dispose of the criminal matter.[25] This catch-22 traps clients in detention and impedes their rights to access the courts and defend their cases. ICE's well-documented unconstitutional behavior stokes fears that

---

[22] Tiffany J. Lieu, *The Accountability Deficit: When Immigration Detention Obstructs One's Day in Criminal Court*, 125 Colum. L. Rev. 1631, 1648–54 (2025).

[23] Julia Rock & Isabelle Taft, *ICE Detainees in New York Jails Can't Talk to Their Lawyers*, N.Y. Focus (Oct. 6, 2025), https://nysfocus.com/2025/10/06/ice-detention-jails-legal-phone-access-new-york; Debbie Nathan, *ICE Held an NYC Child Incommunicado at Secret Hotels, then Deported Him*, The Intercept (Aug. 18, 2025), https://theintercept.com/2025/08/18/ice-children-hotel-detention-nyc-deported/.

[24] *See* Lieu, *supra* n.22 at 1673–74.

[25] *Id.* at 1648–54. In *amici*'s experience, New York courts have issued bench warrants for *amici*'s clients in ICE detention even though the clients were not responsible for their failure to maintain contact or attend court appearances.

impede *amici*'s provision of legal services—fears that would no doubt be magnified without the protections the sanctuary laws provide.

Over a decade ago, New York City chose to prioritize the rights of *all* New Yorkers in the criminal legal system over assisting the federal government with its deportation efforts. Now, more than ever before, the sanctuary laws are necessary to prevent further erosion of New Yorkers' rights in the criminal legal system.

## III. THE SANCTUARY LAWS PROTECT NEW YORKERS' RIGHT TO ACCESS PUBLIC SERVICES AND FACILITIES.

New York City's Human Resources Administration ("HRA"), along with other City agencies, implements the City's constitutional obligation to support New Yorkers in need. N.Y. Const. art. XVII, § 1. HRA is the largest social services agency in the country and serves more than three million New Yorkers annually across fifteen major federal, state, and local public benefits programs.[26] In New York, "care for the needy is not a matter of 'legislative grace'; it is a constitutional mandate," *Aliessa v. Novello*, 754 N.E.2d 1085, 1092 (N.Y. 2001), and aid to the needy is "a fundamental part of the social contract," *Tucker v. Toia*, 371 N.E.2d 449, 451 (N.Y. 1977). Among its obligations, New York must provide state-funded public benefits to immigrants classified as "Persons Residing Under Color of Law ('PRUCOL')."[27] *Aliessa*, 754 N.E.2d at 1093. New Yorkers are eligible for many essential services irrespective of their immigration status, such as domestic violence support services, food assistance, and emergency shelter, and all New

---

[26] N.Y.C. Hum. Res. Admin., *About*, https://www.nyc.gov/site/hra/about/about-hra.page (last visited Dec. 3, 2025). New York administers and delivers public benefits through local social services districts. N.Y. Soc. Serv. Law §§ 61(1), 62 ("[E]ach public welfare district shall be responsible for the assistance and care of any person who resides or is found in its territory and who is in need of public assistance and care which he is unable to provide for himself.").

[27] *See, e.g.*, N.Y. Soc. Serv. Law § 122; General Information Systems Message from Valerie Figueroa, Deputy Comm'r Emp't & Income Support Programs, N.Y. Off. of Temp. & Disability Assistance (May 12, 2023), https://otda.ny.gov/policy/gis/2023/23DC039.pdf (describing PRUCOL categories). Federal law even authorizes states to extend public benefits to undocumented or otherwise non-qualified immigrants. *See, e.g.*, 8 U.S.C. § 1621(d).

15

Yorkers may apply for benefits and services for their citizen or noncitizen children.[28] NYC Health + Hospitals is the "nation's largest municipal health care delivery system" and provides health care to all New Yorkers, regardless of immigration status or ability to pay.[29] Every day, *amici* help their immigrant clients and members access these public benefits and services and, in doing so, we observe how the sanctuary laws aid the City in fulfilling its constitutional and statutory mandates.

