## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| |
|---|
| THE UNITED STATES OF AMERICA, |
| Plaintiff, |
| v. |
| CITY OF NEW YORK, *et al.*, |
| Defendants. |

No. 1:25-cv-04084

## PROPOSED BRIEF OF *AMICI CURIAE* SEVENTY-FIVE CITIES, COUNTIES, AND ELECTED OFFICIALS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Submitted By:

Erin Monju
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
erin@publicrightsproject.org

Karianne Jones*
Evergreen Legal Strategies LLP
1763 Columbia Rd NW, Suite 100
Washington, D.C. 20009
karianne@evergreenlegalstrategies.com

*Application for admission *pro hac vice* forthcoming

*Attorneys for Proposed Amici Curiae*
*Seventy-Five Cities, Counties,*
*and Elected Officials*

# TABLE OF CONTENTS

INTEREST OF *AMICI* ........................................................................... 1

ARGUMENT ....................................................................................... 1

I.   So-Called Sanctuary Policies Promote Public Safety .................... 3

II.  So-Called Sanctuary Policies Promote Economic Well-Being ............................................................................. 10

III. So-Called Sanctuary Policies Promote Health and Welfare ........ 14

CONCLUSION ................................................................................... 19

ADDITIONAL COUNSEL ................................................................. 21

Appendix A - List of *Amici* Local Governments ............................... 24

# TABLE OF AUTHORITIES

### CASES

*Chicago v. Sessions*,
    888 F.3d 272 (7th Cir. 2018) ............................................................. 3

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) ......................................................................... 2

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*,
    471 U.S. 707 (1985) ......................................................................... 1

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ......................................................................... 2

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    584 U.S. 453 (2018) ......................................................................... 19

*Ocean v. Grewal*,
    475 F. Supp. 3d 355 (D.N.J. 2020) ............................................... 18, 19

*Philadelphia v. Sessions*,
    309 F. Supp. 3d 289 (E.D. Pa. 2018) ............................................. 18

*Philadelphia v. United States*,
    916 F.3d 276 (3d Cir. 2019) ............................................................ 18

*San Francisco v. Barr*,
    965 F.3d 753 (9th Cir. 2020) ........................................................... 18

*San Francisco v. Garland*,
    42 F.4th 1078 (9th Cir. 2022) .......................................................... 18

*Steinle v. San Francisco*,
    919 F.3d 1154 (9th Cir. 2019) ......................................................... 18

*United States v. California*,
    314 F. Supp. 3d 1077 (E.D. Cal. 2018) .......................................... 18

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019) ........................................................... 18

*United States v. Illinois*,
No. 25-CV-1285, 2025 WL 2098688 (N.D. Ill. July 25,
2025)................................................................................... 18, 19

*United States v. New Jersey*,
No. 20-1364, 2021 WL 252270 (D.N.J. Jan. 26, 2021) ................. 18

*United States v. New York*,
No. 25 Civ. 744, 2025 WL 3205011 (N.D.N.Y Nov. 17,
2025)............................................................................................ 19

**OTHER AUTHORITIES**

Allison McCord Stafford et al., *Documentation Status and
Self-Rated Physical Health Among Latinx Young Adult
Immigrants: The Mediating Roles of Immigration and
Healthcare Stress*, 10 J. Racial & Ethnic Health
Disparities 761 (2023) .................................................... 15

Amanda Seitz & Jacquelyn Martin, *As Trump's Raids Ramp
Up, a Texas Region's Residents Stay Inside - Even When
They Need Medical Care*, AP News (July 21, 2025) .................... 16

*Balancing Community Trust and Enforcement: The
Complex Issue of Immigration*, Police Executive
Research Forum (Apr. 12, 2025)...................................... 9

Ben Zipperer, *Trump's Deportation Agenda Will Destroy
Millions of Jobs*, Econ. Pol'y Inst. (July 10, 2025) ...................... 14

Braden Ross, *La Vergne Police Chief Urges Community to
Use Emergency Services Despite Fears of Immigration
Enforcement*, WSMV4 (May 22, 2025) .......................... 9

Carl Davis, Marco Guzman & Emma Sifre, *Tax Payments
by Undocumented Immigrants*, Inst. on Tax'n Payment &
Econ. Pol'y, 3 (July 30, 2024)........................................ 12

Carter Evans, *Trump's Immigration Crackdown Causing
Labor Shortages to California's Construction Industry,*

*Builder Says: "They're hiding,"* CBS News (July 18, 2025) .......................................................................... 14

Charis E. Kubrin & Bradley J. Bartos, *Sanctuary Status and Crime in California: What's the Connection?*, 3 Just. Evaluation J. 115 (2020) ..................................................... 4

Charles Wellford & James Cronin, *Clearing Up Homicide Clearance Rates,* 181728 Nat'l Inst. Just. J. 2 (2000)..................... 5

Christian Gunadi, *On the Association between Undocumented Immigration and Crime in the United States*, 73 Oxford Econ. Papers 200 (2021) ..................................... 4

Dale T. Manning & Jesse Burkhardt, *The Local Effects of Federal Law Enforcement Policies: Evidence from Sanctuary Jurisdictions and Crime*, 40 Contemp. Econ. Pol'y 423 (2022)......................................................... 5, 10

David K. Hausman, *Sanctuary Policies Reduce Deportations without Increasing Crime*, 117 PNAS 27262, 27262 (2020) ....................................................... 4

Deborah Baskin & Ira Sommers, *The Influence of Forensic Evidence on the Case Outcomes of Assault and Robbery Incidents*, 23 Crim. Just. Pol'y Rev. 186, 203 (2012) ..................... 5

Dkt. 76, Declaration of Support for Preliminary Injunction, *San Francisco v. Trump*, No. 25-CV-0135 (N.D. Cal. Mar. 17, 2025)........................................................................ 17

Emily Baumgaertner Nunn et al., *Migrants Are Skipping Medical Care, Fearing ICE, Doctors Say*, N.Y. Times (May 8, 2025) ................................................................ 15

Felipe M. Gonçalves, Elisa Jácome & Emily K. Weisburst, *Immigration Enforcement and Public Safety*, 3 (Nat'l Bureau of Econ. Rsch., Working Paper No. 32109, 2024............... 7

Hannah Rappleye et al., *Immigration Crackdown Makes Women Afraid to Testify Against Abusers, Experts Warn*, NBC News (Sept. 22, 2018)........................................... 7

iv

Helen B. Marrow, *The Power of Local Autonomy: Expanding Health Care to Unauthorized Immigrants in San Francisco*, 35 Ethnic & Racial Stud. 72 (2012) ..................... 17

