# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

THE UNITED STATES OF AMERICA,

                Plaintiff,

     v.

CITY OF NEW YORK; ERIC L. ADAMS, Mayor of The City of New York, in his official capacity; NEW YORK CITY COUNCIL; ADRIENNE E. ADAMS, Speaker of the New York City Council, in her official capacity; NEW YORK CITY DEPARTMENT OF CORRECTION; LYNELLE MAGINLEY-LIDDIE, Commissioner of the New York City Department of Correction, in her official capacity; NEW YORK CITY DEPARTMENT OF PROBATION; JUANITA N. HOLMES, Commissioner of the New York City Department of Probation, in her official capacity; NEW YORK CITY POLICE DEPARTMENT; JESSICA S. TISCH, Commissioner of the New York City Police Department, in her official capacity,

                Defendants.

Civil Action No. 1:25-cv-04084-RER-PK

**[PROPOSED] BRIEF OF *AMICI CURIAE***
**FORMER LAW ENFORCEMENT OFFICIALS**
**IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE PLAINTIFF'S COMPLAINT**

Ames C. Grawert
Brianna Seid (motion for admission *pro hac vice* forthcoming)
Brennan Center for Justice at NYU School of Law
120 Broadway, Suite 1750
New York, New York 10271

*Counsel for proposed* amici curiae

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ..................................................................................................... ii

STATEMENT OF INTEREST ................................................................................................ 1

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ........................................................................................................................... 2

    I.      Experience and Research Show that the Challenged Provisions Advance Public Safety. ........................................................................................................... 5

          A.      Burdening Local Police with Immigration Enforcement Undermines Public Safety and Reduces Trust. ............................................................. 5

          B.      Local Entities Are Best Positioned to Determine How to Use Local Resources. ....................................................................................... 9

    II.    The Challenged Provisions Allow Local Law Enforcement to Pursue Local Interests, and Federal Law Enforcement to Pursue Federal Interests. .................. 12

CONCLUSION ....................................................................................................................... 15

**TABLE OF AUTHORITIES**

**Cases**                                                                     **Page(s)**

*City of Chi. v. Sessions*,
    888 F.3d 272 (7th Cir. 2018) ......................................................................4, 13

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    584 U.S. 453 (2018).....................................................................................14

*New York v. U.S. Immigr. & Customs Enf't*,
    466 F. Supp. 3d 439 (S.D.N.Y. 2020).............................................................4

*Printz v. United States*,
    521 U.S. 898 (1997).....................................................................................14

*United States v. New Jersey*,
    2021 WL 252270 (D.N.J. Jan. 26, 2021) ........................................................13

**Statutes**

N.Y.C. Administrative Code § 9-131 ...................................................... *passim*

N.Y.C. Administrative Code § 9-205 ...................................................... *passim*

N.Y.C. Administrative Code § 10-178 ..................................................... *passim*

N.Y.C. Administrative Code § 14-154 ..................................................... *passim*

**Other Authorities**

*2025 Trends in Crime and Safety in New York City*, Brennan Ctr. for Just. (Nov.
    18, 2025), https://www.brennancenter.org/our-work/research-reports/2025-
    trends-crime-and-safety-new-york-city .......................................................9

*Attorney General James Announces Takedown of Gun and Drug Trafficking Ring
    Operating in New York City*, N.Y. State Att'y Gen. (July 25, 2024),
    https://ag.ny.gov/press-release/2024/attorney-general-james-announces-
    takedown-gun-and-drug-trafficking-ring ......................................................11

Benjamin O'Brien et al., *The Politics of Refuge: Sanctuary Cities, Crime, and
    Undocumented Immigration*, 55 Urban Affairs Review 3 (2019) ...........................9

*Best Practices for Law Enforcement to Preserve Community Trust in the Context
    of Increased Immigration Enforcement*, Law Enf't Immigr. Task Force (Dec.
    23, 2024), https://leitf.org/2024/12/best-practices-for-law-enforcement-to-
    preserve-community-trust-in-the-context-of-increased-immigration-
    enforcement...............................................................................................6

**Other Authorities**                                                                 **Page(s)**

Bridgette Adu-Wadier, *How the FBI Works with Local Law Enforcement to Respond to Violent Crime*, WTTW (Sept. 2, 2025, at 19:28 CST), https://news.wttw.com/2025/09/02/how-fbi-works-local-law-enforcement-respond-violent-crime ...............................................................................................11

Camilo Montoya-Galvez, *ICE's Detainee Population Reaches 66,000, a New Record High, Statistics Show*, CBS News (Nov. 6, 2025), https://www.cbsnews.com/news/ices-detainee-population-reaches-66000-a-new-record-high-statistics-show/ ........................................................................7

David J. Bier, *65 Percent of People Taken by ICE Had No Convictions, 93 Percent No Violent Convictions*, Cato Inst. (June 20, 2025), https://www.cato.org/blog/65-people-taken-ice-had-no-convictions-93-no-violent-convictions..................................................................................................7

*Do 287(g) Agreements with ICE Make Communities Safer?*, Am. Immigr. Council (July 18, 2024) .............................................................................................................5

