# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

№ 25-CV-04084 (RER) (PK)

UNITED STATES OF AMERICA

VERSUS

CITY OF NEW YORK, ZOHRAN KWAME MAMDANI, NEW YORK CITY COUNCIL, JULIE MENIN, NEW YORK CITY DEPARTMENT OF CORRECTION, STANLEY RICHARDS, NEW YORK CITY DEPARTMENT OF PROBATION, SHARUN GOODWIN, NEW YORK CITY POLICE DEPARTMENT, AND COMMISSIONER JESSICA S TISCH.

**MEMORANDUM & ORDER**

**RAMÓN E. REYES, JR., District Judge:**

The United States of America (the "United States") brought this action against the City of New York and several of its agencies and officials ("New York City" or "Defendants") "to preempt several local provisions of law—namely, the New York City Administrative Code §§ 9-131, 9-205, 14-154, 10-178, and New York City Police Department Operations Order No. 4 [] ('Sanctuary Provisions' or 'challenged provisions')—that are designed to impede the Federal Government's ability to enforce the federal immigration laws." (ECF No. 1 ¶ 4). The United States contends these Sanctuary Provisions violate the Supremacy Clause of the Constitution of the United States, art. VI, cl. 2. (*Id.*) Defendants have moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. (ECF Nos. 52, 53).

After carefully reviewing the record, and for the reasons set forth herein, the Court grants Defendants' motion and dismisses the complaint.[1]

## BACKGROUND

### I. Federal Statutory and Regulatory Framework

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012) (citation omitted). "This authority rests, in part, on the National Government's constitutional power to 'establish an uniform Rule of Naturalization.'" *Id.* at 394–95 (quoting Art. I, § 8, cl. 4). "The foundation of our laws on immigration and naturalization is the Immigration and Nationality Act (INA), 66 Stat. 163, as amended, 8 U.S.C. § 1101 *et seq.*, which sets out the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *Kansas v. Garcia*, 589 U.S. 191, 195 (2020). Two categories of immigration law are relevant to this case: (1) law regarding administrative warrants and detainers; and (2) law related to information sharing and cooperation. *See Boston*, 833 F. Supp. 3d at 35–37; *Illinois*, 796 F. Supp. 3d at 505.

---

[1] This is among nearly a dozen recent cases in which the United States has challenged state and local so-called "Sanctuary Provisions" that purportedly effect the federal government's immigration enforcement activities in violation of the Supremacy Clause. In all prior cases, the United States' challenges to such provisions have been rejected. *See United States v. the State of New Jersey et al.*, No. 26-CV-1770 (GC) (JTQ), 2026 WL 2621025 (D.N.J. Sept. 4, 2026); *United States v. City of Rochester, et al.*, No. 25-CV-6226 (FPG), 2026 WL 2581845 (W.D.N.Y. Sept. 1, 2026); *United States v. Cnty. of Washtenaw*, No. 26-11166 (FKB), 2026 WL 2453724 (E.D. Mich. Aug. 21, 2026); *United States v. Minnesota*, No. 25-CV-3798 (ECT) (JFD), 2026 WL 2085701 (D. Minn. July 20, 2026); *United States v. City of Newark*, No. 25-CV-5081 (EP) (AME), 2026 WL 1816022 (D.N.J. June 24, 2026); *United States v. City of Los Angeles*, No. 25-CV-5917 (FMO) (AYPX), 2026 WL 1790971 (C.D. Cal. June 20, 2026); *United States v. City of Bos.*, 833 F. Supp. 3d 30 (D. Mass. 2026); *United States v. Colorado*, 831 F. Supp. 3d 1108 (D. Colo. 2026); *United States v. New York*, 814 F. Supp. 3d 266 (N.D.N.Y. 2025); *United States v. New York*, 810 F. Supp. 3d 329 (N.D.N.Y. 2025); *United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025). Because much has already been written about these issues with which this Court agrees, this decision will be relatively brief.

a. <u>Administrative Warrants and Immigration Detainers</u>

To facilitate enforcement of the United States' immigration law, federal officers may effectuate arrests pursuant to a warrant issued by the Attorney General, *i.e.* an administrative warrant. 8 U.S.C. § 1226(a). Further, federal immigration officers can request assistance from any other federal, state, or local law enforcement agency that has custody of an individual the Department of Homeland Security ("DHS" or the "Department") seeks to arrest and remove by issuing a section 287.7 detainer. 8 C.F.R. § 287.7(a). A section 287.7 detainer has two components. First, a "request that such agency advise the Department, prior to release of the alien." *Id.* Second, a request that "such agency shall maintain custody of the alien" for up to forty-eight hours. *Id.* at (d). Compliance with section 287.7 detainers is not mandatory. *See Hernandez v. United States*, 939 F.3d 191, n.11 (2d Cir. 2019); *Orellana v. Cnty. of Suffolk*, No. 17-CV-4267 (WFK), 2025 WL 481723, at *2 (E.D.N.Y. Jan. 2, 2025). Federal immigration officers may detain any non-citizen awaiting a removal decision from immigration court. 8 U.S.C. § 1226(a). Federal immigration officers must detain "criminal aliens" (as defined under *id.* § 1226(c)) and non-citizens subject to a final order of removal during the pendency of the "removal period" (as defined under *id.* § 1231(a)(1)–(2)).