Administrative Code § 10-178 and NYPD Operations Order 4 prohibit New York City's resources, including the NYPD's resources, from being used for immigration enforcement. N.Y.C. Admin. Code § 10-178; NYPD Operations Order No. 4, Compl. Ex. H, ECF No. 1-10. Operations Order 4 also forbids NYPD officers from asking about immigration status except where that status is directly relevant to a criminal investigation. NYPD Operations Order No. 4 at 2; *see also* Executive Order 41 (Sept. 17, 2003) (imposing a similar prohibition on all City employees and on NYPD officers).[30] These sanctuary laws directly relate to New York City's "traditional police power" to "provide for the public health, safety, and morals." *Barnes*, 501 U.S. at 569; *see also* N.Y. Const. art. XVII, § 3 ("The protection and promotion of the health of the inhabitants of the state are matters of public concern . . . ."). They seek to combat well-documented chilling effects that impede eligible residents' access to services and impair New Yorkers' health and safety. They also respect New York City's constitutional and statutory obligations. If immigrants fear interactions with City employees and are deterred from accessing public services and facilities, then New York City is less healthy and less safe, and the public welfare suffers.

---

[28] N.Y.C. Hum. Res. Admin., *Community Guide to HRA Public Benefits for Immigrants* 1-2, https://www.nyc.gov/assets/hra/downloads/pdf/services/language/benefits_guide_immigrants/hra_benefits_en.pdf.
[29] *About NYC Health + Hospitals*, NYC Health + Hospitals, https://www.nychealthandhospitals.org/about-nyc-health-hospitals/ (last visited Dec. 3, 2025).
[30] N.Y.C. Exec. Order No. 41 (2021), https://www.nyc.gov/assets/immigrants/downloads/pdf/eo-41.pdf (last visited Dec. 3, 2025); *see* Compl. 14 (referencing Executive Order 41). The federal government does not challenge Executive Order 41 in this litigation.

Ensuring that all eligible New Yorkers may freely access public benefits and services is not just New York City's constitutional and statutory obligation—it is an essential public health measure affecting millions of people.[31] But the fear of immigration enforcement significantly reduces the uptake of public benefits and services by eligible immigrants due to a chilling effect.[32] Conversely, immigrants living in areas where local authorities do not enforce federal immigration detainers maintain their use of the public benefits.[33] A similar chilling effect threatens education. Immigration raids reduce school attendance.[34]

The City Council acknowledged the adverse consequences of these chilling effects and sought to directly combat them by enacting the sanctuary laws. The Committee Report for the sanctuary legislation later codified, *inter alia*, as Administrative Code § 10-178 explains that the legislation responds to concerns that immigrant residents will forgo services such as medical care, food pantries, and homeless shelters; that immigrant victims and witnesses of crimes will be reluctant to engage with law enforcement; and that immigrant parents are scared to drop their

---

[31] *See, e.g.*, Tara Watson, *Inside the Refrigerator: Immigration Enforcement and Chilling Effects in Medicaid Participation*, 6 Am. Econ. J.: Econ. Pol'y 313, 330 (2014) (stating that "increases in Medicaid participation reduce hospitalizations for conditions that benefit from preventative care"); Amy Finkelstein et al., *The Oregon Health Insurance Experiment: Evidence from The First Year*, 127 Q. J. Econ. 1057, 1082−1099 (2012) (describing positive effects reported by adults who received Medicaid coverage via lottery); *see generally* Sarah Suiter & Meredith Meadows, *Educational Attainment and Educational Contexts as Social Determinants of Health*, 50 Primary Care: Clinics in Off. Practice 579 (2023) (describing connections between education and health).

[32] *See, e.g.*, Marcella Alsan & Crystal Yang, *Fear and the Safety Net: Evidence from Secure Communities*, 106 Rev. Econ. & Statistics 1427, 1428 (2024) (finding that the fear of deportation tied to increased immigration enforcement reduced participation by immigrant citizens in two federal benefits programs); Edward Vargas & Maureen Pirog, *Mixed-Status Families and WIC Uptake: The Effects of Risk of Deportation on Program Use*, 97 Soc. Sci. Q. 555, 569 (Sept. 2016) (finding that risk of deportation has a chilling effect on citizen children's receipt of WIC supplemental nutrition program benefits).

[33] *Fear and the Safety Net*, 106 Rev. Econ. & Statistics at 1438; *see also* Daniela Alulema & Jacquelyn Pavilon, Ctr. For Migration Studies, *Immigrants' Use of New York City Programs, Services, and Benefits: Examining the Impact of Fear and Other Barriers to Access* 10−11 (Jan. 2022) (discussing New York City's efforts to combat chilling effects).