*Here's What We Know about Foreign-Born Workers, and How They Compare to the Native-Born Population*, Peterson G. Found. (last visited Aug. 20, 2025) ........................... 11

*Immigrant Entrepreneurship in the US*, Nat'l Bureau of Econ. Rsch. (Oct. 21, 2024). ......................................................... 12

Jacqueline M. Torres et al., *Deportation Worry, Cardiovascular Disease Risk Factor Trajectories, and Incident Hypertension: A Community-Based Cohort Study*, 8 J. Am. Heart Ass'n 1 (2019).............................................. 15

Jan Hoffman, *Sick and Afraid, Some Immigrants Forgo Medical Care*, N.Y. Times (June 26, 2017) ................................... 17

Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328 (2015) .............................................................................. 7

Julia Gelatt, Jeanne Batalova & Randy Capps, *Navigating the Future of Work: The Role of Immigrant-Origin Workers in the Changing U.S. Economy*, Migration Pol'y Inst., 1 (Oct. 2020) ....................................................... 11

Karen Hacker et al., *The Impact of Immigration and Customs Enforcement on Immigrant Health: Perceptions of Immigrants in Everett, Massachusetts, USA*, 73 Soc. Sci. & Med. 586 (2011).................................................. 15

Karla M. Sanford, *Undocumented Workers Power L.A.'s Restaurants. Will the Industry Protect Them?*, L.A. Times (June 30, 2025) ........................................................... 14

Kathleen M. Roche et al., *Impacts of Immigration Actions and News and the Psychological Distress of U.S. Latino Parents Raising Adolescents*, 62 J. Adolesc. Health 525 (2018) ............................................................................. 9

Kristina Murphy, Lyn Hinds & Jenny Fleming, *Encouraging Public Cooperation and Support for Police*, 18 Policing & Soc'y 136 (2008) ........................................................ 5

Marta Ascherio, *Do Sanctuary Policies Increase Crime? Contrary Evidence from a County-Level Investigation in the United States*, 106 Soc. Sci. Rsch. 102743 (2022).................... 5

Michael T. Light, Jingying He & Jason P. Robey, *Comparing Crime Rates between Undocumented Immigrants, Legal Immigrants, and Native-Born US Citizens in Texas*, 117 PNAS 32340 (2020).................................... 3

Nathaniel Meyersohn & Vanessa Yurkevich, *America's Migrant Workers Are Terrified to Work But Unable to Stay Home*, CNN (June 14, 2025) ........................................... 13, 14

*National Latino Family Report 2025*, AP-OD (last visited Aug. 20, 2025)................................................................... 8

*New American Fortune 500 in 2024*, Am. Immigr. Council (Sept. 9, 2024) ............................................................... 12

Patricia A. Cavazos-Rehg et al., *Legal Status, Emotional Well-Being and Subjective Health Status of Latino Immigrants*, 99 J. Nat'l Med. Ass'n 1126 (2007) ......................... 15

Paul H. Robinson, Jeffrey Seaman & Muhammad Sarahne, *Standing Back and Standing Down: Citizen Non-Cooperation and Police Non-Intervention as Causes of Justice Failures and Crime*, 51 Hofstra L. Rev. 923 (2023) ............................................................................... 5

*Public Health Talking Points for Immigration Justice*, Health In Partnership (last visited July 23, 2025) ......................... 16

Radha Vishnuvajjala, *Insecure Communities: How an Immigration Enforcement Program Encourages Battered Women to Stay Silent*, 32 Boston College J. Law & Soc. Just. 185 (2012) ............................................................... 7

Ran Abramitzky et al., *Law-Abiding Immigrants: The Incarceration Gap Between Immigrants and the US-Born, 1870–2020,* Nat'l Bureau of Econ. Rsch., Working Paper No. 31440 (2023) ................................................................ 4

Ricardo D. Martínez-Schuldt & Daniel E. Martínez, *Immigrant Sanctuary Policies and Crime-Reporting Behavior: A Multilevel Analysis of Reports of Crime Victimization to Law Enforcement, 1980 to 2004*, 86 Am. Sociol. Rev. 154 (2021) .................................................... 8

Ricardo D. Martínez-Schuldt & Daniel E. Martínez, *Sanctuary Policies and City-Level Incidents of Violence, 1990 to 2010*, 36 Just. Q. 567 (2019) ................................ 5

Robert C. Davis et al., *Working Smarter on Cold Cases: Identifying Factors Associated with Successful Cold Case Investigations*, 59 J. Forensic Sci. 375 (2014) ................ 5

Robert Lynch & Michael Ettlinger, *The Economic Impact on Citizens and Authorized Immigrants of Mass Deportation*, Univ. N.H. Carsey Sch. Pub. Pol'y (Aug. 29, 2024) ........................................................................ 11

Ryan Edwards & Francesc Ortega, *The Economic Contribution of Unauthorized Workers: An Industry Analysis*, 3, Nat'l Bureau of Econ. Rsch., Working Paper No. 22834 (2016) ........................................................ 13

Steven Asch, Barbara Leake & Lillian Gelberg, *Does Fear of Immigration Authorities Deter Tuberculosis Patients From Seeking Care?*, 161 West J. Med. 373 (1994) .................... 17

*Study Finds Trump's Election Was Associated With Decrease in Well-Child Visits for Children of Immigrant Mothers*, Boston University (Sept. 8, 2023) .................................. 16

Thomas J. Miles & Adam B. Cox, *Does Immigration Enforcement Reduce Crime? Evidence from Secure Communities*, 57 J.L. & Econ. 937 (2014) ....................................... 4

Tom K. Wong et al., *How Interior Immigration Enforcement Affects Trust in Law Enforcement*, 19 Persp. on Pol. 357 (2021) ........................................................................... 6

Tom K. Wong, *The Effect of Sanctuary Policies on Crime and the Economy*, Ctr. for Am. Progress (Jan. 26, 2017).............. 10

*U.S. Immigration Statistics*, Am. Immigr. Council (last visited July 22, 2025) ............................................................. 12, 13

## INTEREST OF AMICI

State and local jurisdictions like Amici bear primary responsibility for ensuring the safety and well-being of their residents and communities. This principle is neither novel nor controversial; indeed, it lies at the core of our federalist system of government. *See, e.g., Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985) (residents' health and safety are "primarily, and historically, a matter of local concern"). In exercising that sovereign duty to promote public safety, local governments—including Amici, which comprise 75 cities, counties, and elected officials from across the United States—have adopted laws and policies reflecting their careful judgment of what practices best serve their communities.