*Effects of Federal Funding Cuts on Public Safety*, Brennan Ctr. for Just. (last visited Nov. 22, 2025), https://www.brennancenter.org/series/effects-federal-funding-cuts-public-safety ....................................................................................9

*Fear and Silence: 2025 Insights from Advocates for Immigrant Survivors*, All. for Immigrant Survivors (June 18, 2025), https://www.immigrantsurvivors.org/2025-insights-from-advocates-for-immigrant-survivors.........................................................................................................7

*Instability in the Northern Triangle*, Council on Foreign Relations (Sep. 19, 2025), https://www.cfr.org/global-conflict-tracker/conflict/violent-instability-northern-triangle .................................................................................................6

JB Pritzker, *Written Testimony to the U.S. House Committee on Oversight and Accountability*, U.S. House of Representatives (June 12, 2025), https://oversight.house.gov/wp-content/uploads/2025/06/Pritzker-Written-Testimony.pdf ..............................................................................................................11

*Joint HIS New York Investigation Leads to Takedown of Gun, Drug Trafficking Ring*, U.S. Immigr. & Customs Enf't (July 30, 2024), https://www.ice.gov/news/releases/joint-hsi-new-york-investigation-leads-takedown-gun-drug-trafficking-ring.................................................................10, 11

Kelly A. Yotebieng et al., *It Takes More than Translating a Flier: Considerations in Serving Immigrants as Victims of Crime in a Large Midwestern City*, 8 Border Crossing 12 (2018).........................................................................................8

**Other Authorities**                                                                        **Page(s)**

Law Enforcement Immigration Task Force & Police Executive Research Forum, *Building Trust with Immigrant Communities*, Police Executive Research Forum (2020) ...................................................................................................7

Loren Collingwood & Benjamin Gonzalez O'Brien, *Sanctuary Cities: The Politics of Refuge* (Oxford Academic, 2019)................................................................7

Marta Ascherio, *Do Sanctuary Policies Increase Crime? Contrary Evidence from a County-Level Investigation in the United States*, 106 Soc. Sci. Research 102734 (2022)...................................................................................................8

Mary Spiro, *Sociological Research Reveals How Immigrants Can Reduce Crime*, Am. Socio. Ass'n (Oct. 31, 2025), https://www.asanet.org/sociological-research-reveals-how-immigrants-can-reduce-crime ...................................................9

*Multi-Agency Task Force Leads to Arrest*, City of Albuquerque (May 2, 2022), https://www.cabq.gov/police/news/multi-agency-task-force-leads-to-arrest ..........................11

Nancy Morawetz & Alina Das, *Legal Issues in Local Police Enforcement of Federal Immigration Law*, *in* The Role of Local Police: Striking a Balance Between Immigration Enforcement & Civil Liberties 69 (2009)............................................10

New York City Police Department Operations Order No. 4 (Jan. 18, 2025) ....................... *passim*

Nicola Delvino & Markus González Beilfuss, *Latino Migrant Victims of Crime: Safe Reporting for Victims with Irregular Status in the United States and Spain*, 65 Am. Behavioral Scientist 1193 (2021) ....................................................8

Nik Theodore & Robert Habans, *Policing Immigrant Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, 42 J. Ethnic & Migration Studies 970 (2016)................................................................................7

N.Y.C. Council Comm. on Immigr., Committee Report of the Governmental Affairs Division, Int. Nos. 486 & 487 (Oct. 15, 2014), *available at* https://legistar.council.nyc.gov/View.ashx?M=F&ID=3289149&GUID=3629 4E88-06D7-4E8E-B90D-F14347207E3D.............................................................12

N.Y.C. Council Comm. on Immigr., Committee Report of the Governmental Affairs Division, Int. No. 656-A (Nov. 2, 2011), *available at* https://legistar.council.nyc.gov/View.ashx?M=F&ID=1599492&GUID=8418 8E2C-4B64-4C67-A02F-C2789137C70C.............................................................12

Press Release, New York City Council, City Council Speaker Melissa Mark-Viverito et al. Announce New Legislation that Will Prohibit New York City from Honoring Civil Immigration Detainers Unless a Warrant is Issued by a Federal Judge (Oct. 2, 2014), https://council.nyc.gov/press/2014/10/02/320/ ......................13

iv

**Other Authorities**                                                      **Page(s)**

Press Release, New York City Council, *Council to Prevent Unnecessary Deportations* (Feb. 27, 2013), https://council.nyc.gov/press/2013/02/27/555/ ........................13

Press Release, New York City Council, *Council to Vote on Legislation to Restrict the Use of City Resources for Federal Immigration Enforcement* (Oct. 31, 2017 ), https://council.nyc.gov/press/2017/10/31/1541/ ...........................................13

Robert C. Davis & Nicole J. Henderson, *Willingness to Report Crimes: The Role of Ethnic Group Membership and Community Efficacy*, 49 Crime & Delinquency 564 (2003) ...........................................................................................7