b. <u>Information Sharing and Cooperation</u>

"Consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. To that end, federal law bars federal, state, and local governmental entities and officials from "prohibit[ing]" or "in any way restrict[ing]" the flow of "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" to and from DHS. 8 U.S.C. § 1373(a); *see also id*. § 1373(b)

(similar); *id*. § 1644 (similar). Many federal courts have found, "the phrase 'information regarding the citizenship or immigration status, lawful or unlawful, of any individual' is naturally understood as a reference to a person's legal classification under federal law." *Boston*, 833 F. Supp. 3d at 37 (quoting *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019)); *see also Illinois*, 796 F. Supp. 3d at 516–19 (collecting cases). Federal law allows states and localities to expand their participation in immigration enforcement by entering a "1357(g) agreement." 8 U.S.C. § 1357(g)(1). A 1357(g) agreement authorizes state and local officials to perform functions of federal immigration officers "to the extent consistent with State and local law." *Id*.

## II. State and Local Law

### a. Judicial Warrants and Detainers

"New York state and local law enforcement officers are not authorized by New York law to effectuate arrests for civil law immigration violations." *People ex rel. Wells v. DeMarco,* 168 A.D.3d 31, 34 (2nd Dep't 2018) (granting a habeas petition on the basis that local law enforcement's detention of petitioner pursuant to a section 287.7 detainer was unlawful); *see also Orellana*, 2025 WL 481723 at *13 ("The Court declines to declare the reasoning of the *Wells* court 'unsound.'").[2] Considering the interplay between federal and state law, New York City's administrative code dictates when its officers may give

[2] *Wells* is binding on trial courts throughout the state since neither the Court of Appeals nor any other appellate department has addressed this issue. *See, e.g., Phelps v. Phelps*, 128 A.D.3d 1545, 1547 (4th Dep't 2015) ("where the issue has not been addressed within the Department, Supreme Court is bound by the doctrine of stare decisis to apply precedent established in another Department, either until a contrary rule is established by the Appellate Division in its own Department or by the Court of Appeals").

effect to a section 287.7 detainer. N.Y.C Administrative Code §§ 9-131(b), 9-205(b), 14-154(b).

New York City's Department of Correction, Department of Probation, and the Police Department may honor a section 287.7 detainer request only if (a) federal immigration authorities provide a "judicial warrant" and (b) the individual "has been convicted of a violent or serious crime" or "is identified as a possible match in the terrorist screening database." N.Y.C Administrative Code §§ 9-131(b), 9-205(b), 14-154(b)(1). In addition, the Police Department may honor a section 287.7 detainer request in anticipation of receipt of a judicial warrant, if the individual (a) "has been convicted of a violent or serious crime and has illegally re-entered the country after a previous removal or return" or (b) "is identified as a possible match in the terrorist screening database." N.Y.C Administrative Code § 14-154(b)(2). "[H]owever, . . . if federal immigration authorities fail to present the department with a judicial warrant for such person" within forty-eight hours "such person shall be released and the department shall not notify federal immigration authorities of such person's release." *Id.*

b. Information-Sharing and General Cooperation

In general, New York City has prohibited the expenditure of "city resources, including, but not limited to, time spent by employees, officers, contractors, or subcontractors while on duty, or the use of city property" towards "immigration enforcement." N.Y.C Administrative Code § 10-178(c). However, "nothing in this section shall prevent any city officer or employee from complying with federal law or restrict their discretion to take any action if such restriction is prohibited by federal law." *Id.* at (e). In particular, New York City forbids its agencies from "subject[ing] its officers or employees

to the direction and supervision of the secretary of homeland security or the head of any non-local law enforcement agency primarily in furtherance of immigration enforcement" (*id.* at (b)), and bars the use of Department of Correction property by federal immigration authorities for "an office or quarters" (N.Y.C Administrative Code § 9-131(h)(2)).