[34] *See, e.g.*, Dana Goldstein & Irene Casado Sanchez, *Immigration Raids Add to Absence Crisis for Schools*, N.Y. Times (June 16, 2025), https://www.nytimes.com/2025/06/16/us/immigration-raids-school-absences-deportation-fears.html.

17

children off at school and attend school conferences.[35] Without the protections of the sanctuary laws, immigrants were "essentially . . . forced to retreat even further into the shadows . . . [M]any immigrants will forego their right to vital City services for which they, or their family members, are eligible out of fear of deportation," which raises "concerns for that family, but also for the community at large."[36]

These chilling effects have likewise impacted *amici* and other service providers' clients and members. For example, before the sanctuary laws, a Sanctuary for Families asylum-seeking client, who was a survivor of torture, spent the night on the subway with her children after a shelter employee told her that her information had been released to immigration enforcement authorities, who would be coming to the shelter to detain her.[37] Similarly, Make the Road New York's members frequently asked the organization whether it was safe for them to apply for food stamps for their United States-citizen children. Some members chose to go hungry rather than risk deportation due to the use of public benefits.[38]

As the sources cited above illustrate, chilling effects impact all immigrants, including people who have attained lawful permanent resident status and United States citizenship—up to thirty-eight percent of New Yorkers. A municipality can build trust with immigrant communities and combat chilling effects by adopting and publicizing policies that ensure the security of residents' personal information and forbid participation in federal immigration enforcement efforts.[39] The sanctuary laws serve this trust-building function. They inform all New York City

---

[35] Committee Report of the Governmental Affairs and Human Services Divisions, Prop. Int. Nos. 1558, 1565, 1566, 1568, 1569, and 1578 at 17–18, 22 (Apr. 26, 2017), https://shorturl.at/faIjU ("Committee Report 4/26/17").
[36] *Id.* at 17-18.
[37] Testimony of Sanctuary for Families, Hearing Testimony before the Council of the City of N.Y. on Int 1568-2017 at 60 (Apr. 26. 2017), https://shorturl.at/faIjU ("Hearing Testimony 4/26/17").
[38] Testimony of Make the Road N.Y., *id.* at 86.
[39] *See, e.g.*, Francisco Pedraza et al., *Cautious Citizenship: The Deterring Effect of Immigration Issue Salience on Health Care Use and Bureaucratic Interactions among Latino US Citizens*, 42 J. Health Politics, Pol'y & L. 925, 953

residents that they may apply for public benefits and use public services, visit the facilities needed to access them, and seek assistance from police officers without an intrusive inquiry into their immigration status or fear of arrest. New York City is healthier and safer as a result.

Moreover, the prohibition on immigration status inquiries respects New York City's obligations under the federal and state Equal Protection Clauses and Title VI. *See* U.S. Const. amend. XIV; N.Y. Const. art. I, § 11(a); 42 U.S.C. § 2000d. If a City officer or employee asks only some people about their immigration status, this may constitute unlawful national origin or racial discrimination. *See Farm Lab. Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 535 (6th Cir. 2002) (stating that a law enforcement agency's disproportionate inquiries about immigration status of Hispanic motorists was circumstantial evidence of unlawful discrimination); U.S. Dep't of Health & Hum. Servs., *Civil Rights Requirements- A. Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq. ("Title VI")*[40] (providing, as an example of conduct that may violate Title VI: "A local welfare office makes assumptions . . . and asks only those persons who look or sound foreign about their citizenship and immigration status."). An officer or employee's questions about immigration status may also violate state and local laws, some of which prohibit discrimination based on citizenship or immigration status in addition to national origin. *See, e.g.*, N.Y. Civ. Rights Law § 40; N.Y. Exec. Law § 296(2), (4); NYC Admin. Code § 8-107(4). Executive Order 41 and Operations Order 4 require New York City employees to follow a more prudent course of action and not ask about immigration status unless it is necessary or directly relevant to the services being sought.

---

(Oct. 2017), https://escholarship.org/uc/item/9p48r4jt; Tom Wong et al., U.S. Immigr. Pol'y Ctr., *How Interior Immigration Enforcement Affects Trust in Law Enforcement* 8–14 (Apr. 3, 2019), https://usipc.ucsd.edu/publications/usipc-working-paper-2.pdf.