In this litigation and in other litigation across the country, the federal government seeks to upset that well-established principle, attacking local policies that limit the entanglement of local law enforcement with federal immigration officers. New York City's challenged policies manifest a commitment to integrating immigrants into the city's community and promoting public safety, public health, and a robust economy. Amici share New York City's goals of protecting the well-being of all residents and offer a critical perspective on how policies like those challenged in this case do just that.

## ARGUMENT

The authority of local governments to make their own policy decisions about the health and safety of their communities is a fundamental feature of our

constitutional system. *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996)) ("[The] structure and limitations of federalism … allow the States 'great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.'"). As Amici well know, New York City's decisions to adopt policies limiting entanglement with federal immigration enforcement is not only sound as a matter of constitutional design; it's also good policy. Extensive research shows that jurisdictions adopting policies similar to those of New York City—in which scarce local law enforcement resources are allocated to the investigation of crimes, rather than the enforcement of federal civil immigration laws—have safer, healthier, and more economically resilient communities.

2

I.    **So-Called Sanctuary Policies[1] Promote Public Safety.**

As an initial matter, the Trump Administration's repeated attempts to demonize immigrant communities are simply unsupported by the evidence. Immigrant communities are statistically *less likely to commit crime*. Specifically, U.S.-born citizens are twice as likely as undocumented immigrants to be arrested for violent crimes[2] and four times as likely to be arrested for property crimes.[3] They are

---

[1] Jurisdictions with policies like New York City's adopt or are labeled with a variety of descriptors, including "sanctuary cities" and "welcoming jurisdictions." Although the Trump Administration has adopted the term "sanctuary cities" to demonize places that prioritize resources for local purposes, it has not offered a specific definition of the term. Indeed, "localities which have concluded that cooperation in federal civil immigration efforts is counterproductive or simply offensive are often labeled 'sanctuary' cities or states, but that term is commonly misunderstood." *Chicago v. Sessions*, 888 F.3d 272, 281 (7th Cir. 2018). The term is a misnomer because such jurisdictions "do[] not interfere in any way with the federal government's lawful pursuit of its civil immigration activities, and presence in such localities will not immunize anyone to the reach of the federal government." *Id.* Given the common usage of the term, however, this brief uses the phrases "so-called sanctuary jurisdictions" and "so-called sanctuary policies" to refer to those jurisdictions and policies that seek to limit the entanglement of local law enforcement with federal immigration efforts.

[2] Michael T. Light, Jingying He & Jason P. Robey, *Comparing Crime Rates between Undocumented Immigrants, Legal Immigrants, and Native-Born US Citizens in Texas*, 117 PNAS 32340, 32340 (2020), https://www.pnas.org/doi/full/10.1073/pnas.2014704117.

[3] *Id.*

also significantly more likely to be incarcerated than immigrants, documented or not.[4] Is it thus unsurprising that increasing removals does not lower crime rates.[5]

In any event, and as many Amici have explained in litigation across the country, so-called sanctuary policies, like those challenged here, make communities safer. Any argument to the contrary is belied by extensive social science research amassed over the course of the past several decades, which confirms that such policies either have no statistical effect on crime rates[6] or result in *lower* crime

---

[4] Ran Abramitzky et al., *Law-Abiding Immigrants: The Incarceration Gap Between Immigrants and the US-Born, 1870–2020* (Nat'l Bureau of Econ. Rsch., Working Paper No. 31440, 2023), https://www.nber.org/papers/w31440; Christian Gunadi, *On the Association between Undocumented Immigration and Crime in the United States*, 73 Oxford Econ. Papers 200, 209 (2021), https://academic.oup.com/oep/article/73/1/200/5572162.

[5] Thomas J. Miles & Adam B. Cox, *Does Immigration Enforcement Reduce Crime? Evidence from Secure Communities*, 57 J.L. & Econ. 937, 937 (2014), https://www.journals.uchicago.edu/doi/10.1086/680935 (finding that research on the implementation of one federal program that significantly increased the apprehension and removal of undocumented immigrants showed that increased enforcement had "no observable effect on the overall crime rate").

[6] David K. Hausman, *Sanctuary Policies Reduce Deportations without Increasing Crime*, 117 PNAS 27262, 27262 (2020), https://pnas.org/doi/full/10.1073/pnas.2014673117; Charis E. Kubrin & Bradley J. Bartos, *Sanctuary Status and Crime in California: What's the Connection?*, 3 Just. Evaluation J. 115, 115 (2020), https://www.tandfonline.com/doi/full/10.1080/24751979.2020.1745662.

rates[7]—particularly for violent crimes like robbery, assault, and homicide.[8] In part, that is because one of the most important factors in a crime being "cleared," or solved, is the willingness of witnesses to share information with the police.[9] Local law enforcement thus relies on building trust with the communities they protect—a foundational principle of community policing that encourages cooperation with law enforcement.[10] Policies that make it more difficult for the police to maintain the trust

---

[7] Marta Ascherio, *Do Sanctuary Policies Increase Crime? Contrary Evidence from a County-Level Investigation in the United States*, 106 Soc. Sci. Rsch. 102743, 102743 (2022), https://www.sciencedirect.com/science/article/abs/pii/S0049089X22000497.

[8] Dale T. Manning & Jesse Burkhardt, *The Local Effects of Federal Law Enforcement Policies: Evidence from Sanctuary Jurisdictions and Crime*, 40 Contemp. Econ. Pol'y 423, 423 (2022), https://onlinelibrary.wiley.com/doi/abs/10.1111/coep.12564; Ricardo D. Martínez-Schuldt & Daniel E. Martínez, *Sanctuary Policies and City-Level Incidents of Violence, 1990 to 2010*, 36 Just. Q. 567, 567 (2019), https://www.tandfonline.com/doi/abs/10.1080/07418825.2017.1400577.

[9] Deborah Baskin & Ira Sommers, *The Influence of Forensic Evidence on the Case Outcomes of Assault and Robbery Incidents*, 23 Crim. Just. Pol'y Rev. 186, 203 (2012), https://journals.sagepub.com/doi/10.1177/0887403410395576; Robert C. Davis et al., *Working Smarter on Cold Cases: Identifying Factors Associated with Successful Cold Case Investigations*, 59 J. Forensic Sci. 375, 378 (2014), https://onlinelibrary.wiley.com/doi/10.1111/1556-4029.12384; Charles Wellford & James Cronin, *Clearing Up Homicide Clearance Rates,* 181728 Nat'l Inst. Just. J. 2, 4 (2000), https://nij.ojp.gov/library/publications/clearing-homicide-clearance-rates; Paul H. Robinson, Jeffrey Seaman & Muhammad Sarahne, *Standing Back and Standing Down: Citizen Non-Cooperation and Police Non-Intervention as Causes of Justice Failures and Crime*, 51 Hofstra L. Rev. 923, 926 (2023)/hlr/vol51/iss4/5/.