Seth Hoy, *Illinois County "Just Says No" to Costly Immigration Detainers*, Am. Immigr. Council (Sept. 14, 2011), https://www.americanimmigrationcouncil.org/blog/illinois-county-"just-says-no"-to-costly-immigration-detainers/ ................................................................10

Susannah N. Tapp & Emilie J. Cohen, *Criminal Victimization, 2024*, U.S. Dep't of Just. (Sept. 2025), https://bjs.ojp.gov/document/cv24.pdf ......................................6

*Thirty Charged in Sweeping Federal Case Targeting Tren de Aragua Members and Associates for Drug Trafficking, Murder-for-Hire, and Firearms Crimes*, U.S. Attn'y's Off., Dist. of Colo. (Aug. 18, 2025), https://www.justice.gov/usao-co/pr/thirty-charged-sweeping-federal-case-targeting-tren-de-aragua-members-and-associates ..................................................11

Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Ctr. Am. Progress (2017), https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ ...........................................4, 5, 10

Tom K. Wong, *The Impact of Interior Immigration Enforcement on the Day-to-Day Behaviors of Undocumented Immigrants*, U.S. Immigr. Pol'y Ctr. (Apr. 3, 2019), https://usipc.ucsd.edu/publications/usipc-working-paper-1.pdf.........................5, 6, 8

*US: Immigrants 'Afraid to Call 911'*, Hum. Rts. Watch (May 14, 2014 at 23:55 EDT), https://www.hrw.org/news/2014/05/14/us-immigrants-afraid-call-911 .........................7

**STATEMENT OF INTEREST**

This brief is respectfully submitted on behalf of former law enforcement officials who have spent their careers working to keep communities and residents safe.[1]

Amici have experience in roles across the criminal justice system and have spent decades in leadership positions in policing and prosecution. They have witnessed firsthand the value of community trust in preserving public safety, as well as the critical importance of having a clear division of responsibilities between local and federal law enforcement. Amici's experience bears directly on questions of law and policy before the Court, such as the nature and gravity of a city's interest in allocating its resources and encouraging individuals to report crimes without fear of repercussions. Amici therefore aim to assist the Court by providing their real-world perspective on these questions based on their years of law enforcement experience.

**PRELIMINARY STATEMENT**

Law enforcement professionals depend on the trust of the communities they serve. It is the glue that holds the criminal justice system together. Without trust, victims and witnesses will not come forward to report crimes to police. They will be reluctant to cooperate with prosecutors, hindering prosecutors' ability to collect and present the best possible evidence. And they will hesitate to enter courthouses to give testimony against people who have wronged them. As a result, actions that undermine trust between communities and law enforcement also undermine the ability of law enforcement professionals to do their jobs and keep their communities safe.

As law enforcement professionals, amici know firsthand that decisions about how to allocate local resources to advance local goals for public safety and crime prevention are best made

---

[1] No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund the preparation or submission of this brief. A list of amici appears as **Appendix A**.

by those who know their communities. Well-crafted laws and regulations defining the ways in which local law enforcement will participate in federal immigration enforcement further such public safety goals.

To strike what they believe to be the appropriate balance for their communities, cities around the country have passed laws and issued policies specifying the degree to which they will take on federal immigration enforcement responsibilities. These are not one-size-fits-all policies. Rather, they are grounded in judgments about how to keep particular communities safe, judgments that are best made by those who are closest to those communities. They allow federal law enforcement to continue to pursue federal priorities. And they rest on sound research and the experience of law enforcement professionals; allowing cities to decide how to efficiently allocate their resources in light of their specific personnel and experience.

In New York City, these policies are a collection of local statutes and guidance documents, published at New York City Administrative Code §§ 9-131, 9-205, 14-154, 10-178, and New York City Police Department Operations Order No. 4 (Jan. 18, 2025) (the "Challenged Provisions"), that limits cooperation with federal immigration enforcement. These policies prohibit any New York City official from honoring a civil immigration detainer except when federal law enforcement presents a valid judicial warrant, using state resources for federal immigration enforcement, or sharing specific information about people they interact with while carrying out their law enforcement mission.

Rather than impeding federal immigration enforcement, these provisions ensure that city officials do not utilize their scarce resources, collected to ensure the City can perform its duties, to perform the federal government's work. The Challenged Provisions also contain explicit exceptions to ensure collaboration between state, local, and federal authorities on dangers to public

2

safety. The limitation on the city's ability to honor civil detention requests, for example, and on disclosure of information, contain exceptions where the requests concern individuals convicted of a violent or serious crime or who may be a match on a terrorist screening database. N.Y.C. Admin. Code. § 9-131(b), (h)(1) (covering the City's Department of Correction). And as the United States concedes, the Challenged Provisions specifically permit the sharing of information on immigration status. Compl. ¶ 79 (citing N.Y.C. Admin. Code. § 9-131(h)(1)).

This balance reflects New York City's judgment, informed by law enforcement experience, about how city officials can protect public-safety interests while preserving community trust. Amici therefore support Defendant's Motion to Dismiss Plaintiff's Complaint (Docket 21).