New York City has limited the flow of certain information to federal immigration authorities. Except for information "related to a person's citizenship or immigration status," the Department of Correction may only disclose information concerning individuals "convicted of a violent or serious crime or identified as a possible match in the terrorist screening database" or where such disclosure "is otherwise required by law." N.Y.C Administrative Code § 9-131(h)(1). New York City Police Department Operations Order Number 4 ("NYPD Ops. Order No. 4") states that, per section 10-178, officers cannot "contact[] federal civil immigration authorities to let them know where an individual is located." NYPD Ops. Order No. 4 ¶ 6(a).

III. Procedural History

On July 24, 2025, the United States initiated this action. (ECF. No. 1 ("Compl.")). The United States brings this case against (1) the City of New York, (2) Zohran Kwame Mamdani, the Mayor of the City of New York, (3) New York City Council, (4) Julie Menin, Speaker of the New York City Council, (5) New York City Department of Correction, (6) Stanley Richards, Commissioner of the New York City Department of Correction, (7) New York City Department of Probation, (8) Sharun Goodwin, Commissioner of the New York City Department of Probation, (9) New York City Police Department, and (10) Jessica S

Tisch, Commissioner of the New York City Police Department as defendants (collectively "New York City" or "Defendants"). (*Id.*)[3]

The United States targets select provisions of New York City law regarding cooperation with the federal government on immigration enforcement, in particular execution of section 287.7 detainers and information sharing. (*See generally* Compl.). The United States asserts the challenged provisions violate the Supremacy Clause on three bases: (1) the challenged provisions are preempted by federal immigration law (*id*. ¶¶ 104–06), (2) "enforcement of the challenged provisions . . . discriminates against the Federal Government" (*id.* ¶ 108), and (3) "enforcement of the challenged provisions . . . effects direct regulation of the Federal Government" (*id.* ¶ 112). The United States seeks declaratory and injunctive relief. (*Id.* ¶ 4).

On December 2, 2025, New York City moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 52 ("Defs.' Mot."); ECF No. 53 ("Defs.' Mem.")). The United States opposed. (ECF No. 54 ("Pl.'s Opp'n")). Defendants replied. (ECF No. 55 ("Defs.' Reply")). After Defendants' motion to dismiss was fully briefed, the Court ordered supplemental briefing on the United States' Article III standing to bring suit. (Order dated June 29, 2026; *see also* ECF Nos. 68, 73, and 75).

[3] The United States sued individual officers in their official capacities. (*See generally* Compl.). Since filing their complaint, the United States has substituted defendants to reflect the current occupants of the named offices. (*See* Order dated 2/27/26).

## LEGAL STANDARD

A defendant may move to dismiss a civil action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss for failure to state a claim, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Bare conclusory statements will not suffice. *Id*. at 681. When courts consider whether a complaint "states a plausible claim for relief," they must accept all factual allegations stated in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Id.* at 679; *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curium).

## DISCUSSION

### I. The United States Lacks Article III Standing

Article III standing is a "threshold question in every federal case" that "determine[s] the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) (citation omitted). The United States, as the party invoking federal jurisdiction, bears the burden of establishing the "irreducible constitutional minimum" of standing for each claim asserted. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted). "Standing is not dispensed in gross . . . to the contrary, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.'" *Town of Chester, N.Y. v. Laroe Ests.*,

*Inc.*, 581 U.S. 433, 439 (2017) (citation modified). To establish standing, "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338 (citations omitted).

A. <u>287.7 Immigration Detainers and Administrative Warrants</u>

One of the United States' purported injuries is New York City's non-adherence to section 287.7 detainer requests that "such agency shall maintain custody of the alien" for up to forty-eight hours. 8 C.F.R. § 287.7(d). The United States alleges, "[b]y . . . barring DHS access to aliens in local custody upon their release as provided by federal law (e.g., an administrative warrant), New York City's Sanctuary Provisions require federal immigration officers to engage in difficult and dangerous efforts to re-arrest aliens who were previously in local custody, endangering immigration officers, the particular alien, and others who may be nearby." (Compl. ¶ 95). The United States asks this Court to "issue a permanent injunction that prohibits Defendants as well as their successors, agents, and employees, from enforcing N.Y.C. Administrative Code §§ 9-131; 14-154; 9-205." (Compl. at 36).

"For standing purposes, redressability refers to a 'non-speculative likelihood that the injury can be remedied by the requested relief.'" *Guan v. Mayorkas*, 530 F. Supp. 3d 237, 262–63 (E.D.N.Y. 2021) (citation omitted). "Plaintiffs' injuries are redressable if their requested relief can compensate them for their losses or eliminate any effects caused by the defendants' challenged conduct." *Id.* (citation modified). A "partial remedy satisfies the redressability requirement." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021).