[40] U.S. Dep't of Health & Human Services, *Civil Rights Requirements — Title VI of the Civil Rights Act of 1964*, https://www.hhs.gov/civil-rights/for-individuals/special-topics/needy-families/civil-rights-requirements/index.html (last visited Dec. 4, 2025).

## **CONCLUSION**

New York City has three million immigrant residents. Through this lawsuit, the federal government seeks to reduce a municipal structure designed to benefit the City's entire population—including these three million—to a mere cog in its deportation machine. *Amici* stand against this attempt. For the reasons given in this brief and the reasons given in the City's motion to dismiss, the Court should grant the motion to dismiss and dismiss the complaint.

Respectfully submitted,

/s/ Meghna Philip

Meghna Philip
Hasan Shafiqullah
Paula Garcia Salazar
Brian Perbix
Evan Henley
THE LEGAL AID SOCIETY
49 Thomas Street, Floor 10
New York, NY 10013
(212) 577-3367
mphilip@legal-aid.org
*Counsel for The Legal Aid Society,*
*Immigrant Defense Project, and*
*Make the Road New York*

Rosa Cohen-Cruz
THE BRONX DEFENDERS
360 E. 161st Street
Bronx, NY 10451
(718) 508-3402
rosac@bronxdefenders.org

Jodi Ziesemer
NEW YORK LEGAL ASSISTANCE
GROUP
100 Pearl Street, 19th Floor
New York, NY 10004
(212) 613-5013
jziesemer@nylag.org

20

Kendal Nystedt
UNLOCAL, INC.
45 W. 29th Street, Suite 203
New York, NY 10001
(646) 240-4135
kendal@unlocal.org

Jose Perez
Rex Chen
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 219-3360
jperez@latinojustice.org
rchen@latinojustice.org

Stan Germán
NEW YORK COUNTY DEFENDER
SERVICES
100 William Street, 20th Floor
New York, NY 10038
(917) 522-8234
sgerman@nycds.org

Lucas Marquez
BROOKLYN DEFENDER SERVICES
177 Livingston Street, 7th Floor
Brooklyn, NY 11201
(718) 254-0700
lmarquez@bds.org

Scott Foletta
NEIGHBORHOOD DEFENDER SERVICE
OF HARLEM
317 Malcolm X. Boulevard
New York, NY 10027
(212) 876-5500
sfoletta@ndsny.org

21

## <u>CERTIFICATION UNDER LOCAL CIVIL RULE 7.1(c)</u>

In accordance with Local Civil Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, the undersigned certifies that the word count in this amicus brief (not including the caption, table of contents, table of authorities, and signature block as well as this certification), as established using the word count function on Microsoft Word, complies with the word-count limitations of this Court and is 6,673 words.

/s/ Evan Henley

Evan Henley

# APPENDIX A

## STATEMENTS OF INTEREST

A.    **The Legal Aid Society** ("Legal Aid") has provided free legal services to low-income people in New York City since 1876. As the primary provider of indigent criminal defense services in New York City, Legal Aid's Criminal Defense Practice defends the rights of thousands of New Yorkers accused of crimes. Legal Aid's Immigration Law Unit is a leader in the provision of legal services in immigration matters. Legal Aid's Civil Practice represents tenants, survivors of domestic violence, public benefits applicants and recipients, and workers, among others, in a wide variety of cases. Legal Aid's Law Reform Units engage in policy advocacy and affirmative litigation to respond to emergent issues and protect and expand the rights of our clients. Legal Aid's staff has deep interdisciplinary expertise on laws protecting the rights of New Yorkers, including immigrants, and on ICE's operations., including immigrants, and on ICE's operations.

B.    **Bronx Defenders** ("BxD") is a legal services organization that represents clients who are immigrants and clients who live in communities with immigrants. Our clients have an interest in the real-life impact of these laws, including preventing extended detention in criminal cases and mitigating the chilling effect that local immigration enforcement has on services like hospitals, courts, and 911 emergency response. BxD also has an organizational interest in preserving sanctuary laws because they help us provide high-quality holistic defense to Bronx residents in need. Representing clients who are subject to extended detention and afraid of engaging with government services takes more time and more specialists staffed on individual cases, straining BxD's resources and potentially reducing the total clients BxD can serve.