[10] Kristina Murphy, Lyn Hinds & Jenny Fleming, *Encouraging Public Cooperation and Support for Police*, 18 Policing & Soc'y 136, 136 (2008), http://www.tandfonline.com/doi/abs/10.1080/10439460802008660.

of all community members, including immigrant populations, increase the likelihood that crimes go unreported, unsolved, or unprosecuted.

Indeed, extensive studies show that immigrants who fear removal for themselves or members of their communities are less likely to cooperate with local law enforcement. For example, a 2021 survey found that, in jurisdictions where local police coordinate with the federal government to enforce federal immigration laws, undocumented immigrants are less likely to trust that law enforcement will keep them or their communities safe; less likely to believe law enforcement will protect witness confidentiality; and less likely to think law enforcement will protect the rights of all people equally, even those who are undocumented.[11]

And the problem is not just a generalized skepticism about police. Rather, that skepticism manifests itself in ways that make entire communities less safe: through decreased reporting of crime and decreased cooperation from victims and witnesses with law enforcement during their investigation and prosecution of crime. For example, one study found that increased immigration enforcement reduced Hispanics' crime reporting rate by 30 percent and increased their crime victimization

---

[11] Tom K. Wong et al., *How Interior Immigration Enforcement Affects Trust in Law Enforcement*, 19 Persp. on Pol. 357, 357 (2021), https://www.cambridge.org/core/product/identifier/S1537592719003943/type/journal_article.

rate by 16 percent.[12] Similarly, a nationwide survey of Latinas found that, regardless of immigration status, respondents who reported a greater fear of removal for themselves, a family member, or a close friend were less likely to report being a victim of a violent crime to the police.[13] Other studies show that undocumented victims of domestic violence, most of whom are women, are less likely to report abuse to authorities than documented or non-immigrant women because of fear of immigration consequences, among other reasons.[14] And beyond decreased reporting, law enforcement officers themselves have reported that fear of removal interferes with victim cooperation in prosecutions.[15]

---

[12] Felipe M. Gonçalves, Elisa Jácome & Emily K. Weisburst, *Immigration Enforcement and Public Safety*, 3 (Nat'l Bureau of Econ. Rsch., Working Paper No. 32109, 2024), https://www.nber.org/papers/w32109.

[13] Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328, 334 (2015), https://journals.sagepub.com/doi/10.1177/0886109915576520.

[14] Radha Vishnuvajjala, *Insecure Communities: How an Immigration Enforcement Program Encourages Battered Women to Stay Silent*, 32 Boston College J. Law & Soc. Just. 185, 186–187 (2012).

[15] *See* Hannah Rappleye et al., *Immigration Crackdown Makes Women Afraid to Testify Against Abusers, Experts Warn*, NBC News (Sept. 22, 2018), https://www.nbcnews.com/politics/immigration/immigration-crackdown-makeswomen-afraid-testify-against-abusers-experts-warn-n908271 ("Since President Trump's inauguration, [Denver City Attorney Kristin Bronson] said, she's had to drop 30 cases of domestic violence because the victims were too afraid of deportation to cooperate and appear in court.").

Many Amici Communities have adopted policies, like those challenged here, in furtherance of what the evidence overwhelmingly shows: that decreased fear of immigration enforcement in local communities increases public safety overall. Indeed, a longitudinal study examining crime reporting trends from 1980 to 2004 found that Latinos were 23 percent more likely to report being victims of a violent crime after their jurisdiction adopted a so-called sanctuary policy.[16]

The federal government seeks to undermine those efforts through its immigration enforcement policies and harmful rhetoric, which work to deter immigrants from cooperating with or seeking help from local law enforcement. In fact, in a survey conducted to assess sentiment among the Latino community this year, 35 percent of Latino parent-respondents said they might avoid reporting a crime to the police.[17] That mirrors a similar survey, conducted in in 2017 (the first year of the first Trump Administration), in which almost 30 percent of participants (members of Latino immigrant communities) said they "very often" or "always"

---

[16] Ricardo D. Martínez-Schuldt & Daniel E. Martínez, *Immigrant Sanctuary Policies and Crime-Reporting Behavior: A Multilevel Analysis of Reports of Crime Victimization to Law Enforcement, 1980 to 2004*, 86 Am. Sociol. Rev. 154, 170 (2021), https://journals.sagepub.com/doi/10.1177/0003122420978406 (calculation drawn from figures in Table 4).

[17] *National Latino Family Report 2025*, AP-OD, https://nationalsurvey.ap-od.org/2025-report/ (last visited Aug. 20, 2025).

avoided contact with police; 39.4 percent avoided medical care, police, and services; and 47.6 percent warned their children to stay away from authorities.[18]

State and local law enforcement agencies are also concerned. For example, in May 2025 in La Vergne, Tennessee, a six-month-old baby died after being found unresponsive because their caretaker was afraid to call 911 due to his immigration status.[19] The police chief, addressing a community town hall, acknowledged that "there are communities in La Vergne that are losing trust in law enforcement in this country right now, and it's going to make our job very difficult."[20] These concerns were echoed in an April 2025 report detailing the experiences of five police leaders facing difficulty maintaining the trust of immigrant communities amid increased ICE activity—trust the report described as "essential to learning about crimes in their jurisdictions and to identifying and apprehending offenders."[21]

---

[18]  Kathleen M. Roche et al., *Impacts of Immigration Actions and News and the Psychological Distress of U.S. Latino Parents Raising Adolescents*, 62 J. Adolesc. Health 525, 529 (2018), https://pubmed.ncbi.nlm.nih.gov/29503033/.

[19]  Braden Ross, *La Vergne Police Chief Urges Community to Use Emergency Services Despite Fears of Immigration Enforcement*, WSMV4 (May 22, 2025), https://www.wsmv.com/2025/05/22/la-vergne-police-chief-urges-community-use-emergency-services-despite-fears-immigration-enforcement/.