## ARGUMENT

The Challenged Provisions are local policies that limit how much local law enforcement will assist federal immigration authorities by, for example, sharing information beyond the requirements of federal law or honoring ICE detainers. The Challenged Provisions do not stop federal officers from enforcing federal immigration laws, but instead simply define the extent of local involvement. These are vital tools for protecting local interests and ensuring that local police, prosecutors, and corrections officials are seen as neutral guardians of public safety. Fundamentally, the purpose is to clearly set out how local resources will be used to further local priorities, while allowing federal resources to go towards federal priorities.

In other words, the Challenged Provisions do not hinder law enforcement, contrary to the Complaint's claims. *See, e.g.*, Compl. ¶¶ 3-4, 6-8, 92-95. Nor do they immunize undocumented immigrants from federal law enforcement, prevent federal law enforcement from pursuing immigration enforcement actions, or prevent local law enforcement from working with federal law enforcement to ensure that those who commit crimes are held responsible for their actions. *See City of Chi. v. Sessions*, 888 F.3d 272, 281 (7th Cir. 2018) (noting the extent of cooperation

3

between federal immigration enforcement and local authorities notwithstanding local policies), *reh'g en banc granted in part, vacated in part on other grounds*, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated to same extent*, 2018 WL 4268814 (7th Cir. Aug. 10, 2018).

Instead, the Challenged Provisions and policies like them promote public safety by allowing local resources to be spent on local priorities, and by preserving the essential trust between local law enforcement and the communities that they serve. That trust increases the likelihood that victims and witnesses will come forward. Without the community's trust, it is harder for police and prosecutors to reach and work with witnesses, who may come to view law enforcement and government spaces, such as courtrooms, with trepidation. *See, e.g.*, *New York v. U.S. Immigr. & Customs Enf't*, 466 F. Supp. 3d 439, 443-44 (S.D.N.Y. 2020), *vacated on other grounds* 2023 WL 2333979 (2d Cir. Feb. 28, 2023) (noting that plaintiffs "offered substantial evidence" that non-citizen litigants may fear participation in the legal system, even reporting domestic violence, litigating family court actions, and defending themselves from criminal charges). These policies also support law enforcement by allowing local agencies to focus their limited resources on their most pressing threats, including violent crime, rather than entangling officers in federal immigration enforcement responsibilities that fall outside their training and divert them from other public safety priorities. And jurisdictions that implement such policies report stronger community cooperation and improved crime-fighting outcomes. *See, e.g.*, Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Ctr. Am. Progress (2017), https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ (concluding that counties with policies akin to the Challenged Provisions have statistically lower rates of crime and stronger economies than comparable counties without them).

I. **Experience and Research Show that the Challenged Provisions Advance Public Safety.**

The Complaint characterizes the Challenged Provisions as a threat to public safety. *See, e.g.*, Compl. ¶¶ 2, 8. That is inconsistent with the experience of amici, several of whom served in New York City, and whose judgment aligns more closely with the policy choice that New York has made. The benefit to public safety of laws like the Challenged Provisions has been borne out in jurisdictions across the country: promoting trust in government, easing burdens on victims to report crimes or abuse, facilitating the availability of witnesses and access to courthouses, and lessening the incentives to commit crimes against immigrant communities.

A. **Burdening Local Police with Immigration Enforcement Undermines Public Safety and Reduces Trust.**

The Challenged Provisions serve primarily to foster trust in law enforcement, trust that is in turn critical for effective policing. For this reason, the Challenged Provisions prohibit officers from sharing specific types of information collected from people they interact with, ensuring that routine interactions with law enforcement do not become de facto immigration screenings. Local police and prosecutors rely on witnesses and victims—regardless of their immigration status—to report crimes when they occur and to cooperate in efforts to bring perpetrators to justice. Put simply, police cannot protect the community from, and prosecutors cannot prosecute, crimes that they do not know about. Lower crime reporting rates and cooperation with law enforcement place the entire community at risk by inhibiting law enforcement's ability to identify and respond to threats to public safety. *See, e.g.*, *Do 287(g) Agreements with ICE Make Communities Safer?*, Am. Immigr. Council (July 18, 2024) ("When immigrants don't report crimes . . . it makes communities and all their residents less safe."); Tom K. Wong, *The Impact of Interior Immigration Enforcement on the Day-to-Day Behaviors of Undocumented Immigrants*, U.S. Immigr. Pol'y Ctr. (Apr. 3, 2019), at 17, https://usipc.ucsd.edu/publications/usipc-working-paper-1.pdf. ("To the extent that

5

people, undocumented or not, are less likely to report crimes that they witness, let alone are victims of, to the police, serious public safety implications can result."). By keeping immigration enforcement separate from local policing, the Challenged Provisions help build trust so that community members feel safe coming forward when they witness or experience crime.