Here, New York law forecloses relief. "As a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona*, 567 U.S. at 407. New York law does not authorize state and local law enforcement officers to "effectuate arrests for civil law immigration violations." *Wells,* 168 A.D.3d at 34. Further, New York City officers are not empowered to make arrests pursuant to administrative warrants*. Id*. at 42. Thus, even if this Court eliminated sections 9-131(b), 9-205(b), 14-154(b) of New York City's Administrative Code, New York City officers would still be unable to execute a section 287.7 detainer request to maintain custody of a non-citizen without a judicial warrant.

As in *Boston,* "an order enjoining" the City of New York "from enforcing" its "prohibition on detaining noncitizens solely pursuant to a civil immigration detainer or administrative warrant—could not alter this status quo." *Boston*, 833 F. Supp. 3d at 43. Other actors, not this Court, hold the authority to grant the United States the redress it seeks. The New York legislature "could enact a statute authorizing . . . law enforcement officers to arrest people pursuant to federal civil immigration detainers . . . [o]r Congress (but not this Court) could enact federal legislation granting local law enforcement officers this authority." *See id.* at 44. Therefore, the United States' claims regarding New York City's execution of section 287.7 detainer custody requests are not redressable by the relief it seeks, and it therefore lacks standing to challenge the same.

B. <u>Information Sharing</u>

The United States seeks "a judgment declaring that the challenged provisions (N.Y.C. Administrative Code §§ 9-131 and 14-154; 9-205; 10-178 and NYPD Ops. Order No. 4) violate 8 U.S.C. § 1373 and are therefore invalid." (Compl. at 36). "The traceability

requirement for Article III standing means that the plaintiff must demonstrate a causal nexus between the defendant's conduct and the injury." *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016) (citation modified). As in Boston, "[a]ny injury the United States has suffered from alleged violations of § 1373 is not traceable" to the challenged provisions, "which are facially consistent with § 1373." *Boston*, 833 F. Supp. 3d at 48.

In relevant part, section 1373(a) bars local governments from restricting their agencies and officials from disclosing "information regarding the citizenship or immigration status, lawful or unlawful" to federal immigration authorities. 8 U.S.C. § 1373(a). Whereas, sections 9-131 and 14-154 restrict execution of section 287.7 detainer "request[s] that such agency advise the Department, prior to release of the alien." N.Y.C Administrative Code §§ 9-131 and 14-154. The United States' assertion "that information concerning the release of aliens from local custody is information 'regarding the citizenship or immigration status, lawful or unlawful, of any individual,'" is contrary to law. (ECF No. 73 at 2). As noted above, numerous federal courts have interpreted this language to mean "a person's legal classification under federal law." *Boston*, 833 F. Supp. 3d at 37 (quoting *California*, 921 F.3d at 891–92; *see also, e.g.*, *Illinois*, 796 F. Supp. 3d at 516–19 (collecting cases).

Further, New York City's other provisions that limit information-sharing with federal immigration authorities exempt information regarding a person's legal classification under federal law. Section 9-131(h)(1) of the NYC Administrative Code prevents Department of Correction personnel from disclosing information to federal immigration authorities in general, *e.g.* "any person's incarceration status, release dates, court appearance dates, or any other information related to persons in the department's custody," but explicitly

allows for the disclosure of information "related to a person's citizenship or immigration status." *Id.* Section 10-178(c) bars the use of City resources towards immigration enforcement, including information disclosure. N.Y.C Administrative Codes § 10-178(c). However, section 10-178(e) establishes "nothing in this section shall" . . . "restrict" a "city officer or employee['s]" . . . "discretion to take any action if such restriction is prohibited by federal law." N.Y.C Administrative Code § 10-178(e). Thus, in adherence to section 1373 as well as 1644, section 10-178 does not restrict the disclosure of information regarding persons' legal classifications to federal immigration authorities.

There is no nexus between section 1373 and the challenged provisions. Since the United States alleged 1373 injuries are not traceable to the challenged provisions, the United States does not have standing to bring its related claims.

II. The United States' Preemption Claims Fail

Even if the United States has standing—and it does not—its preemption claims fail.

When courts are called upon to address preemption questions, "the analysis always begins with the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 101 (2d Cir. 2009) (citation modified). "A state's ability to control its officers and employees lies at the heart of state sovereignty." *Illinois*, 796 F. Supp. 3d at 523; *see also Printz v. United States*, 521 U.S. 898, 931 (1997) ("To say that the Federal Government cannot control the State, but can control all of its officers, is to say nothing of significance."). Further, "[t]he regulation of health and safety matters is primarily and historically a matter of local concern."

*Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 719 (1985). Since quintessential police powers are implicated here, a presumption against preemption applies.