C.    **New York Legal Assistance Group** ("NYLAG"), founded in 1990, is a leading civil legal services organization combatting economic, racial, and social injustice by advocating for people experiencing poverty or in crisis. The Immigrant Protection Unit of NYLAG provides

1

legal consultation and representation to immigrant New Yorkers. We have a robust practice of affirmative applications for naturalization, lawful permanent residency, and protection for immigrant survivors of violence as well as removal defense in both the detained and non-detained contexts. NYLAG participates in the New York Immigrant Family Unity Project (NYIFUP), providing universal representation to immigrant New Yorkers facing the revocation of status and removal from the United States while in ICE custody. NYLAG has developed expertise in post-removal order defense as well as the complex intersection of criminal and immigration law.

D. **Unlocal, Inc.** UnLocal, Inc. is a community-centered non-profit organization that provides legal representation and community education to New York City's immigrant communities. UnLocal depends upon the preservation of NYC's Sanctuary Laws in our legal advice, representation, and community education work.

E. **LatinoJustice PRLDEF** ("LatinoJustice") Founded in 1972, LatinoJustice PRLDEF's mission is to use and challenge laws to create a more just and equitable society, transform harmful systems, empower Latino communities, fight for racial justice, and grow the next generation of leaders. For over fifty years, LatinoJustice has litigated landmark civil rights cases and advanced policy reforms in our primary pillars of practice including immigrants' rights. LatinoJustice has filed, joined and supported numerous amicus briefs supporting and defending immigrants' rights.

F. **Immigrant Defense Project** ("IDP") is a New York-based nonprofit legal resource, training and advocacy organization dedicated to promoting fundamental fairness for immigrants accused or convicted of crimes. Since 1997, IDP has published the premier legal resource and treatise on criminal-immigration law for defense counsel in New York State, which is updated annually. As an organization devoted to fair treatment for immigrants involved in the

2

criminal legal system, IDP is deeply committed to defending New York City's sanctuary laws and policies, which help ensure that New Yorkers can safely exercise their constitutional rights and help ensure that our city resources allow all New Yorkers to thrive.

G.      **New York County Defender Services** ("NYCDS") is a public defender office serving indigent clients in the borough of Manhattan since 1997. Like other *amici*, NYCDS provides comprehensive legal advocacy for its clients facing all manner of criminal charges and the related collateral impacts of criminal prosecution. NYCDS's Immigration Unit is specifically tasked with aiding and advising each and every NYCDS client with immigration concerns or otherwise facing immigration consequences as a result of their criminal case. In collaboration with Immigration and other units, NYCDS's Policy Team engages in advocacy and affirmative litigation to respond to emergent issues and advocate for systemic reforms that impact all clients, regardless of citizenship. Amicus bears witness every day to the disproportionate impacts of the justice system borne by our non-citizen clients, in and out of the courtroom.

H.      **Brooklyn Defender Services** ("BDS") is one of the largest public defense offices in New York State, representing low-income people in criminal, family, civil, and immigration proceedings each year. Our criminal defense practice represents people charged with crimes in Brooklyn and Queens. Since 2009, BDS has counseled thousands of clients in immigration matters, including deportation defense, affirmative applications, advisal, and immigration consequence consultations in the criminal court system. For over twenty-five years, BDS has worked, in and out of court, to protect and uphold civil rights and change laws and systems that perpetuate injustice and inequality.

I.      **Neighborhood Defender Service of Harlem** ("NDS") is known nationally and internationally for its innovative, community-based, holistic public defense practice.   Since

3

opening its doors in Harlem in 1990, NDS has pioneered the holistic interdisciplinary model of public defense in criminal, civil and family court proceedings. NDS attorneys, social workers, client advocates, litigation assistants, and administrative staff have worked together to represent thousands of clients.

J. **Make the Road New York** ("MRNY") is a nonprofit, membership-based community organization that integrates community organizing, adult and youth education, legal and survival services, and policy advocacy, in a holistic approach to help low-income New Yorkers improve their lives and neighborhoods. MRNY has over 170 staff, over 28,000 members, and five offices spread throughout New York City, Long Island, and Westchester. MRNY is at the forefront of numerous initiatives to analyze, develop, and improve civil and human rights for immigrant communities, including issues related to detention and deportation of immigrant community members. Its attorneys and accredited representatives regularly represent both detained and non-detained clients in the greater New York City area in immigration matters, as well as represent clients in their legal matters in various state courts, including housing and family court.