[20] *Id.*

[21]  *Balancing Community Trust and Enforcement: The Complex Issue of Immigration*, Police Executive Research Forum (Apr. 12, 2025), https://www.policeforum.org/index.php?option=com_content&view=article&id=1331:trending12apr25&catid=20:site-content.

At bottom, policies like those challenged here make communities safer. They are grounded not in fantastical or extremist rhetoric, but in evidence-based and rational decision-making and are eminently within the domain of the police power maintained by State and local governments, including many Amici Communities.

## II.    So-Called Sanctuary Policies Promote Economic Well-Being.

So-called sanctuary policies are not only essential for advancing public safety—they also preserve scarce local resources. According to one estimate, so-called sanctuary cities with lower crime rates save more than $100 million per year in crime-related costs, while cooperation with federal immigration enforcement increases costs by $3.28 billion per year.[22] That is because "[w]hen local law enforcement focuses on keeping communities safe, rather than becoming entangled in federal immigration enforcement efforts, … community members stay more engaged in the local economy."[23] According to one study, cities and municipalities that adopt policies like those challenged in this case have higher median household incomes, less poverty, and less reliance on public assistance.[24] They also have higher labor force participation, higher employment-to-population ratios, and lower

---

[22] Manning & Burkhardt, *supra* n.8.

[23] Tom K. Wong, *The Effect of Sanctuary Policies on Crime and the Economy*, Ctr. for Am. Progress (Jan. 26, 2017), https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/.

[24] *Id.*

unemployment.[25] The study found that, on average, median household income is $4,353 higher in counties with so-called sanctuary policies than in counties without such policies.[26]

It should come as no surprise that communities with strong immigrant presence have healthy economies, given that immigrants are key contributors to the labor force across sectors. For one thing, immigrants are more likely to work than native residents.[27] Indeed, one report found that between 2010 and 2018, immigrants and their U.S.-born children represented 83 percent of workforce growth.[28] The report projected that through 2035, all growth in the working-age population of the U.S. would come from immigrants and their children.[29] Immigrants also start

---

[25] *Id.*

[26] *Id.*; *see also* Robert Lynch & Michael Ettlinger, *The Economic Impact on Citizens and Authorized Immigrants of Mass Deportation*, Univ. N.H. Carsey Sch. Pub. Pol'y (Aug. 29, 2024), https://carsey.unh.edu/sites/default/files/media/2024-08/economic-impact-mass-deportation-lit-review.pdf (finding that large-scale removals lead to reduced GDP and employment, and to lower wages for citizens and authorized-immigrant workers).

[27] *Here's What We Know about Foreign-Born Workers, and How They Compare to the Native-Born Population*, Peterson G. Found., https://www.pgpf.org/article/the-foreign-born-labor-force-of-the-united-states/ (last visited Aug. 20, 2025).

[28] Julia Gelatt, Jeanne Batalova & Randy Capps, *Navigating the Future of Work: The Role of Immigrant-Origin Workers in the Changing U.S. Economy*, Migration Pol'y Inst., 1 (Oct. 2020), https://www.migrationpolicy.org/research/future-work-immigrant-origin-workers-us-economy.

[29] *Id.*

businesses at far higher rates than the U.S. population overall.[30] In 2023, there were over 3.8 million immigrant entrepreneurs, generating $116.2 billion in business income and creating millions of jobs.[31] A 2024 American Immigration Council report found that a stunning 46 percent of Fortune 500 companies were founded by immigrants or the children of immigrants.[32]

And despite widespread narratives that immigrants are a burden on U.S. taxpayers, immigrants generate tax revenue, hold immense spending power, and help to build housing wealth. In 2023, immigrant tax contributions amounted to more than $650 billion, and the collective spending power of immigrant households was $1.7 trillion.[33] Even undocumented immigrants generate tax revenue—indeed, often more than similarly situated U.S. citizens—funding programs like Social Security and Medicare that they themselves are barred from accessing.[34] An analysis by the

---

[30] *Immigrant Entrepreneurship in the US*, Nat'l Bureau of Econ. Rsch. (Oct. 21, 2024), https://www.nber.org/be/20242/immigrant-entrepreneurship-us.

[31] *U.S. Immigration Statistics*, Am. Immigr. Council, https://map.americanimmigrationcouncil.org/ locations/national/ (last visited Aug. 20, 2025).

[32] *New American Fortune 500 in 2024*, Am. Immigr. Council (Sept. 9, 2024), https://www.americanimmigrationcouncil.org/report/new-american-fortune-500-2024/.

[33] *U.S. Immigration Statistics*, *supra* n.31.

[34] Carl Davis, Marco Guzman & Emma Sifre, *Tax Payments by Undocumented Immigrants*, Inst. on Tax'n Payment & Econ. Pol'y, 3 (July 30, 2024), https://itep.org/undocumented-immigrants-taxes-2024/.

National Bureau of Economic Research estimated that unauthorized workers contribute three percent of private sector GDP annually, which amounts to close to $5 trillion over a 10-year period.[35] Immigrants also build housing wealth, often moving into neighborhoods in decline and restoring them, thereby raising property values and making them more attractive to other U.S. residents.[36]

But when immigrants and their families fear indiscriminate immigration enforcement, it is more difficult for them to participate fully in the economy. Recent targeting of work sites by ICE illustrates the problem, showing how heightened fear of enforcement can disrupt local economies. A CNN story in June reported on a meat production plant that was left operating at 30 percent capacity after an immigration enforcement action removed dozens of workers.[37] In Los Angeles, a spate of ICE raids has caused a slump in the restaurant industry, with fewer diners visiting

---

[35] Ryan Edwards & Francesc Ortega, *The Economic Contribution of Unauthorized Workers: An Industry Analysis*, 3 (Nat'l Bureau of Econ. Rsch., Working Paper No. 22834, 2016), https://www.nber.org/system/files/working_papers/w22834/w22834.pdf.

[36] *U.S. Immigration Statistics*, *supra* n.31.

[37] Nathaniel Meyersohn & Vanessa Yurkevich, *America's Migrant Workers Are Terrified to Work But Unable to Stay Home*, CNN (June 14, 2025), https://www.cnn.com/2025/06/13/business/ice-workplace-raids-home-depot.

restaurants and more workers calling out.[38] Leaders in hospitality,[39] childcare,[40] and construction[41] sectors also project workforce shortages due to increased immigration enforcement actions.

The decision by local governments to limit entanglement with federal immigration policy reflects the recognition that their immigrant populations are best able to contribute to economic growth and a thriving community without the fear of indiscriminate enforcement hanging over their heads. That choice is eminently reasonable, and it is their choice to make, *see infra*.