In amici's experience as law enforcement professionals, fostering the community's trust in law enforcement is critical to improving crime reporting rates. This is an area where there is significant room for progress. According to a leading federal survey, less than half of all non-fatal violent crimes were reported to police in 2024. Susannah N. Tapp & Emilie J. Cohen, *Criminal Victimization, 2024*, U.S. Dep't of Just. (Sept. 2025), at 7, https://bjs.ojp.gov/document/cv24.pdf. The figure was even lower for property crimes: less than a third of thefts made it to the attention of law enforcement in 2024. *Id.*

These problems are even more salient in immigrant communities. Law enforcement often faces an uphill battle when building trust with immigrants, many of whom come from countries where police are often ineffective, corrupt, or routinely participate in political violence. *See, e.g.*, *Best Practices for Law Enforcement to Preserve Community Trust in the Context of Increased Immigration Enforcement*, Law Enf't Immigr. Task Force (Dec. 23, 2024), https://leitf.org/2024/12/best-practices-for-law-enforcement-to-preserve-community-trust-in-the-context-of-increased-immigration-enforcement; *Instability in the Northern Triangle*, Council on Foreign Relations (Sep. 19, 2025), https://www.cfr.org/global-conflict-tracker/conflict/violent-instability-northern-triangle. And research consistently shows that reporting rates are lower in immigrant communities, where residents may fear that contacting the police or cooperating with prosecutors will lead to detention or deportation regardless of their criminal history (or lack

thereof).[2] That fear is not unfounded: the federal government's current approach to immigration enforcement has ensnared tens of thousands of immigrants with no criminal charges or convictions at all. *See, e.g.*, Camilo Montoya-Galvez, *ICE's Detainee Population Reaches 66,000, a New Record High, Statistics Show*, CBS News (Nov. 6, 2025), https://www.cbsnews.com/news/ices-detainee-population-reaches-66000-a-new-record-high-statistics-show/ ("Department of Homeland Security figures show just over half—or around 33,000—of the individuals in ICE detention as of Thursday morning did not have criminal charges or convictions and were being held solely because of civil immigration violations."); David J. Bier, *65 Percent of People Taken by ICE Had No Convictions, 93 Percent No Violent Convictions*, Cato Inst. (June 20, 2025), https://www.cato.org/blog/65-people-taken-ice-had-no-convictions-93-no-violent-convictions.

Clearly delineating the distinct roles of police and immigration officials helps address this fear, especially when paired with meaningful outreach to immigrant communities to educate new immigrants about the protective function police play in the United States. That delineation relies in turn on the adoption, clear communication, and consistent enforcement of rules on the

---

[2]    *See, e.g.*, Loren Collingwood & Benjamin Gonzalez O'Brien, *Sanctuary Cities: The Politics of Refuge* 118 (Oxford Academic, 2019) (finding that provisions similar to the Act have no negative effect on crime rates within cities while legislation requiring state and federal cooperation results in a decrease in 911 reporting calls); Robert C. Davis & Nicole J. Henderson, *Willingness to Report Crimes: The Role of Ethnic Group Membership and Community Efficacy*, 49 Crime & Delinquency 564, 564 (2003) (following 1,123 interviews, correlates willingness to report crimes with feelings of community empowerment and community efficacy); *Fear and Silence: 2025 Insights from Advocates for Immigrant Survivors*, All. for Immigrant Survivors (June 18, 2025), https://www.immigrantsurvivors.org/2025-insights-from-advocates-for-immigrant-survivors (surveying 170 immigrant advocates and attorneys, ultimately reporting that 75.6% have concerns about contacting police); *US: Immigrants 'Afraid to Call 911'*, Hum. Rts. Watch (May 14, 2014 at 23:55 EDT), https://www.hrw.org/news/2014/05/14/us-immigrants-afraid-call-911 (illustrating how the entanglement of local law enforcement with immigration enforcement harms public safety overall); Law Enforcement Immigration Task Force & Police Executive Research Forum, *Building Trust with Immigrant Communities*, Police Executive Research Forum (2020) (stating that even immigrants with legal status are worried about reporting crimes because they fear the police may mistake their legal status); Nik Theodore & Robert Habans, *Policing Immigrant Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, 42 J. Ethnic & Migration Studies 970, 977 (2016) (finding that 70% of undocumented immigrants surveyed reported they are less likely to contact law enforcement authorities if they are victims of crime).

circumstances in which local police will—and will not—assist federal officials with federal immigration enforcement.[3]

Though this judgment rests on amici's own experience, it is neither anecdotal nor theoretical. To the contrary, empirical research indicates that cities which limit cooperation with immigration enforcement more effectively maintain legitimacy in immigrant-heavy neighborhoods. For example, one study finds that when undocumented immigrants are told that local law enforcement officials are working with ICE, they are 60.8% less likely to report crimes witnessed, 42.9% less likely to report crimes they are victim to, and 68.3% less likely to participate in public events where police may be present. Tom K. Wong, *The Impact of Interior Immigration Enforcement on the Day-to-Day Behaviors of Undocumented Immigrants*, U.S. Immigr. Pol'y Ctr. (Apr. 3, 2019), at 17, https://usipc.ucsd.edu/publications/usipc-working-paper-1.pdf.