All of the United States' preemption claims—express, conflict, and field—fail because the relevant federal statutes do not regulate private actors. In order for a federal law to preempt state law, "it must satisfy two requirements . . . [f]irst, it must represent the exercise of a power conferred on Congress by the Constitution; pointing to the Supremacy Clause will not do" and "[s]econd, since the Constitution 'confers upon Congress the power to regulate individuals, not States,' . . . the . . . provision at issue must be best read as one that regulates private actors." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018) (citation omitted). The United States alleges sections 1373(a) and 1644 have preemptive effect. (Compl. ¶ 105). Sections 1373(a) and 1644 contain nearly identical language and therefore will be analyzed together.

Neither section 1373(a) nor section 1644 "confers on private entities . . . a federal right to engage in certain conduct subject only to certain (federal) constraints." *Murphy*, 584 U.S. at 479. Facially, "[t]he plain text of § 1373 only operates on State and local government entities and officials." *Illinois*, 796 F. Supp. 3d at 521. In effect, sections 1373(a) and 1644 regulate "how information 'regarding citizenship or immigration status' of a private individual might be distributed between governments"; they do not "create or restrict the rights of any private actor." *Id.* Numerous federal courts have found that sections 1373(a) and 1644 do not regulate private actors and therefore lack preemptive effect. *See id.*; *Colorado v. United States Dep't of Just.*, 455 F. Supp. 3d 1034, 1059 (D. Colo. 2020); *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 372 (D.N.J. 2020).

The United States argues the proper question "is whether the INA *as a whole* regulates private actors." (Pl.'s. Opp'n at 27). The Court disagrees. The United States' proposed lens would allow the federal government to "smuggle unconstitutional commands to States into specific provisions of a broader statute, and then rely on separate provisions for cover." *Illinois*, 796 F. Supp. 3d at 521–22. This approach was rejected in *Murphy* where the Court focused its analysis on the challenged section of the Professional and Amateur Sports Protection Act (PAPSA), despite recognizing a "closely related provision of PASPA, § 3702(2) *does* restrict private conduct." *Murphy*, 584 U.S. at 480. The United States' argument rests exclusively on commentary from a footnote in *State of New York v. Department of Justice.* (Pl.'s Opp'n at 27 (citing *New York v. Dep't of Just.*, 951 F.3d 84, n. 27 (2d Cir. 2020))). *New York* analyzed section 1373 as applied to a federal funding requirement and did not conclusively address the preemption issue raised here, accordingly the Court respectfully declines to follow its dicta. Since sections 1373(a) and 1644 do not regulate private actors, they do not preempt the challenged provisions.

Notwithstanding the foregoing, the United States' preemption arguments fail for other reasons.

A. <u>Express Preemption</u>

"Express preemption arises when a federal statute expressly directs that state law be ousted." *Island Park*, 559 F.3d at 101 (citation modified). The United States claims "federal immigration law's protections for information sharing . . . [e].g. 8 U.S.C. §§ 1373(a), 1644" expressly preempt the challenged provisions. (Compl. ¶ 105). The United States fails to establish that sections 1373(a) and 1644 "oust" the challenged information

sharing provisions, nor could they. These statutes only apply “[n]otwithstanding any other provision of Federal, State, or local law.” 8 U.S.C. §§ 1373(a), 1644. Against the police power presumption and absent clear language, the United States’ express preemption claims fail.

B. Field Preemption

New York City notes that the complaint “contains one generic reference to ‘occupy[ing] the field’ in paragraph 105. However, Plaintiff does not even clearly identify what the field is.” (Defs.’ Mem. at 27). The United States counters that through the INA, “Congress intended to occupy the field of apprehension and detention of aliens, but Defendants’ enactment of the Sanctuary Provisions attempts to invade and regulate within this field.” (Pl.’s Opp’n at 28; *see also* Compl. ¶ 29). Irrespective of whether the United States sufficiently pled field preemption, the challenged provisions do not regulate the apprehension and detention of non-citizens. The challenged provisions govern the allocation of municipal resources towards federal immigration enforcement. Since the challenged provisions and the INA occupy different fields, the United States’ field preemption claim fails.

C. Conflict Preemption

Conflict preemption is present where “‘compliance with both federal and state regulations is a physical impossibility” or “the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” *Arizona*, 567 U.S. at 399 (citation modified). “‘The burden of establishing obstacle preemption, like that of impossibility preemption, is heavy: the mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting

preemption, particularly when the state law involves the exercise of traditional police power.'" *New York State Telecommunications Ass'n, Inc. v. James*, 101 F.4th 135, 155 (2d Cir. 2024) (citation omitted). The United States alleges the challenged provisions "constitute and create obstacles to the enforcement of federal immigration law" and "undermine federal immigration law's protections for information sharing and thus are preempted under . . . conflict preemption principles." (Compl. ¶¶ 104–05).