## III. So-Called Sanctuary Policies Promote Health and Welfare.

Entanglement with federal immigration enforcement also threatens the health of communities. It contributes directly to decreased health by stoking an atmosphere

---

[38] Karla M. Sanford, *Undocumented Workers Power L.A.'s Restaurants. Will the Industry Protect Them?*, L.A. Times (June 30, 2025), https://www.latimes.com/food/story/2025-06-30/los-angeles-restaurant-owners-protect-immigrant-workers-ice-raids.

[39] *See* Meyersohn & Yurkevich, *supra* n.37.

[40] *See* Ben Zipperer, *Trump's Deportation Agenda Will Destroy Millions of Jobs*, Econ. Pol'y Inst. (July 10, 2025), https://www.epi.org/publication/trumps-deportation-agenda-will-destroy-millions-of-jobs-both-immigrants-and-u-s-born-workers-would-suffer-job-losses-particularly-in-construction-and-child-care/.

[41] *See* Carter Evans, *Trump's Immigration Crackdown Causing Labor Shortages to California's Construction Industry, Builder Says: "They're hiding,"* CBS News (July 18, 2025), https://www.cbsnews.com/news/trump-immigration-crackdown-labor-shortages-california-construction-industry-builder-says/.

of fear and chaos and increasing stress among members of immigrant communities.[42]

It also discourages individuals from seeking out the medical care they or their families need—even, as one study found, for young children.[43]

In fact, as reported by the *New York Times* earlier this year, one in five lawfully present immigrants said that they or a family member had avoided seeking medical care because of their concerns about immigration enforcement.[44] As ICE raids have ramped up across the country, social workers, doctors, and medical professionals have seen upticks in patient anxiety, appointment no-shows, and reluctance from immigrants to access medical resources—including emergency

---

[42] Allison McCord Stafford et al., *Documentation Status and Self-Rated Physical Health Among Latinx Young Adult Immigrants: The Mediating Roles of Immigration and Healthcare Stress*, 10 J. Racial & Ethnic Health Disparities 761, 769 (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC8853124/; Jacqueline M. Torres et al., *Deportation Worry, Cardiovascular Disease Risk Factor Trajectories, and Incident Hypertension: A Community-Based Cohort Study*, 8 J. Am. Heart Ass'n 1, 9 (2019), https://www.ahajournals.org/doi/10.1161/JAHA.119.013086.

[43] *See also* Karen Hacker et al., *The Impact of Immigration and Customs Enforcement on Immigrant Health: Perceptions of Immigrants in Everett, Massachusetts, USA*, 73 Soc. Sci. & Med. 586, 589 (2011), https://www.sciencedirect.com/science/article/abs/pii/S0277953611003522 (analyzing focus group discussions and finding that immigrants' removal fears led to avoidance of care); Patricia A. Cavazos-Rehg et al., *Legal Status, Emotional Well-Being and Subjective Health Status of Latino Immigrants*, 99 J. Nat'l Med. Ass'n 1126, 1130 (2007), https://pmc.ncbi.nlm.nih.gov/articles/PMC2574408/ (surveying 143 Latino immigrants and finding 39 percent indicated they avoided social services for fear of removal).

[44] Emily Baumgaertner Nunn et al., *Migrants Are Skipping Medical Care, Fearing ICE, Doctors Say*, N.Y. Times (May 8, 2025), https://www.nytimes.com/2025/05/08/health/migrants-health-care-trump.html.

care.[45] A July 2025 *Associated Press* report found that in the Rio Grande Valley, where health outcomes were already worse than the national average, increased immigration enforcement activity has caused many to skip medical appointments, fail to pick up prescriptions, and even refuse to sign their children up for health insurance.[46]

When this happens, the overall impact is not limited to immigrants; it affects entire communities. As the American Public Health Association notes, "[t]he health of the nation cannot be upheld, promoted, or protected when our immigrant and refugee communities are in fear of being detained and deported."[47] That is at least in part because when immigrants are reluctant to seek out healthcare for communicable diseases, it is more likely that such diseases will spread to others, including those

---

[45] *Id.*

[46] Amanda Seitz & Jacquelyn Martin, *As Trump's Raids Ramp Up, a Texas Region's Residents Stay Inside - Even When They Need Medical Care*, AP News (July 21, 2025), https://apnews.com/article/trump-immigration-medicaid-health-illegal-985fb65ee53095d5cedf39bdac58500f; *see also Study Finds Trump's Election Was Associated With Decrease in Well-Child Visits for Children of Immigrant Mothers*, Boston University (Sept. 8, 2023), https://medicalxpress.com/news/2023-09-trump-election-decrease-well-child-children.html (finding that anti-immigration rhetoric during the 2016 presidential election cycle, and the anti-immigration policy that followed, was associated with a decline in well-child visits for children of immigrant mothers).

[47] *Public Health Talking Points for Immigration Justice*, Health In Partnership, https://www.apha.org/getContentAsset/8c14db2e-633d-4541-ab60-d0f9de174b08/7ca0dc9d-611d-46e2-9fd3-26a4c03ddcbb/HIP-Public-Health-Talking-Points-for-Immigration-Justice-2025.pdf?language=en (last visited Aug. 20, 2025).

outside of immigrant communities.[48] For example, a study found that tuberculosis outbreaks are more likely when fear of immigration enforcement deters immigrants from accessing healthcare.[49]

But policies like those challenged in this case can mitigate the negative impact that fear of immigration enforcement would otherwise have on public health.[50] As Santa Clara County Executive James R. Williams has explained, these policies "promote community members' trust in government services. With that trust comes increased engagement with County systems across the board, from maternal and pediatric healthcare to services for vulnerable seniors, increasing the well-being of the entire community."[51] The federal government's efforts to undermine those sound policies should be rebuffed.

* * * * * * *

---

[48] Jan Hoffman, *Sick and Afraid, Some Immigrants Forgo Medical Care*, N.Y. Times (June 26, 2017), https://www.nytimes.com/2017/06/26/health/undocumented-immigrants-health-care.html.

[49] Steven Asch, Barbara Leake & Lillian Gelberg, *Does Fear of Immigration Authorities Deter Tuberculosis Patients From Seeking Care?*, 161 West J. Med. 373, 373 (1994), https://pmc.ncbi.nlm.nih.gov/articles/PMC1022616/.

[50] Helen B. Marrow, *The Power of Local Autonomy: Expanding Health Care to Unauthorized Immigrants in San Francisco*, 35 Ethnic & Racial Stud. 72, 84 (2012), https://www.taylorfrancis.com/chapters/edit/10.4324/9781315868622-6/power-local-autonomy-helen-marrow.