By contrast, amici have not seen any evidence that policies like the Challenged Provisions cause an increase in crime, or that there is a connection between immigration and crime in general. Nor would such evidence be consistent with their experience. *See, e.g.*, Marta Ascherio, *Do Sanctuary Policies Increase Crime? Contrary Evidence from a County-Level Investigation in the United States*, 106 Soc. Sci. Research 102743, 8 (2022) (analyzing data from 3,105 U.S. counties and concluding that local police declining notification and detainer requests from federal immigration enforcement "lead to a post-hoc *decline* in crime rates") (emphasis added); Benjamin

---

[3]    *See* Kelly A. Yotebieng et al., *It Takes More than Translating a Flier: Considerations in Serving Immigrants as Victims of Crime in a Large Midwestern City*, 8 Border Crossing 12, 24-26 (2018) (noting that, despite the crime reducing effect of immigrants in the United States, these individuals are often victims with inadequate infrastructure to cooperate with federal immigration authorities and could be better supported with well-tailored victim service provider services); Nicola Delvino & Markus González Beilfuss, *Latino Migrant Victims of Crime: Safe Reporting for Victims with Irregular Status in the United States and Spain*, 65 Am. Behavioral Scientist 1193, 1202-03 (2021) (describing the interplay between immigration, criminal legislation, and enforcement structures and finding that those with irregular status are scared to report crime for fear of repercussion but that improvements could be made through clearer communications and better guidelines).

O'Brien et al., *The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration*, 55 Urban Affairs Review 3, 3-40 (2019) (finding that policies like the Challenged Provisions have no statistical impact on crime rate); Mary Spiro, *Sociological Research Reveals How Immigrants Can Reduce Crime*, Am. Socio. Ass'n (Oct. 31, 2025), https://www.asanet.org/sociological-research-reveals-how-immigrants-can-reduce-crime (citing multiple studies to conclude that "[r]esearch demonstrates that cities with higher immigrant populations tend to have lower crime rates."). Indeed, New York City has experienced sustained declines in major crimes in recent years and by many metrics ranks among the safest large cities nationwide even while experiencing an influx of immigrant populations.[4]

**B.        Local Entities Are Best Positioned to Determine How to Use Local Resources.**

The Challenged Provisions also help free local law-enforcement to concentrate on direct threats to public safety—such as violent crime, serious drug trafficking, and domestic violence—rather than enmeshing them in federal immigration enforcement tasks for which they are neither trained nor resourced.

Local police, prosecutors, and corrections agencies operate under tight personnel and budget constraints. This concern is even more pressing today, as the federal government cuts grants and cooperative agreements.[5] When local law enforcement becomes involved in gathering information for federal law enforcement, it risks diverting time, personnel, and attention away from core public safety functions. And cooperating with federal immigration enforcement, such as

---

[4]    *See generally*, *2025 Trends in Crime and Safety in New York City*, Brennan Ctr. for Just. (Nov. 18, 2025), https://www.brennancenter.org/our-work/research-reports/2025-trends-crime-and-safety-new-york-city (reporting on trends indicating that New York City has become safer by many common crime metrics compared to previous years and ranks among the safest large cities).

[5]    *See generally*, *Effects of Federal Funding Cuts on Public Safety*, Brennan Ctr. for Just., https://www.brennancenter.org/series/effects-federal-funding-cuts-public-safety (last visited Nov. 22, 2025) (cataloguing and reporting on programs that result in federal funding cuts and the ramifications these cuts have on public safety).

holding people for longer periods of time pursuant to ICE detainers, imposes real costs on local jurisdictions. For instance, one county estimated that holding detainees at the request of ICE costs nearly $15 million annually, with only limited federal reimbursement.[6] These are funds that county leaders could instead spend on constituents' priorities. This resource-allocation dynamic could help explain why jurisdictions with policies like the Challenged Provisions see fewer crimes than those without.[7]

Importantly, the Challenged Provisions do not forbid cooperation with federal authorities. Rather, they draw boundaries that allow for collaboration that is consistent with federal law and supports, rather than impedes, local priorities.[8] Indeed, New York City and jurisdictions like it continue to participate in joint task forces and information sharing around serious or violent crime. In 2024, for example, the NYPD alongside other local and federal law enforcement agencies conducted a major operation leading to the takedown of a multistate firearm and drug-trafficking ring. *Joint HIS New York Investigation Leads to Takedown of Gun, Drug Trafficking Ring*, U.S. Immigr. & Customs Enf't (July 30, 2024), https://www.ice.gov/news/releases/joint-hsi-new-york-investigation-leads-takedown-gun-drug-trafficking-ring; *Attorney General James Announces Takedown of Gun and Drug Trafficking Ring Operating in New York City*, N.Y. State Att'y Gen.

---

[6]     Seth Hoy, *Illinois County "Just Says No" to Costly Immigration Detainers*, Am. Immigr. Council (Sept. 14, 2011), https://www.americanimmigrationcouncil.org/blog/illinois-county-"just-says-no"-to-costly-immigration-detainers/.

[7]     *See* Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Ctr. Am. Progress (2017), https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ (following statistical analysis, finding that counties with policies similar to the Act have lower rates of crime and stronger economies than comparable counties without such laws); *see also* Mem. Supp. Def's Mot. Dismiss, ECF No. 16, at 1 (noting that Boston is "the safest major city in the country").