Here, the challenged provisions involve the exercise of traditional police power. Further, the United States delineates in its papers the avenues available to affect its enforcement scheme against the backdrop of federalism. The federal government may receive New York City's assistance detaining individuals and receive information regarding their release where "federal immigration authorities present a judicial warrant and the alien has a specified prior conviction within the past five years." (Pl.'s Opp'n at 30). The federal government may "facilitate congressionally-authorized arrests" without the "most basic information about the alien" in New York City's possession and instead rely on their own information sources. (Pl.'s Opp'n at 31). In order for the federal government to maintain an office on Department of Correction land, the Attorney General may enter into a cooperative agreement with New York City, New York City Department of Correction, or the Commissioner of the New York City Department of Correction. (*See* Pl.'s Opp'n at 22). New York City has currently opted not to enter into such agreements, which may upset the federal government's immigration enforcement priorities. N.Y.C Administrative Code § 10-178(e). But the "possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Kansas*, 589 U.S. at 212.

New York City's exercise of volition is evidence of non-conscription; it is not a basis for preemption.

The proffered conflicts amount to mere tensions, as opposed to true obstacles, and the United States' conflict preemption claim therefore fails.

### III. The Tenth Amendment's Anticommandeering Doctrine Precludes Relief

Even were the Court to find that the United States has standing and the challenged provisions are preempted—both answered in the negative above—United States' claims would still fail because the anticommandeering doctrine of the Tenth Amendment to the Constitution of the United States precludes relief.

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

> The legislative powers granted to Congress are sizable, but they are not unlimited. The Constitution confers on Congress not plenary legislative power but only certain enumerated powers. Therefore, all other legislative power is reserved for the States, as the Tenth Amendment confirms. And conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States. The anticommandeering doctrine simply represents the recognition of this limit on congressional authority.

*Murphy*, 584 U.S. at 471.[4]

---

[4] Adherence to anticommandeering is important for three reasons. First, "a healthy balance of power between the States and the Federal Government reduces the risk of tyranny and abuse from either front.'" *Id*. at 473 (citation modified). Second, it promotes "political accountability" . . . "if a State imposes regulations only because it has been commanded to do so by Congress, responsibility is blurred." *Id*. at 473–74. Third, it "prevents Congress from shifting the costs of regulation to the States." *Id*. at 474. States are tasked with "govern[ing] in accordance with the will of their citizens" and "[t]oday, as at the time of the founding, the allocation of scarce resources among competing needs and interests lies at the heart of the political process." *Alden v. Maine*, 527 U.S. 706, 751 (1999).

The United States argues it is "not seeking to compel participation in immigration enforcement . . . but rather to remove Defendants' express and implicit obstacles to the Executive's duty to carry out its immigration enforcement duties." (Pl.'s Opp'n at 35) (citing Compl. ¶¶ 7–8, 90). New York City replies "if accepted, [the United States' claims] would require the City to affirmatively assist the federal government in enforcing immigration laws in violation of the Tenth Amendment's anticommandeering doctrine." (Defs.' Reply at 19). New York City is correct, at least partially.

The United States seeks injunctive and declaratory relief to preempt the challenged provisions. (Compl. ¶ 4). If the challenged provisions were struck, while New York City would not be obligated to carry out federal immigration enforcement, they would be barred from prohibiting their agencies and employees from engaging in federal immigration enforcement by expending personnel, property, and other resources to (1) detain individuals and (2) implement inter-agency information-sharing, including disclosing personally identifiable information, all potentially in violation of state law. And of course, there is nothing within federal law that obligates states to participate in federal immigration enforcement or compels states to comply therewith.

The United States' preemption arguments amount to nothing more than a backdoor around the Tenth Amendment and rest on a false distinction between (a) compelling local governments' participation in federal immigration enforcement and (b) prohibiting local governments from dictating how their personnel and other resources may be utilized towards federal immigration enforcement. (Pl.'s Opp'n at 35 ("And §§ 1373 and 1644 only forbid *restricting* assistance to immigration authorities—they do not mandate action—and they leave states free to control how employees keep data and

spend their time—so long as employees remain permitted to voluntarily share information with federal immigration authorities.")). "The basic principle—that Congress cannot issue direct orders to state legislatures—applies" to commands for "affirmative action" and the imposition of "prohibitions." *Murphy*, 584 U.S. at 455 (citation modified). If states cannot remain free to control their agencies and employees to resist federal immigration enforcement, which is within states' constitutional prerogatives, the Tenth Amendment anticommandeering doctrine means nothing.