[51] *See* Dkt. 76, Declaration of Support for Preliminary Injunction, *San Francisco v. Trump*, No. 25-CV-0135 (N.D. Cal. Mar. 17, 2025).

What is happening here is a full-scale repeat of precisely the same arguments that the Trump Administration pressed and lost in its first go-around. They offer nothing new, nothing novel, nothing to distinguish this case from the many they've lost before.[52] To put it plainly, no federal law prohibits or displaces the kind of local decisions challenged here. Indeed, any contrary conclusion would run afoul of the U.S. Constitution, which prevents Congress from "strong arm[ing]" local

---

[52] *See Ocean v. Grewal*, 475 F. Supp. 3d 355, 376 (D.N.J. 2020) (holding that 8 U.S.C. § 1373 applies "only to information specifically regarding an individual's immigration or citizenship status"), *aff'd*, *Ocean Cnty. Board of Comm'rs v. New Jersey*, 8 F.4th 176 (3d Cir. 2021); *United States v. New Jersey*, No. 20-1364, 2021 WL 252270, at *13 (D.N.J. Jan. 26, 2021) (reaffirming conclusion in *Ocean*); *San Francisco v. Garland*, 42 F.4th 1078, 1085 (9th Cir. 2022) (noting that the Ninth Circuit has "rejected DOJ's interpretation of Section 1373 repeatedly"); *San Francisco v. Barr*, 965 F.3d 753, 764 (9th Cir. 2020) (holding that "the only information to which § 1373 extends" is "information regarding a person's citizenship or immigration status"); *Steinle v. San Francisco*, 919 F.3d 1154, 1164 (9th Cir. 2019) (holding that "no plausible reading of 'information regarding' 'immigration status' encompasses the state or local release date of an inmate who is an alien"); *United States v. Illinois*, No. 25-CV-1285, 2025 WL 2098688, at *10 (N.D. Ill. July 25, 2025) (noting that "[w]ithout exception," courts have "rejected the [government's] capacious reading"); *United States v. California*, 314 F. Supp. 3d 1077, 1102 (E.D. Cal. 2018) ("[T]he plain meaning of Section 1373 limits its reach to information strictly pertaining to immigration status (i.e. what one's immigration status is) and does not include information like release dates and addresses."), *rev'd in part on other grounds*, *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) ("[T]he United States argues that § 1373 actually applies to more information than just immigration status .... We disagree."); *Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 333 (E.D. Pa. 2018) (holding this provision refers to "an individual's category of presence in the United States—e.g., undocumented, refugee, lawful permanent resident, U.S. citizen, etc.—and whether or not an individual is a U.S. citizen, and if not, of what country"), *vacated in part on other grounds*, *Philadelphia v. United States*, 916 F.3d 276 (3d Cir. 2019).

governments "into doing its bidding." *Ocean*, 475 F. Supp. 3d at 381 (rejecting the same arguments raised in this case); *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 474 (2018) ("A more direct affront to state sovereignty is not easy to imagine" than in a federal law that "dictates what a state legislature may and may not do."). The Trump Administration thus lacks any legal basis for the claims it presses in this case, or indeed to support its more general endeavor to usurp state and local governments to carry out offensive and dangerous immigration policy, *see United States v. New York*, No. 25 Civ. 744, 2025 WL 3205011, at *13, *16–20 (N.D.N.Y. Nov. 17, 2025) (dismissing similar claims); *United States v. Illinois*, No. 25 Civ. 1285, 2025 WL 2098688, at *18, *25–27 (N.D. Ill. July 25, 2025) (same).

State and local governments like Amici are duty-bound to promote the safety and welfare of all residents in their communities, regardless of immigration status. In enacting the challenged policies, New York City has lawfully exercised its sovereign duty to do just that.

## CONCLUSION

Amici support New York City's motion to dismiss and respectfully submit that its motion should be granted.

Dated: December 9, 2025

Submitted By:

/s/ *Erin Monju*
Erin Monju
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
erin@publicrightsproject.org

/s/ *Karianne Jones*
Karianne Jones*
Evergreen Legal Strategies LLP
1763 Columbia Rd NW, Suite 100
Washington, D.C. 20009
karianne@evergreenlegalstrategies.com

*Application for admission *pro hac vice* forthcoming

*Attorneys for Proposed Amici Curiae
Seventy-Five Cities, Counties,
and Elected Officials*

# ADDITIONAL COUNSEL

ROBERT MAGEE
Corporation Counsel
24 Eagle Street, Room 106
Albany, NY 12207
*Attorney for the City of Albany, New York*

LAUREN KEEFE
City Attorney of Albuquerque
One Civic Plaza, 4th Floor
Albuquerque, NM 87102
*Attorney for the City of Albuquerque, New Mexico*

ROSALYN GUY-MCCORKLE
Allegheny County Solicitor
445 Fort Pitt Boulevard, Suite 300
Pittsburgh, PA 15219
*Attorney for Allegheny County, Pennsylvania*

SARAH W. CHAPLIN
AMY B. KRAHAM
Senior Assistant City Attorneys
210 Lottie Street
Bellingham, WA 98225
*Attorneys for the City of Bellingham, Washington*

ADAM CEDERBAUM
Corporation Counsel
One City Hall Square, Room 615
Boston, MA 02201
*Attorney for the City of Boston, Massachusetts*

JESSICA C. BROWN
City Attorney
Office of City Attorney &
    Corporation Counsel
149 Church Street
Burlington, VT 05401
*Counsel for the City of Burlington, Vermont*

MEGAN B. BAYER
City Solicitor
795 Massachusetts Avenue
Cambridge, MA 02139
*Attorney for the City of Cambridge, Massachusetts*

MARY B. RICHARDSON-LOWRY
Corporation Counsel of the City of
    Chicago
121 North LaSalle Street, Room 600
Chicago, IL 60602
*Attorney for the City of Chicago, Illinois*

21

HEATHER BAKER
City Attorney
City Hall
9770 Culver Boulevard, 3rd Floor
Culver City, CA 90232
*Attorney for the City of Culver City,
    California*

LEESA MANION
Prosecuting Attorney
Chinook Building
401 5th Avenue, Suite 800
Seattle, WA 98104
*Prosecuting Attorney for Martin
    Luther King, Jr. County*

BRIAN E. WASHINGTON
County Counsel
3501 Civic Center Drive, Suite 275
San Rafael, CA 94903
*Counsel for the County of Marin,
    California*