[8]     *See* Nancy Morawetz & Alina Das, *Legal Issues in Local Police Enforcement of Federal Immigration Law*, *in* The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties 69, 69-70 (2009) (noting the high risks involved with including local police in immigration enforcement, such as that enforcement actions will violate the rights of people in the community, and describing the benefits of local police developing collaborative boundaries with immigration enforcement).

(July    25,    2024),    https://ag.ny.gov/press-release/2024/attorney-general-james-announces-takedown-gun-and-drug-trafficking-ring.

And cities across the country, even those with laws and policies similar to the Challenged Provisions, cooperate with federal law enforcement to address violent crimes. *See, e.g.*, *Thirty Charged in Sweeping Federal Case Targeting Tren de Aragua Members and Associates for Drug Trafficking, Murder-for-Hire, and Firearms Crimes*, U.S. Attn'y's Off., Dist. of Colo. (Aug. 18, 2025),    https://www.justice.gov/usao-co/pr/thirty-charged-sweeping-federal-case-targeting-tren-de-aragua-members-and-associates (noting the assistance of the Denver Police Department, among other local agencies).

In Illinois, the state police form part of the Chicago Violent Crimes Task Force where they work with federal agencies to combat gang violence, narcotics trafficking, and gun-related offenses. *See* JB Pritzker, *Written Testimony to the U.S. House Committee on Oversight and Accountability*, U.S. House of Representatives, 4 (June 12, 2025), https://oversight.house.gov/wp-content/uploads/2025/06/Pritzker-Written-Testimony.pdf. The head of the FBI's Chicago Field Office described one recent joint operation between the FBI and its "'partners,'" the Illinois State Police, where both forces collaborated to "identify the 25 baddest of the bad, worst violent criminals who had outstanding warrants." Bridgette Adu-Wadier, *How the FBI Works with Local Law Enforcement to Respond to Violent Crime*, WTTW (Sept. 2, 2025, at 19:28 CST), https://news.wttw.com/2025/09/02/how-fbi-works-local-law-enforcement-respond-violent-crime. Police in Albuquerque, New Mexico, participate in federal task forces that have arrested violent criminals. *See, e.g.*, *Multi-Agency Task Force Leads to Arrest*, City of Albuquerque (May 2, 2022), https://www.cabq.gov/police/news/multi-agency-task-force-leads-to-arrest        (highlighting

11

collaboration between Albuquerque Police Department and many other law enforcement partners to conduct arrests).

In other words, local and federal law enforcement work together in other contexts every day to keep us all safe. The Challenged Provisions, and other laws and policies like them, do not impede this critical collaboration.

## II.    The Challenged Provisions Allow Local Law Enforcement to Pursue Local Interests, and Federal Law Enforcement to Pursue Federal Interests.

The New York City Council has repeatedly emphasized that City immigration policy, including the Challenged Provisions, exist to foster a safe and welcoming city for all by promoting trust in local law enforcement and distinguishing the duties of New York City Police from those of federal immigration authorities. While crafting the policies in question, the Council specifically considered the risk that "the fear of deportation due to cooperation between City agencies and ICE negatively affects community policing, and the willingness of immigrant crime victims and immigrant witnesses to report crimes." N.Y.C. Council Comm. on Immigr., Committee Report of the Governmental Affairs Division, Int. Nos. 486 & 487, at 3 (Oct. 15, 2014), *available at* https://legistar.council.nyc.gov/View.ashx?M=F&ID=3289149&GUID=36294E88-06D7-4E8E-B90D-F14347207E3D; *see also* N.Y.C. Council Comm. on Immigr., Committee Report of the Governmental Affairs Division, Int. No. 656-A, at 10, 12 (Nov. 2, 2011), *available at* https://legistar.council.nyc.gov/View.ashx?M=F&ID=1599492&GUID=84188E2C-4B64-4C67-A02F-C2789137C70C (summarizing testimony to the Council to the effect that the then-existing "practice of cooperating with ICE has significant public safety implications because witnesses and victims are less likely to cooperate with local law enforcement for fear that they or their family members will be deported").

12

Similar concerns appeared in public communications around the Council's deliberations, with City leaders highlighting the need to "make all of us safer by encouraging immigrant communities to report crimes and cooperate with investigations." Press Release, New York City Council, City Council Speaker Melissa Mark-Viverito et al. Announce New Legislation that Will Prohibit New York City from Honoring Civil Immigration Detainers Unless a Warrant is Issued by a Federal Judge (Oct. 2, 2014), https://council.nyc.gov/press/2014/10/02/320/ (discussing what would become N.Y.C. Administrative Code § 9-131); *see also, e.g.*, Press Release, New York City Council, Council to Vote on Legislation to Restrict the Use of City Resources for Federal Immigration Enforcement (Oct. 31, 2017 ), https://council.nyc.gov/press/2017/10/31/1541/ ("The City Council has been proud to lead the way in greatly restricting ICE activity in New York City … Such initiatives have improved the morale of our immigrant communities and the trust they have in local officials to protect and serve their needs.").[9]