"Congress cannot circumvent" the Court's bar on "compelling States to enact or enforce a federal regulatory program" by "conscripting the State's officers directly." *Printz*, 521 U.S. at 935. If we take the United States' argument to its logical end, it would have New York City's agencies and their individual employees determine for themselves the extent to which they will comply with state and local law in the course of their duties. Such a regime would preclude states and municipalities from controlling their agencies and employees in the performance of their duties and directing the expenditure of municipal resources and obviously violate federalism, contravene due process, and foreclose efficiencies available through the implementation of uniform processes.

The United States' claims hinge in large part on the applicability of *City of New York*. (Compl. ¶¶ 43, 90; Pl.'s Opp'n at 35–36). In *City of New York*, the court found:

> [W]e need not locate with precision the line between invalid federal measures that seek to impress state and local governments into the administration of federal programs and valid federal measures that prohibit states from compelling passive resistance to particular federal programs. It suffices to say that, at least in the context of the City's facial challenge, Sections 434 and 642 are of the latter variety.

*City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999).[5] *City of New York*'s continued viability post-*Murphy* however, is questionable. *See New York v. United States Dep't of Just.*, 964 F.3d 150, 165 (2d Cir. 2020) ("[O]ur Circuit's previous reliance on the distinction between 'measures that seek to impress state and local governments into the administration of federal programs' and 'federal measures that prohibit states from compelling passive resistance to particular federal programs' in striking down a Tenth Amendment challenge to Section 1373, *City of New York*, 179 F.3d at 35, is no longer valid in light of *Murphy*.") (Pooler, J. joined by Chin, J. and Carney, J., dissenting).[6] Considering its questionable viability and the growing contrary authority, the Court respectfully declines to follow *City of New York* and finds sections 1373(a) and 1644 violate the Tenth Amendment's anti-commandeering doctrine.

IV. <u>The United States' Intergovernmental Immunity Claims Fail</u>

The intergovernmental immunity doctrine prohibits "state laws that *either* 'regulat[e] the United States directly *or* discriminat[e] against the Federal Government or those with whom it deals' (*e.g.,* contractors)." *United States v. Washington (Washington II)*, 596 U.S. 832, 838–39 (2022) (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion) (other citations omitted).

---

[5] Section 434 of the Personal Responsibility and Work Opportunity Reconciliation Act has been codified as 8 U.S.C. § 1644. Section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act has been codified as 8 U.S.C. § 1373.

[6] Numerous other federal courts post-*Murphy* have found similar challenges based on sections 1373 and 1644 to violate the Anti-Commandeering doctrine. *E.g., Colorado*, 455 F. Supp. 3d at 1057; *Grewal*, 475 F. Supp. 3d at 378.

a. <u>Direct Regulation</u>

The Court has "decisively rejected the argument that any state regulation which indirectly regulates the Federal Government's activity is unconstitutional." *North Dakota*, 495 U.S. at 434–35 (citations omitted). "The Court has more recently adopted a functional approach to claims of governmental immunity, accommodating of the full range of each sovereign's legislative authority and respectful of the primary role of Congress in resolving conflicts between the National and State Governments." *Id.* at 435.

The United States argues New York City's enforcement of the challenged provisions "effects direct regulation of the Federal Government" . . . "[b]y refusing to honor civil detainers and warrants expressly authorized by Congress," "restricting access to detention facilities and the aliens within them," and "limit[ing] the circumstances in which federal immigration authorities may interrogate illegal aliens." (Compl. ¶¶ 112–14).

The parameters of direct regulation is an open question in this Circuit. New York City advocates this Court adhere to *McHenry County*. "As the Seventh Circuit has explained, while 'States may not regulate the federal government directly,' a regulation prohibiting state or local government cooperation with the federal government 'regulates only State and local entities and law enforcement—not the federal government.'" (Defs.' Mem. at 33 (citing *McHenry Cnty. v. Kwame Raoul*, 44 F.4th 581, 592–93 (7th Cir. 2022)). Whereas the United States propones this Court follow *CoreCivic*. (Pl.'s Opp'n at 20). In *CoreCivic,* the Third Circuit rejected New Jersey's assertion that "a law regulates the federal government directly only if the law's text applies to it" and that in effect the challenged provision "carries the same sting as a law whose text applies expressly to the federal government." *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 321–22

(3d Cir. 2025). Since neither case binds, the Court looks to the doctrines "constitutional foundations" and "the actual workings of our federalism." *United States v. New Mexico*, 455 U.S. 720, 731 (1982).

The intergovernmental immunity doctrine originates from *McCulloch v. Maryland*. In *McCulloch* the Court held that under the Supremacy Clause, "[t]he states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by congress to carry into effect the powers vested in the national government." *McCulloch v. State*, 17 U.S. 316, 317 (1819).