KRISTYN ANDERSON
City Attorney
City Hall, Room 210
350 South 5th Street
Minneapolis, MN 55415
*Attorney for the City of Minneapolis,
    Minnesota*

KRYSIA KUBIAK
City Solicitor and Chief Legal Officer
414 Grant Street
Pittsburgh, PA 15219
*Counsel for the City of Pittsburgh,
    Pennsylvania*

ROBERT TAYLOR
City Attorney
1221 Southwest 4th Avenue, Room
    430
Portland, OR 97204
*Attorney for the City of Portland,
    Oregon*

SUSANA ALCALA WOOD
City Attorney
915 I Street, 4th Floor
Sacramento, CA 95814
*Attorney for City of Sacramento,
    California*

HEATHER FERBERT
San Diego City Attorney
1200 3rd Avenue, Suite 1100
San Diego, CA 92101
*Counsel for the City of San Diego,
    California*

JOHN D. NIBBELIN
County Counsel
400 County Center, 6th Floor
Redwood City, CA 94063
*Attorney for San Mateo County,*
  *California*

DOUGLAS T. SLOAN
City Attorney
1685 Main Street, Room 310
Santa Monica, CA 90401
*Attorney for the City of Santa Monica,*
  *California*

TONY LOPRESTI
County Counsel
70 West Hedding Street East Wing,
  9th Floor
San José, CA 95110
*Counsel for the County of Santa*
  *Clara, California*

LYNDSEY M. OLSON
City Attorney
400 City Hall & Court House
15 West Kellogg Boulevard
St. Paul, MN 55102
*Attorney for the City of St. Paul,*
  *Minnesota*

FARIMAH FAIZ BROWN
City Attorney
2180 Milvia Street, 4th Floor
Berkeley, CA 94704
*Attorney for the City of Berkeley,*
  *California*

LAUREN LANGER
City Attorney
City Hall
8300 Santa Monica Boulevard
West Hollywood, CA 90069
*Attorney for the City of West*
  *Hollywood, California*

23

## Appendix A - List of *Amici* Local Governments

City of Albany, New York

City of Albuquerque, New Mexico

Allegheny County, Pennsylvania

City of Bellingham, Washington

City of Berkeley, California

City of Boston, Massachusetts

City of Burlington, Vermont

City of Cambridge, Massachusetts

City of Chicago, Illinois

City of Culver, California

City of Evanston, Illinois

City of Kenmore, Washington

Martin Luther King, Jr. County, Washington

County of Marin, California

City of Minneapolis, Minnesota

City of New Haven, Connecticut

City of Northampton, Massachusetts

City of Pittsburgh, Pennsylvania

City of Portland, Oregon

City of Rochester, New York

City of Sacramento, California

City of San Diego, California

San Mateo County, California

County of Santa Clara, California

City of Santa Monica, California

City of St. Paul, Minnesota

City of West Hollywood, California

**Local Government Leaders**

Brenda Adams
*Supervisor, Town of Canaan, New York*

Elizabeth Alcantar Loza
*Mayor, City of Cudahy, California*

Luis Alejo
*Supervisor, Monterey County, California*

Soli Alpert
*Rent Stabilization Board Chair, City of Berkeley, California*

Rachel Barnhart
*Legislator, Monroe County, New York*

Adam Bazaldua
*Councilmember, City of Dallas, Texas*

Celina R. Benitez
*Mayor, City of Mount Rainier, Maryland*

Ravinder Bhalla
*Mayor, City of Hoboken, New Jersey*

Xouhoa Bowen
*Vice Mayor and Councilmember, City of San Leandro, California*

Chelsea Byers
*Mayor, City of West Hollywood, California*

Chris Canales
*Councilmember, City of El Paso, Texas*

Michael Chameides
*Supervisor, Columbia County, New York*

John Clark
*Mayor, Town of Ridgway, Colorado*

Christine Corrado
*Councilmember, Township of Brighton, New York*

Olgy Diaz
*Councilmember, City of Tacoma, Washington*

Roger Dickinson
*Councilmember, City of Sacramento, California*

Justin Douglas
*Commissioner, Dauphin County, Pennsylvania*

Bryan "Bubba" Fish
*Councilmember, City of Culver, California*

Nikki Fortunato Bas
*Supervisor, Alameda County, California*

Brenda Gadd
*Councilmember, Metropolitan Nashville and Davidson County, Tennessee*

Heidi Garrido
*Councilmember, City of Hopkins, Minnesota*

Jonathan Guzman
*School Committee Vice-chair, City of Lawrence, Massachusetts*

Beau Harbin
*Legislator, Cortland County, New York*

Bear Heiser
*Mayor Pro Tem, City of Kyle, Texas*

Susan Hughes-Smith
*Legislator, Monroe County, New York*

Christopher Jaramillo
*Norristown Area School District Board President, Montgomery County, Pennsylvania*

Lisa Kaplan
*Councilmember, City of Sacramento, California*

Jerald Lentini
*Director, Township of Manchester, New Jersey*

Jessie Lopez
*Councilmember, City of Santa Ana, California*

Alexander Marion
*Auditor, City of Syracuse, New York*

Yasmine-Imani McMorrin
*Councilmember, City of Culver City, California*

Christian Menefee
*County Attorney, Harris County, Texas*

William Moehle
*Supervisor, Town of Brighton, New York*

Steven Mulroy
*District Attorney, Shelby County, Tennessee*

Patricia Nolan
*Councilmember, City of Cambridge, Massachusetts*

Isabel Piedmont-Smith
*Councilmember, City of Bloomington, Indiana*

Veronica Pillar
*Legislator, Tompkins County, New York*

Jacqueline "Jack" Porter
*Commissioner, City of Tallahassee, Florida*

Jaime Resendez
*Councilmember, City of Dallas, Texas*

Miguel Sanchez
*Councilmember, City of Providence, Rhode Island*

Dawn Marie Sass
*Clerk/Deputy Treasurer, City of Exeter, Wisconsin*

Seema Singh
*Councilmember, City of Knoxville, Tennessee*

David Stout
*Commissioner, El Paso County, Texas*

Lena Tam
*Supervisor, Alameda County, California*

Nicole Warren
*Assistant City Attorney, City of Austin, Texas*

Ginny Welsch
*Councilmember, Metropolitan Nashville and Davidson County, Tennessee*

Braxton White
*Commissioner, Clarion County, Pennsylvania*

Robin Wilt
*Councilmember, Township of Brighton, New York*