These are policy judgments that go to New York City's core local interests, which New York City was entitled to make. *See, e.g.*, *United States v. New Jersey*, 2021 WL 252270, at *7 (D.N.J. Jan. 26, 2021) ("New Jersey's decision not to cooperate with the enforcement of federal immigration law is a clear exercise of its police power to regulate the conduct of its own law enforcement agencies."); *City of Chi.*, 888 F.3d at 291 ("[L]ocal and state governments have concluded that the safety of their communities is furthered by a relationship of trust with the undocumented persons and lawful immigrants residing therein—and those localities are clearly in the best position to determine the security needs of their own communities."). The Challenged

---

[9]     *See also* Press Release, New York City Council, Council to Prevent Unnecessary Deportations (Feb. 27, 2013), https://council.nyc.gov/press/2013/02/27/555/ ("If immigrants believe that the police will hand them over to immigration authorities, they are less likely to report crimes, and this can only have a negative effect on public safety. We have seen too many families torn apart by current detention and deportation practices. This is heartbreaking and unfair. Our legislation will ensure that the City does not enable such a harmful policy.").

Provisions preserve the proper constitutional balance, focusing local resources on local priorities, and leaving federal priorities to be acted upon by federal dollars. *See, e.g.*, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 474 (2018) ("If Congress enacts a law and requires enforcement by the Executive Branch, it must appropriate the funds needed to administer the program."); *Printz v. United States*, 521 U.S. 898, 922 (1997) ("The power of the Federal Government would be augmented immeasurably if it were able to impress into its service—and at no cost to itself—the police officers of the 50 States.").

In other words, the Challenged Provisions simply leave the enforcement of federal law to the federal government. This means that—contrary to the allegations in the Complaint, *see, e.g.*, Compl. ¶¶ 7-9, 89, 113, 114—the Challenged Provisions do not impede federal immigration enforcement. Rather, they direct City officials not to use City resources to perform functions that federal law assigns to federal immigration officers, such as civil immigration arrests or detainer-based custody transfers without judicial authorization. And even with these limitations, New York City law expressly preserves avenues for cooperation where federal activities intersect with local public-safety responsibilities. *See* N.Y.C. Admin. Code §§ 9-131(b), 14-154(b) (permitting City authorities to honor detainers where, for example, the person to be detained appears on a terrorist watchlist); *id.* at § 10-178(e) (expressly preserving avenues for cooperation "that are not primarily intended to further immigration enforcement").

In amici's experience, that balance is an appropriate one. The goals of local law enforcement can be compromised if officers spend time and resources on immigration holds rather than crime investigations. Local officers also often lack the training to carry out immigration tasks, increasing liability or misallocation of resources. By clearly delineating local and federal roles, the

14

Challenged Provisions help ensure different arms of law enforcement can pursue their mandates with the resources available to them.

## CONCLUSION

N.Y.C. Administrative Code §§ 9-131, 9-205, 14-154, 10-178, and New York City Police Department Operations Order No. 4. effectively promote New York City's interest in preserving public safety and maintaining an appropriate division of responsibility between local and federal law enforcement. For these reasons, and consistent with amici's decades of experience in law enforcement, amici support Defendants' Motion to Dismiss.

Dated: December 9, 2025        Respectfully submitted,

By:     /s/ Ames C. Grawert

Ames C. Grawert
Brianna Seid (motion for admission *pro hac vice* forthcoming)
Brennan Center for Justice
 at NYU School of Law
120 Broadway, Suite 1750
New York, NY 10271

(646) 292-8310
grawerta@brennan.law.nyu.edu
seidb@brennan.law.nyu.edu

*Attorneys for Amici Curiae*
*Former Law Enforcement Officials*

15

**CERTIFICATE OF COMPLIANCE WITH LOCAL CIVIL RULE 7.1(C)**

In accordance with Local Civil Rule 7.1 (c), I hereby certify that the preceding Memorandum of Law contains 4,443 words, including footnotes, as established by Microsoft Word, the software used to prepare the brief.

Dated: December 9, 2025                Respectfully submitted,

By:        /s/ Ames C. Grawert

Ames C. Grawert
Brianna Seid (motion for admission *pro hac vice* forthcoming)
Brennan Center for Justice
 at NYU School of Law
120 Broadway, Suite 1750
New York, NY 10271

(646) 292-8310
grawerta@brennan.law.nyu.edu
seidb@brennan.law.nyu.edu

*Attorneys for Amici Curiae*
*Former Law Enforcement Officials*

16

## **APPENDIX A**

List of *Amici Curiae*

- Chief Chris Burbank (Retired) – Salt Lake City Police Department
- Dr. Tracie L Keesee – Former Deputy Commissioner, NYPD
- Beth McCann – District Attorney, Denver, Colorado, 2017–25
- Benjamin B. Tucker – Former First Deputy Commissioner, NYPD; Former Deputy Director, State, Local and Tribal Affairs, Office National Drug Control Policy
- Cyrus Vance, Jr. – District Attorney, Manhattan, 2010–2