> Originally we understood it as barring any state law whose effect . . . was or might be to increase the cost to the Federal Government of performing its functions, including laws that imposed costs on federal contractors. We later came to understand the doctrine, however, as prohibiting state laws that *either* regulate the United States directly *or* discriminate against the Federal Government or those with whom it deals. (*e.g.,* contractors).

*United States v. Washington*, 596 U.S. 832, 838 (2022) (citation modified).

One obvious and natural constraint of the intergovernmental immunity doctrine is the anti-commandeering doctrine.

> Although the anticommandeering principle is simple and basic, it did not emerge in our cases until relatively recently . . . The pioneering case was *New York*. . . Justice O'Connor's opinion for the Court traced this rule to the basic structure of government established under the Constitution. The Constitution, she noted, "confers upon Congress the power to regulate individuals, not States." In this respect, the Constitution represented a sharp break from the Articles of Confederation. "Under the Articles of Confederation, Congress lacked the authority in most respects to govern the people directly." Instead, Congress was limited to acting "only upon the States" . . . The Constitutional Convention considered plans that would have preserved this basic structure, but it rejected them in favor of a plan under which "Congress would exercise its legislative authority directly over individuals rather than over States" . . . "We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." . . . "Congress may not simply commandee[r] the legislative processes of the

> States by directly compelling them to enact and enforce a federal regulatory program."

*Murphy*, 584 U.S. at 471–72 (2018) (citation modified) (quoting *New York v. United States*, 505 U.S. 144, 162–66, 170 (1992)).

"At least to some degree, the doctrines are opposite sides of the same coin . . . a finding that any of the challenged provisions violates intergovernmental immunity would imply that a Defendant must assist with the federal government's immigration enforcement effort." *Minnesota*, 2026 WL 2085701 at *22; *see also California*, 921 F.3d at 891 ("A finding that SB 54 violates the doctrine of intergovernmental immunity would imply that California *cannot* choose to discriminate against federal immigration authorities by refusing to assist their enforcement efforts—a result that would be inconsistent with the Tenth Amendment and the anticommandeering rule.")

This Court declines to define the bounds of direct regulation here but finds that enjoining the challenged provisions would result in the commandeering of state and local resources. Such a holding would not "accommodate the full range of each sovereign's legislative authority." *North Dakota*, 495 U.S. at 435 (citation modified). Therefore, the challenged provisions cannot be classified as functionally regulating the United States.

b. Discrimination

"[A] state law is . . . no longer unconstitutional just because it indirectly increases costs for the Federal Government, so long as the law imposes those costs in a neutral, nondiscriminatory way." *Washington II*, 596 U.S. at 839. "The State does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *Washington v. United States (Washington I)*, 460 U.S. 536, 544–45 (1983) (citation omitted).

The United States argues that *Washington I* and *North Dakota* "did not create a comparator requirement, but simply made the common-sense observation that the Federal Government cannot be said to experience discrimination when it receives more favorable treatment than someone else." (Pl.'s Opp'n at 24). The United States is wrong. "Differential treatment is critical to a discrimination-based intergovernmental immunity claim." *New York*, 814 F. Supp. 3d at 282 (citation modified) (citing *McHenry Cnty.*, 44 F.4th at 594). "[A] comparator is necessary." *New York*, 810 F. Supp. 3d at 353. The United States discrimination claim fails for lack of a comparator.

The United States does not and cannot identify a similarly situated entity. State and local agencies and their officers do not enforce immigration law, nor do members of the public. (Pl.'s Opp'n at 22). As the United States concedes, the Federal Government holds the "exclusive charge of enforcing immigration law." (*Id.* at 23). Not only are other federal law enforcement agencies with different charges differently situated, "[f]or a state law to unconstitutionally discriminate against the federal government, it must treat comparable classes of federal and non-federal employees differently, not different classes of federal employees." *Illinois*, 796 F. Supp. 3d at 534 (citing *Washington I*, 596 U.S. at 839) (citation omitted). "[T]he fact that a law affects an exclusively federal domain is not evidence of discrimination," rather "failure to identify a comparator ends the inquiry." *New York*, 810 F. Supp. 3d at 353.

In alignment with other federal courts, this Court finds that New York City's provisions that single out immigration enforcement do not discriminate against the federal government. *See, e.g. Illinois*, 796 F. Supp. 3d at 533–34; *Minnesota*, 2026 WL 2085701, at *19–22.

* * *

Accordingly, Defendants' motion to dismiss the complaint is granted.

## CONCLUSION

For the reasons set forth above, the Court grants Defendants' motion to dismiss. The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

/s/ Ramón E. Reyes, Jr.

RAMÓN E. REYES, JR.
United States District Judge

Dated: October 15, 2026
Brooklyn, New York